# EXHIBIT A

DEFENDANT'S
EXHIBIT ╪
4/17/2012

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 19 2011 ★

BROOKLYN OFFICE

EDWARD WEBER,

Plaintiff,

-against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF EDUCATION; LASHAWN
ROBINSON, AS PRINCIPAL OF
BROWNSVILLE ACADEMY HIGH SCHOOL
(BAHS); LANA PHILLIPS, AS ASSISTANT
PRINCIPAL OF BAHS; KATWONA WARREN,
AS ASSISTANT PRINCIPAL OF BAHS; KEVIN
RANK, AS A GUIDANCE COUNSELOR OF
BAHS; AND DIANA RAMSAWAK, AS A LEAD
TEACHER AT BAHS

Defendants.

**COMPLAINT**

**PLAINTIFF DEMANDS**
**A TRIAL BY JURY**

ROSS, J.

POLLAK M.J.

11-CV-_____  (    )

Plaintiff EDWARD WEBER ("Plaintiff" or "Weber"), by his attorneys GLASS

KRAKOWER LLP, complaining of Defendants CITY OF NEW YORK (the "City"), NEW

YORK CITY DEPARTMENT OF EDUCATION ("NYCDOE"), LASHAWN ROBINSON, AS

PRINCIPAL OF BROWNSVILLE ACADEMY HIGH SCHOOL ("BAHS"); LANA PHILLIPS,

AS ASSISTANT PRINCIPAL OF BAHS; KATWONA WARREN, AS ASSISTANT

PRINCIPAL OF BAHS; KEVIN RANK, AS A GUIDANCE COUNSELOR OF BAHS; AND

DIANA RAMSAWAK, AS A LEAD TEACHER AT BAHS (collectively "Defendants"), alleges

as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff has been a high school teacher within the New York City Department of Education since 2001, and has been assigned to Brownsville Academy High School since September 2005.

2.      Plaintiff has been discriminated against by Defendants because of his age and Jewish religion, and retaliated against for complaining about this discrimination in violation of the Age Discrimination in Employment Act of 1967 as amended ("ADEA"), 29 U.S.C. Section 621 et seq. ("ADEA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000-e et seq. ("Title VII"); the Fourteenth Amendment of the United States Constitution; the New York State Constitution, and the statutory and common laws of the State of New York and the New York City Administrative Code, culminating in an attempt to terminate his employment pursuant to disciplinary charges in accordance with Section 3020-a of the New York State Education Law as of October 2011.  The action seeks declaratory and injunctive relief and compensatory and punitive damages both to secure future protection and to redress the past deprivation of rights secured to Plaintiff under federal and state law.

3.      Plaintiff seeks compensatory and punitive damages to redress the discrimination and retaliation to which Defendants have subjected him, and seeks damages for economic loss; pain and suffering; physical distress; emotional distress and mental anguish; injury to name, career and reputation; costs; reasonable attorney's fees, and punitive damages.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to the ADEA, 29 U.S.C. Section 621, and 28 U.S.C. Sections 1331 and 1337, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000-e.

5.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. Sections 2201 and 2202.

6.      This Court has supplemental jurisdiction over Plaintiff's state and city law claims under 28 U.S.C. Section 1367(a).

7.      All conditions precedent to jurisdiction under the ADEA and Title VII have occurred or been complied with.  Plaintiff dual-filed a timely charge of discrimination and retaliation with both the New York State Division of Human Rights ("SDHR") and United States Equal Employment Opportunity Commission ("EEOC") based on age and creed/religion on November 9, 2010.  Plaintiff received a Notice of Right to Sue letter from the EEOC, dated July 21, 2011.  A copy of the Notice of Right to Sue letter is annexed hereto at Exhibit A.

8.      Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Plaintiff is a resident and works in a public school located in this District.

## PARTIES

9.      At all times relevant hereto, Plaintiff Edward Weber has been a citizen of the United States.  Plaintiff is a resident of Brooklyn, Kings County, State of New York.

10.     Plaintiff is fifty-six (56) years old and is an observant Hasidic ultraorthodox Jew.

11.     Plaintiff has been employed as a teacher by Defendant New York City Department of Education (formerly known as the New York City Board of Education) from approximately 2001 to the present.

12.     Defendant City of New York is a municipality duly organized by the State of New York.

13.     Defendant New York City Department of Education (formerly known as the New York City Board of Education) is an agency of the City of New York.

14.     All actions and omissions described in this Complaint were made by Defendants directly and/or through their supervisory employees and agents.

15.     Defendant NYCDOE has a principal executive office located at the Tweed Courthouse, 52 Chambers Street, New York, NY 10007.

16.     All defendants routinely conducts business within the Eastern District of New York.

17.     At all times relevant to this action, Defendant Lashawn Robinson was and is the Principal of Brownsville Academy High School in Brooklyn, New York.

18.     At all times relevant to this action, Defendant Lana Phillips was and is an Assistant Principal of Brownsville Academy High School in Brooklyn, New York.

19.     At all times relevant to this action, Defendant Katwona Warren was and is an Assistant Principal of Brownsville Academy High School in Brooklyn, New York.

20.     At all times relevant to this action, Defendant Kevin Rank was and is a guidance counselor at Brownsville Academy High School in Brooklyn, New York.

21.     At all times relevant to this action, Defendant Diane Ramsawak was and is a lead teacher at Brownsville Academy High School in Brooklyn, New York.

4

22.     At all times relevant to this action, Defendants Robinson, Phillips, and Warren supervised Plaintiff in the performance of his duties.

23.     At all times relevant to this action, Defendant NYCDOE was Plaintiff's employer within the meaning of the Age Discrimination in Employment Act (ADEA) and Title VII of the Civil Rights Act of 1964 (Title VII).

24.     At all times relevant to this action, Defendant City of New York was Plaintiff's employer within the meaning of the Age Discrimination in Employment Act (ADEA) and Title VII of the Civil Rights Act of 1964 (Title VII).

## FACTS

25.     Plaintiff Weber began teaching with Defendants New York City Department of Education (formerly New York City Board of Education) and Defendant City of New York in 2001 and continuing to the present.

26.     Plaintiff is employed as a chemistry teacher at BAHS, where he is the oldest teacher and, upon information and belief, the only Jewish teacher at the school among the approximately 20 teachers at the school.

27.     Plaintiff is a respected, experienced pedagogue who received tenure from the NYCDOE in June 2004, and maintained an unbroken string of eight satisfactory annual end-of-year ratings, before suddenly starting to be issued Unsatisfactory annual ratings about his performance beginning in the 2009-10 school year.

28.     Plaintiff was wooed from his previous school by BAHS's then-principal, Joanne Nabors, to, at the school, conceive, design, initiate, equip, and teach a Chemistry curriculum, an ambitious innovation given the school's mission and student profile.  After transferring there for the 2005-2006 school year, Plaintiff created a program that imparted to students the

5

fundamentals of basic chemistry to prepare them for post-graduation careers in, for example, medical fields like practical nursing and phlebotomy, as well as to lay a foundation for those admittedly few students for whom chemistry might awaken a desire for more advanced scientific study.

29.     BAHS is part of the NYCDOE's "transfer high schools" network, which seeks to provide academic remediation and the opportunity to earn a high-school diploma to older, previously unsuccessful students who, ages 17-20, are on the verge of aging out of the public secondary school system.  In most cases, the students' shortfalls are due to long histories of interlocking academic and behavioral issues, including homelessness, family dysfunction, truancy, juvenile delinquency, substance abuse, jail time, and teenage parenthood. But the undeniable academic gaps that will tend to disadvantage such students in the core curriculum are likely to be greatly exacerbated in a decidedly more demanding, upper-level course like chemistry.  Thus, transfer high school students tend to be considerably less likely to pass courses -- though not to acquire useful information -- in the sciences, which reward rigor, precision, and preparation, than they are to pass courses in the humanities or the arts where standards are more flexible.  (This may explain why Plaintiff is the only transfer high school teacher in the five boroughs exclusively assigned to chemistry classes.)  Regardless, all classroom pursuits must contend with the BAHS's very high rates of drop-out, truancy, lateness, and absence, the last of which has for years consistently remained in the mid-60 percent range, despite incentives for improved and excellent attendance like movie tickets and pizza parties, all enticements funded by -- according to documents regarding BAHS in the Web-accessible NYCDOE *School Comprehensive Educational Plan* -- school budget set-asides.

6

30.     In the 2008-09 school year, LaShawn Robinson replaced Joanne Nabors as principal of BAHS.  She rated Plaintiff Satisfactory for his Annual Professional Performance Review for the 2008-2009 school year, the same annual rating he had received in his previous eight school years with the NYCDOE.  Meanwhile, upon information and belief, she assembled in preparation for the 2009-10 school year, an administration almost wholly comprised of associates, acquaintances, and friends from her college sorority Delta Sigma Theta.

31.     Until the 2009-10 school year, Plaintiff, a 55-year-old ultra-orthodox Jew, received only Satisfactory annual ratings and Satisfactory observations for his teaching performance.  Upon information and belief, Principal Robinson had no teaching experience when she took over as principal of the school.

32.     In the 2009-10 school year, Plaintiff was, suddenly and without any genuine professional basis, targeted for firing by Principal Robinson and her assistant principals, and, in building a bogus paper trail to justify that termination, issued an unbroken string of negative observation reports seeking to establish his incompetence.  Plaintiff had, prior to that school year, never before received even a single such observation in his nearly a decade as an NYCDOE teacher.  This culminated in, at the end of that 2009-10 school year, Principal Robinson issuing Plaintiff an Unsatisfactory year-end performance review (APPR), the first he ever had received.

33.     Commencing during the 2009-10 school year, Plaintiff has been subjected to repeated hostile, unfair, and discriminatory acts based on his age and religion.

34.     For example, Plaintiff was told on repeated occasions by Defendants that he does not understand technology and was in fact deprived technology, such as a white board, at the school, while younger teachers were given the same technology.

7

35.     Defendant administrators also have repeatedly targeted other older teachers at the school with Unsatisfactory ratings and probationary discontinuances at the school.

36.     Plaintiff also has been on several occasions been denied religious accommodations such as being arbitrarily denied time off for religious observances, and being disturbed at home on Jewish holidays. He also was charged with Section 3020-a incompetency charges seeking his termination days before Yom Kippur in October 2011, for no apparent reason as to timing since he had not even been written up for discipline on a single occasion for the 2011-12 school year.

37.     Plaintiff's religion also was used against him by Principal Robinson making false allegations against him to the NYCDOE's own internal Office of Equal Employment Opportunity (OEO), falsely accusing him of favoring Jewish students over minority students at the school.

38.     Plaintiff also has been repeatedly denied Kosher food at mandatory staff functions even though it is available, and despite his repeated requests for it, while accommodations are made for non-Jewish teachers.

39.     Since Plaintiff dually filed his age and religious discrimination charge with the SDHR and EEOC in November 2010, Plaintiff has continued to be subject to repeated acts of retaliation, such as being issued repeated negative observations and false disciplinary write-ups by BAHS administrators in the Spring of 2011, an end of year Unsatisfactory rating for the 2010-11 school year, and, most recently, preferral of Section 3020-a disciplinary charges and specifications against him wherein the NYCDOE imminently seeks to end his employment before a hearing officer.

40.     Defendants further failed to write up a Satisfactory rated observation Plaintiff performed in the fall of 2010 after he filed the SDHR charge, and Principal Robinson stated on the tape at the appeal hearing regarding his Unsatisfactory rating for the 2009-10 school year that he would never receive a Satisfactory observation again.

41.     The foregoing are just some examples of the harassing, discriminatory and retaliatory treatment that Plaintiff suffered and continues to suffer at the hands of Defendants since the filing of his original SDHR/EEOC discrimination charge in November 2010.

42.     Based on the foregoing, Defendants have engaged in an egregious pattern of retaliation, harassment, and age and religious discrimination against Plaintiff.

43.     Moreover, Defendants have not conducted an appropriate or timely investigation of Plaintiff's complaints and have failed adequately to respond to Plaintiff's concerns, but rather continue to retaliate against him to date.

44.     Upon information and belief, a responsible investigation by Defendants would have shown, among other things, that Plaintiff was subjected to egregious harassing, discriminatory, and retaliatory behavior.

45.     As a result of Defendants' conduct and inaction, Plaintiff continues to be discriminated against in the terms and conditions of his employment.

46.     Defendants' inaction, including their failure to investigate and their ongoing discriminatory conduct, constitutes additional actionable discrimination and retaliation.

47.     Defendant Robinson is liable for the discriminatory and retaliatory acts taken by her supervisory employees, who were acting within the apparent scope of the authority entrusted to her by Defendants.

48.     Upon information and belief, Defendants, through their respective agents and employees, had actual notice and knew and/or should have known of the discrimination, retaliation, and harassment to which Plaintiff was subjected.

49.     Defendants, through their respective agents and employees, failed to take steps to prevent and correct the discrimination, harassment, and retaliation to which Plaintiff has been subjected.

50.     Defendants' actions were motivated throughout by unlawful discrimination, harassment, and retaliation.

51.     As a result of Defendants' acts, Plaintiff has suffered and continues to suffer damage, including, upon information and belief, economic loss, as well as damage to name, profession, career and reputation, mental and physical pain and suffering, severe emotional distress, embarrassment, indignity, inconvenience, and substantial dislocation in his personal and professional life, and potential loss of his tenured teaching position.

## FIRST CAUSE OF ACTION
## AGE DISCRIMINATION UNDER ADEA ("City" and "DOE")

52.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

53.     Defendants' conduct constitutes discriminatory treatment on the basis of age in violation of 29 U.S.C. Section 621 et seq.

54.     As a direct and proximate result of Defendants' acts, Plaintiff has been damaged.

## SECOND CAUSE OF ACTION
## RELIGIOUS DISCRIMINATION UNDER TITLE VII ("City" and "DOE")

55.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

10

56.     Defendants' conduct constitutes discriminatory treatment on the basis of his religion in violation of 42 U.S.C. Section 2000-e et seq.

57.     As a direct and proximate result of Defendants' acts, Plaintiff has been damaged.

## THIRD CAUSE OF ACTION
## AGE AND RELIGIOUS DISCRIMINATION IN VIOLATION OF
## NEW YORK STATE HUMAN RIGHTS LAW (All Defendants)

58.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

59.     New York Human Rights Law, Executive Law Section 296(1)(a), prohibits discriminatory treatment in employment on the basis, of among other things, age and religion.

60.     New York Human Rights Law, Executive Law Section 296(6), provides that it is an unlawful and discriminatory practice for a person to aid, abet, incite, compel or coerce a discriminatory act or to attempt to do so.

61.     Defendants' conduct constitutes discriminatory treatment on the basis of age and religion in violation of the New York Human Rights Law.

62.     As a direct and proximate result of Defendants' acts, Plaintiff has been damaged.

## FOURTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF ADEA ("City" and "DOE")

63.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

64.     The ADEA prohibits an employer, _inter alia_, from taking retaliatory action against an employee because that employee has opposed, _inter alia_, discrimination based on age.

11

65.     As described above, Defendants retaliated against Plaintiff for asserting his rights under the anti-discrimination laws with respect to compensation, terms, conditions, and privileges of employment in violation of the ADEA.  As a direct and proximate result of Defendants' acts, Plaintiff has been damaged.

## FIFTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF TITLE VII ("City" and "DOE")

66.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

67.     Title VII prohibits an employer, inter alia, from taking retaliatory action against an employee because that employee has opposed, inter alia, discrimination based on religion.

68.     As described above, Defendants retaliated against Plaintiff for asserting his rights under the anti-discrimination laws with respect to compensation, terms, conditions, and privileges of employment in violation of Title VII.  As a direct and proximate result of Defendants' acts, Plaintiff has been damaged.

## SIXTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF NEW YORK
## HUMAN RIGHTS LAW (All Defendants)

69.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

70.     Section 296 of the New York State Human Rights Law prohibits any person from taking retaliatory action against an employee because that employee has opposed, inter alia, discrimination based on age and/or religion.

12

71.     As described above, Defendants retaliated against Plaintiff for asserting her rights under the anti-discrimination laws with respect to compensation, terms, conditions, and privileges of employment in violation of the New York State Human Rights Law, and as a direct and proximate result of Defendants' acts, Plaintiff has been damaged.

## SEVENTH CAUSE OF ACTION
## AGE AND RELIGIOUS DISCRIMINATION IN VIOLATION OF NEW YORK
## CITY ADMINISTRATIVE CODE (All Defendants)

72.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

73.     Defendants discriminated against Plaintiff in the terms and conditions of his employment because of his age and religion, in violation of New York State Administrative Code Sections 8-107, 8-502.

74.     As a direct and proximate result of Defendants' acts, Plaintiff has been damaged.

## EIGHTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF NEW YORK
## CITY ADMINISTRATIVE CODE (All Defendants)

75.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

76.     As described above, Defendants retaliated against Plaintiff for asserting his rights under the anti-discrimination laws with respect to compensation, terms, conditions, and privileges of employment in violation of the New York State Human Rights Law.

77.     As described above, Defendants retaliated against Plaintiff for asserting his rights under the anti-discrimination laws with respect to compensation, terms, conditions, and privileges of employment in violation of the New York City Administrative Code Sections 8-107, 8-502.

78.   As a direct and proximate result of Defendants' acts, Plaintiff has been damaged.

## NINTH CAUSE OF ACTION
## 42 U.S.C. SECTION 1983; EQUAL PROTECTION
## UNDER THE UNITED STATES CONSTITUTION (All Defendants)

79.   Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

80.   Defendants' acts as described above constituted adverse and discriminatory actions with respect to terms and conditions of Plaintiff's employment and Plaintiff's ability to engage in the practice of his profession.

81.   Plaintiff's age and religion were substantial and motivating factors in the adverse actions taken by Defendants against Plaintiff.

82.   By their acts as described above, Defendants have deprived Plaintiff of his rights to equal employment opportunities and equal protection of the law under the Fourteenth Amendment of the United States Constitution.

83.   Defendants acted under color of law and in bad faith.

84.   As a direct and proximate result of Defendants' acts, Plaintiff has been damaged.

## TENTH CAUSE OF ACTION
## EQUAL PROTECTION
## UNDER THE NEW YORK CONSTITUTION (All Defendants)

85.   Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

14

86.   Defendants' acts as described above constituted adverse and discriminatory actions with respect to the terms and conditions of Plaintiff's employment and Plaintiff's ability to engage in and practice in his profession.

87.   Plaintiff's age and religion were substantial and motivating factors in the adverse actions taken by Defendants against Plaintiff.

88.   By their acts as described above, Defendants have deprived Plaintiff of his rights to equal employment opportunities and equal protection of the law under the Fourteenth Amendment of the United States Constitution.

89.   Defendants acted under color of law and in bad faith.

90.   As a direct and proximate result of Defendants' acts, Plaintiff has been damaged.

91.   Plaintiff also seeks punitive damages for the Defendants' egregious conduct.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court award the following relief against Defendants:

a.  Judgment declaring that the Defendants' acts breached Plaintiff's rights as secured by federal and state law prohibiting discrimination and retaliation in employment;

b.  Enjoining Defendants from any further acts adversely affecting the terms and conditions of Plaintiff's employment including his appointments, compensation, and privileges;

c.  Compensatory damages to compensate Plaintiff for breach of contract, economic loss, damage to name, profession, career and reputation, pain and suffering, emotional

15

distress and mental anguish, embarrassment, indignity, and dislocation, in an amount

to be determined at trial;

d.   Punitive damages against one or all of the Defendants;

e.   Statutory attorneys' fees, interest, costs, and disbursements; and

f.   Such additional relief which the Court deems just and proper.

**JURY DEMAND**

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Dated:           October 18, 2011
                 New York, New York

                              Respectfully Submitted,

                              **GLASS KRAKOWER LLP**

                              By: _____
                                  Bryan Glass (BG 9823)
                                  11 Penn Plaza, 5th Floor
                                  New York, NY 10001
                                  (212) 537-6859
                                  Attorneys for Plaintiff

16

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Edward Weber<br>562 New York Avenue<br>Brooklyn, NY 11225 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2011-00637 | Holly M. Woodyard,<br>Investigator | (212) 336-3643 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒ Other (briefly state)  **Charging Party wishes to pursue the matter in Federal District Court.**

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Kevin J. Berry,
District Director

July 21, 2011
(Date Mailed)

Enclosures(s)

cc: CITY OF NEW YORK, DEPARTMENT OF EDU
Attn: Director of Human Resources
52 Chambers Street, Room 308
New York, NY 10007

Bryan D. Glass, Esq.
Glass Krakower, LLP
11 Penn Plaza, 5th Floor
New York, NY 10001

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Eastern District of New York ⊡

| | |
|---|---|
| Edward Weber | ) |
| | ) |
| *Plaintiff* | ) |
| v. | ) |
| City of New York; New York City Department of | ) |
| Education; Lashawn Robinson, Principal, et al. | ) |
| | ) |
| *Defendant* | ) |

CV 11 - 5083

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  NYC Department of Education
c/o New York City Law Department
100 Church Street
New York, NY 10007

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Glass Krakower LLP
11 Penn Plaza, 5th Floor
New York NY 10001
(212) 537-6859

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER

CLERK OF COURT

Date: OCT 19 2011

*Signature of Clerk or Deputy Clerk*

# EXHIBIT
# B

1

```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------------------------------------X
      EDWARD WEBER,
 3
                                        PLAINTIFF,
 4
 5                    -against-              Case No:
                                      11-CV-5083(MKB)(CPL)
 6
 7    CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF EDUCATION,
      LASHAWN ROBINSON, AS PRINCIPAL OF BROWNSVILLE ACADEMY HIGH
 8    SCHOOL (BAHS), LANA PHILLIPS, AS ASSISTANT PRINCIPAL OF
      BAHS, KATWONA WARREN, AS ASSISTANT PRINCIPAL OF BAHS,
 9
                                        DEFENDANTS.
10    ------------------------------------------------------------X
11                          DATE:   April 17, 2012
12                          TIME:   10:49 A.M.
13
14                 DEPOSITION of the Plaintiff, EDWARD WEBER,
15    taken by the Defendants, pursuant to a Court Order and to
16    the Federal Rules of Civil Procedure, held at the offices
17    of the New York City Law Department, 100 Church Street, 4th
18    Floor, New York, New York 10007, before Eleanor P. King, a
19    Notary Public of the State of New York.
20
21
22
23
24
25
```

26

E. WEBER

1    was getting my education credits.  I don't know if I

2    answered your question.

3        Q.    What is the process that you have to follow to

4    get your certification to teach chemistry?

5        A.    Right, I just have to fulfill the requirements.

6        Q.    Was there any kind or test or exam?

7        A.    Yes.

8        Q.    And do you recall when you took that?

9        A.    I don't know the exact dates, probably like

10   around 2004 or 2003.

11       Q.    The course work that you were doing, did you do

12   it at night, after school, in the summer, did it vary over

13   time?

14       A.    Both, after school and during the summer.

15       Q.    To the extent that you recall any of your

16   supervisors with New Beginnings, how were your

17   relationships with them?

18       A.    Very good.

19       Q.    And then after New Beginnings were you assigned

20   to Brownsville Academy High School?

21       A.    Yes.

22       Q.    And that was around 2005?

23       A.    Yes.

24       Q.    Were you assigned there prior to the beginning of

25   that school year or sometime mid-year?

27

E. WEBER

1 A. Yes, in the beginning of the year.  The New

2 Beginnings program that I worked for closed down and we

3 were kind of in a pool of available teachers.  And Ms.

4 Nabors who was the principal of Brownsville Academy was

5 very anxious to hire a chemistry teacher, and she went to

6 some lengths to make sure she hired me for Brownsville.

7 Q. Did you have any discussions with her about going

8 to Brownsville?

9 A. She called my house before I was to appear at

10 this meeting and asked my wife what I looked like.  She

11 said she wanted to be the first principal to get me.

12 Q. How did she know about you?

13 A. Well, my wife she thought it would be fairly

14 obvious that I would probably be the only one with a black

15 hat, a black coat and a beard.

16 Q. How did Principal Nabors know that you were a

17 teacher that she wanted to bring to Brownsville, how did

18 she know that you existed?

19 A. I guess she read the list and saw that I was

20 certified in chemistry.

21 Q. Do you know if there were any others certified in

22 chemistry?

23 A. I don't know.

24 Q. Did Brownsville have a chemistry program at that

25 time?

DIAMOND REPORTING (718) 624-7200 info@diamondreporting.com

30

E. WEBER

1    stress this sort of Egyptian, some of the graduations they

2    evoke certain Egyptian rituals.

3       Q.    When you say "they", I just want to understand

4    who are the "they", that you are referring to other than

5    Principal Nabors?

6       A.    Ms. Nabors and some of the teachers that were

7    working there at the time.

8       Q.    Do you recall anyone in particular?

9       A.    I can't remember.

10      Q.    Was Ms. Nabors Egyptian in background, did she

11   come from Egypt?

12      A.    No, not that I know of.

13      Q.    Was she African-American?

14      A.    Yes.

15      Q.    How was your relationship with Ms. Nabors, did it

16   change over them?

17      A.    It was very good.

18      Q.    Did you ever have any problems or issues with her

19   during the time that you worked together?

20      A.    Not that I remember.

21      Q.    Who have been the Assistant Principals at

22   Brownsville Academy since you have been working?

23      A.    Ms. Phillips and what's the other one?

24      Q.    Ms. Warren?

25      A.    Ms. Warren.

32

E. WEBER

1    Q.    So, that's not necessarily connected with what an

2    aspiring principal is, right?

3    A.    No.

4    Q.    Do you know how long Ms. Robinson was around at

5    Brownsville Academy before she became the principal?

6    A.    I think two years.

7    Q.    And how was your relationship with you her during

8    that two-year period, approximate two-year period?

9    A.    Was very good.

10   Q.    Do you know how old Principal Robinson is?

11   A.    Again, I am not very good with judging women's

12   ages.

13   Q.    Do you have any conception of whether she is

14   older than you or younger than you?

15   A.    I think she is younger than me.

16   Q.    Do you think she is a lot younger, a couple of

17   years, what is your feeling?

18   A.    I really don't know.  It is hard to judge.

19   Q.    And is Principal Robinson African-American also?

20   A.    Yes.

21   Q.    Do you know what her religion is?

22   A.    No.

23   Q.    Assistant Principal Phillips, do you know how old

24   she is?

25   A.    No.

33

E. WEBER

1    Q.    Any concept of whether she is older or younger

2    than you?

3    A.    Not really.

4    Q.    And how about Ms. Warren?

5    A.    I also really don't know how old she is.

6    Q.    Do you know what Ms. Phillips' religion is?

7    A.    No.

8    Q.    Do you know what Ms. Warren's religion is?

9    A.    No.

10   Q.    Are they also African-American?

11   A.    Yes.

12   Q.    And also during the time that Ms. Nabors was

13   principal, how was your relationship with Ms. Phillips?

14   A.    Not the best.

15   Q.    Why do you say that?

16   A.    She always had -- she was always very difficult.

17   She was -- I don't know, I can't think of a good adjective

18   to describe her, but she was always rather unpleasant to

19   me.

20   Q.    Can you think of any examples of ways that she

21   was unpleasant, things that you can recall?

22   A.    You know, I remember her asking me to fulfil

23   certain tasks that didn't really seem to make sense.  I

24   remember an incident where she came into my room and

25   started in front of the students and ordering me to change

E. WEBER

1    a lot of the decorations in my room around and she was very

2    unpleasant.

3        Q.    Was that during the time that Principal Nabors

4    was the principal?

5        A.    Yes, I think at the tail end it became more

6    apparent.

7        Q.    At some point I understand that you made some

8    type of a complaint that Assistant Principal Phillips was

9    harassing you?

10       A.    Yes.

11       Q.    Was it in connection with that incident or other

12   incidents around that time?

13       A.    It was connected with that incident.

14       Q.    And who did you make the complaint to?

15       A.    Ms. Nabors.

16       Q.    Do you recall what happened as a result of that

17   complaint, was there a meeting or investigation?

18       A.    There was really no serious investigation into it

19   and my charges were basically treated as they were

20   baseless.

21       Q.    In what ways did you allege or complain that

22   Ms. Phillips was being harassing towards you?

23       A.    I called on the phone and said Ms. Phillips was

24   harassing me.

25       Q.    What did you say that she was doing that

40

E. WEBER

1    Q.    So, maybe a short period of time?

2    A.    Yes.

3    Q.    To the extent that you recall her being there at

4    Ms. Nabors' time, how was your relationship with Ms.

5    Warren?

6    A.    I had a good relationship with her.

7    Q.    And in the time that you had been at Brownsville

8    how many teachers did that school have, did it increase or

9    decrease over time?

10    A.    I think about 20 teachers.

11    Q.    Do you know approximately how many total

12    employees they have, are there other administrators besides

13    teachers, how many are there?

14    A.    I would guess like 35 all together.

15    Q.    So 35, which would include the approximate 20

16    teachers and then whoever else was on the staff?

17    A.    Yes, there is a lot staff in the school.

18    Q.    And then approximately how many students did that

19    school have?

20    A.    I think it was listed or supposed to have 200.

21    Q.    And of course that varied from year to year?

22    A.    Day-to-day.  On a good day 75 kids and different

23    75 kids every day.

24    Q.    And so the approximately 20 teachers that were

25    there, did that increase or decrease over the time that you

E. WEBER

1    were there?

2         A.      The size stayed the same but different people

3    came and went.

4         Q.      Do you know were there other science teachers

5    other than yourself?

6         A.      Yes, Mr. Andrews.

7         Q.      What subject did Mr. Andrews teach?

8         A.      He teaches biology, living environment and what's

9    the crime related --

10        Q.      Forensics?

11        A.      Yes, and Ms. Phillips also teaches earth science.

12        Q.      And Mr. Fosque teaches physics is that science or

13   a different subject?

14        A.      No, he was a full-time physics teacher.

15        Q.      That was considered a category of science?

16        A.      Yes, absolutely.

17        Q.      And then was Mr. Andrews there when you joined?

18        A.      Yes.

19        Q.      To your knowledge is he still there?

20        A.      Yes.

21        Q.      Do you know how old Mr. Andrews is?

22        A.      He is younger than I.

23        Q.      Do you have a conception of 20, 30, 40s,

24   approximately?

25        A.      Maybe 30s.

47

E. WEBER

1    she practices?

2        A.    I don't think so.

3        Q.    So, she doesn't take off for Jewish holidays or

4    anything like that, take off from work?

5        A.    No.

6        Q.    Then how about the other social studies teacher

7    who you said was not religious, does she need to take time

8    of from work for religious observance?

9        A.    No.

10       Q.    And Mr. Stark did take religious days off?

11       A.    Yes.

12       Q.    At some point Principal Robinson became the

13   principal at Brownsville Academy before Ms. Nabors left the

14   school?

15       A.    Yes.

16       Q.    That might have been around the '07/'08 or

17   '08/'09 period?

18       A.    Probably more '08, '09 maybe towards the end of

19   2009, probably yeah.

20       Q.    And prior to Ms. Nabors leaving, when she was

21   still the principal did Ms. Robinson evaluate your

22   performance during classroom walk-throughs or observations

23   of you?

24       A.    Yes, I believe so.

25       Q.    Do you recall what happened with those, do you

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

E. WEBER

1    recall those?

2         A.     She found me to be a very good teacher.

3         Q.     And so you received satisfactory evaluation

4    scores?

5         A.     Yes.

6         Q.     And do you know if Ms. Robinson knew that you are

7    Jewish?

8         A.     Yes, it's pretty obvious.

9         Q.     Do you think she always knew that you were

10   Jewish?

11        A.     Yes.

12        Q.     What about Ms. Nabors as well?

13        A.     Yes.

14        Q.     How about Ms. Phillips?

15        A.     Yes.

16        Q.     Same with Ms. Warren?

17        A.     Yes.

18        Q.     And then after Ms. Robinson became the principal,

19   I think around the end of '08, the beginning of '09?

20        A.     I am thinking, I don't really remember exactly, I

21   am thinking the end of 2009.

22        Q.     The last year that Ms. Nabors was principal you

23   also received a satisfactory performance evaluation; is

24   that correct?

25        A.     Yes.  I think I received a satisfactory from

49

E. WEBER

1      Robinson on her first year, I think.

2                 MS. MCNALLY:  Can you mark this.

3                 (Whereupon, the aforementioned document was

4                 marked as Defendants' Exhibit A for

5                 identification as of this date by the Reporter.)

6      Q.      Take your time to look over it and let me know

7      when you are ready to go forward with the questions.

8      A.      Okay.  Could I take a short break?

9                 MS. MCNALLY:  Sure.

10                (Whereupon, a short recess was taken from

11                11:55 to 11:58.)

12                MS. MCNALLY:  Back on the record.

13     Q.      Have you had a chance to review that document?

14     A.      Yes.

15     Q.      Is this the document that you've seen before?

16     A.      Yes.

17     Q.      And is this a performance evaluation that you

18     received to as the 2005/2006 school year?

19     A.      Yes.

20     Q.      As far as you can tell is this a true and

21     accurate copy of that evaluation?

22     A.      Yes.

23     Q.      Was it Ms. Nabors who evaluated your performance

24     on this occasion?

25     A.      Yes.

50

E. WEBER

1      Q.      And it looks like for every category on the

2    evaluation sheet she checked the box for satisfactory; is

3    that right?

4      A.      Yes.

5      Q.      And the overall evaluation is S for satisfactory?

6      A.      Yes.

7      Q.      And do you recall receiving this around June 20,

8    2006, which is when it was dated?

9      A.      I don't really recall, but yes.

10     Q.      That's your signature at the bottom?

11     A.      Yes.

12     Q.      Was there anything about this evaluation that you

13   disagreed with for any reason?

14     A.      No.

15             MS. MCNALLY:  Can you mark this, please.

16             (Whereupon, the aforementioned document was

17             marked as Defendants' Exhibit B for

18             identification as of this date by the Reporter.)

19     Q.      Let me show you what has been marked as Exhibit B

20   and let me know when you have had a chance to review that.

21     A.      It looks good.

22     Q.      So, similar question to the last one.  Do you

23   recognize if this is the performance evaluation that you

24   received for the 2006/2007 school year?

25     A.      Yes.

51

E. WEBER

1    Q.    As far as you can tell is this an accurate entry

2    and an accurate copy of that evaluation?

3    A.    Yes.

4    Q.    Do you recall receiving it around June 2007?

5    A.    Yes.

6    Q.    Is that your signature at the bottom?

7    A.    Yes.

8    Q.    Similar to the other one it looks like Ms. Nabors

9    was the person who evaluated that; is that right?

10   A.    Yes.

11   Q.    And she put satisfactory for every category and

12   also for the overall score, correct?

13   A.    Yes.

14   Q.    Is there anything about this evaluation that you

15   disagree with for any reason?

16   A.    No.

17          MS. MCNALLY:  Can you mark this, please.

18          (Whereupon, the aforementioned document was

19          marked as Defendants' Exhibit C for

20          identification as of this date by the Reporter.)

21   Q.    Mr. Weber, I am showing you Defendants' Exhibit

22   C, and this is a copy for Mr. Glass.  Same as with the last

23   one let me know when you are ready to move forward.

24   A.    Okay.

25   Q.    Do you recognize this document, have you seen it

52

E. WEBER

1    before?

2        A.    Yes.

3        Q.    Is this a copy of your annual performance

4    appraisal for the 2007/2008 school year?

5        A.    Yes.

6        Q.    As far as you can tell is it a true and accurate

7    copy of that appraisal?

8        A.    Yes.

9        Q.    Was Ms. Nabors the person who evaluated you this

10   time as well?

11       A.    Yes.

12       Q.    It looks like you receive a satisfactory overall

13   evaluation score; is that correct?

14       A.    Yes.

15       Q.    It appears than one this one she didn't fill out

16   any of the specific categories, she didn't check anything

17   one way or the other; is that right?

18       A.    Correct.

19       Q.    Do you have any understanding or knowledge of why

20   she didn't do that?

21       A.    I think it was just assumed that I got all

22   satisfactory.

23       Q.    And did you have anything about this evaluation

24   that you disagree with for any reason?

25       A.    No.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

53

E. WEBER

1    Q.    Is this your signature at the bottom here as

2    well?

3    A.    Yes.

4              MS. MCNALLY:  Can you mark this.

5              (Whereupon, the aforementioned document was

6              marked as Defendants' Exhibit D for

7              identification as of this date by the Reporter.)

8    Q.    Mr. Weber, do you recognize this document is it

9    something that you have seen before?

10   A.    Yes.

11   Q.    Is this the performance evaluation that you

12   received for the 2008/2009 school year?

13   A.    Yes.

14   Q.    And this one it appears, tell me if I am wrong,

15   to have been signed by Principal Robinson?

16   A.    Yes.

17   Q.    Does that refresh your memory at all to the

18   school year that she started being the principal?

19   A.    Yes, it would have been 2009.

20   Q.    Did she start in middle of the year or would she

21   have started in September of 2008 at the beginning of the

22   school year?

23   A.    No, I think she did start in the middle of the

24   year.  It was the middle of the year as I recall.

25   Q.    Is this your signature at the bottom on this

54

E. WEBER

1   document as acknowledging receipt?

2       A.      Yes.

3       Q.      You received overall evaluation of satisfactory

4   on this one too?

5       A.      Yes.

6       Q.      Similar to the last one, there is a column of

7   check boxes for satisfactory and unsatisfactory for the

8   each of the categories and none of them are checked; is

9   that correct?

10      A.      Yes.

11      Q.      And same question as with regard to the last

12  ratings, do you have any understanding as to why none of

13  them were checked?

14      A.      Yes, I assume that they all were satisfactory.

15      Q.      Do you understand that to violate any rules or

16  procedures or anything like that, to not check each box one

17  way or the other?

18      A.      I think they do that sometimes.

19      Q.      Did you have any issue with that?

20      A.      No, it was understood.

21      Q.      And is there anything about this performance

22  evaluation that you disagree with for any reason?

23      A.      No, no.

24              MS. MCNALLY:  Can you mark this, please.

25              (Whereupon, the aforementioned documents

55

E. WEBER

1          were marked as Defendants' Exhibits E and F for

2          identification as of this date by the Reporter.)

3     Q.    Take your time and just so you know I was trying

4   to save paper, so these are all double sided but with the

5   previous one that we have looked at, if there is anything

6   printed on the other side I don't think that anyone filled

7   anything out.  In other words, there was no reason for them

8   to fill out the reverse side of the evaluation, just

9   something to be aware of.  The Exhibits that I show you are

10  going to be double-sided today.

11    A.    Okay.

12    Q.    Have you seen this document before?

13    A.    Yes.

14    Q.    Is this the performance evaluation that you

15  receive for the 2009/2010 school year?

16    A.    Yes.

17    Q.    And this evaluation, can you tell whether it was

18  signed by Principal Robinson?

19    A.    Yes.

20    Q.    And do you recall if it was around in June of

21  2010?

22    A.    Yes.  But I have to say I don't remember them

23  having filled out the back.  I don't remember having

24  receiving the second page at that time.

25    Q.    So, you recall receiving the first page, but you

DIAMOND REPORTING   (718) 624-7200  info@diamondreporting.com

E. WEBER

1  unsatisfactory column for different categories; is that

2  right?

3      A.      Yes.

4      Q.      And then there are several categories that have

5  no checked box one way or the other, do you have any

6  understanding of why that is?

7      A.      I would assume it was satisfactory, I don't know

8  why they didn't check them.

9      Q.      And I know that there is a lot written on here,

10  we will get into detail with that later.  For now, I just

11  want to go through and make sure we are on the same pages,

12  that these are the evaluations that you received and we can

13  go back to them if we need to later.

14          So this is the last one, this is marked as

15  Exhibit F, this one has two sides as well.

16      A.      Quite a dramatic change from --

17      Q.      From '08 to '09?

18      A.      Yes.

19      Q.      With respect to this one, do you recognize this

20  as the performance evaluation that you receive for the

21  2010/2011 school year?

22      A.      I do, but I should say that I did refuse to sign

23  this.

24      Q.      So, you are referring to the bottom there is a

25  second that says acknowledgement by employee but he refuses

60

E. WEBER

1   with me.  It was given to me in the elevator.

2       Q.      Was Ms. Ingradi on her way to your classroom to

3   give it you?

4       A.      She was trying to find me.  I don't know.  I

5   don't know.

6       Q.      She wasn't waiting for you in the elevator, did

7   you run into her by chance in the elevator?

8       A.      I don't really recall.

9       Q.      Did you know if in this school year 2010/2011

10  were other teachers brought into meetings to discuss their

11  performance evaluation?

12      A.      I don't really know.

13      Q.      In the previous years, I know you recall having

14  meetings for your performance evaluation, are you aware if

15  other teachers had meetings as well?

16      A.      I believe so.

17      Q.      So, understanding that this copy doesn't have

18  your signature on it, but you do recall receiving a rating

19  for this year, to the best of your knowledge is this a true

20  and accurate copy of the rating that you were given for

21  that year?

22      A.      Yes.

23      Q.      Similar to the previous year, she has some

24  checkmarks in the U column all for different categories and

25  some that are unchecked, similar to those previous years,

62

E. WEBER

1      A.      Yes.

2      Q.      So, I think you said before that when

3  Ms. Nabors was principal your relationship with Principal

4  Robinson was pretty okay?

5      A.      Yes.

6      Q.      And then somewhat not okay with Ms. Phillips, you

7  had some issues with her?

8      A.      Yes.

9      Q.      Once Ms Nabors left and Ms. Robinson became the

10  principal did you relationship with Ms. Robinson change at

11  all when she became the principal?

12     A.      Yes.

13     Q.      And approximately when did that change?

14     A.      I think it was the beginning of 2010.

15     Q.      What change did you perceive?

16     A.      They just started going after me.

17     Q.      By they, are you including Ms. Robinson, Ms.

18  Warren and Ms. Phillips, all three of them?

19     A.      Yes, the three of them.

20     Q.      Do you have any understanding or belief as to why

21  your relationship with the three of them changed?

22     A.      No.

23     Q.      Prior to the 2009/2010 school year, which is the

24  first year that you received the unsatisfactory rating and

25  evaluation, in the years prior even though you received a

67

E. WEBER

1      A.      I don't.

2      Q.      So, other than the fact that Mr. Jenkins doesn't

3   necessarily have a background or knowledge of science or

4   chemistry, did you have any other problems or issues with

5   him coming and helping you?

6      A.      No.

7      Q.      Your relationship with him was good?

8      A.      Yes.

9      Q.      Was there any other, again I think feedback is a

10  good word, did you receive any other feedback on your

11  teaching skills during the time that Ms. Nabors was

12  principal?

13     A.      I don't remember any specific feedback.

14     Q.      And then how about in the first year that Ms.

15  Robinson was principal, do you recall receiving any

16  feedback?

17     A.      No.

18     Q.      So, you had said earlier that your relationship

19  with the three administrators of the school had changed

20  around the beginning of 2010, is that the time period that

21  you recall beginning to receive some negative feedback or

22  criticism for the first time?

23     A.      Yes.

24     Q.      What was the first event that happened in that

25  regard?

E. WEBER

1     A.     Just looking like around April of 2010.  I see

2   even in February of 2010, they just started going after me.

3     Q.     What happened in February of 2010, did you have a

4   walk-through, an observation or some kind of conversation

5   or meeting?

6     A.     I think it was a formal observation.

7     Q.     Is there a policy, practice or procedure for a

8   formal observation to be given each year to a teacher?

9     A.     I am not aware of the regular regulations.

10     Q.     In your time as a teacher at Brownsville Academy

11   High School, do you recall how many formal observations you

12   received each year?

13     A.     What I remember is what I can think of, I think

14   there were four a year, something like that.

15     Q.     Four formal observations, or would that be like a

16   combination of formal and an informal walk thorough and

17   observation?

18     A.     Towards the end of these last two years, there

19   was at least four observations per year as I recall.

20     Q.     And the years prior to that, you don't recall how

21   many there were?

22     A.     No, I don't remember.

23     Q.     So, in February of 2010, was the first

24   walk-through or observation that you had that school year,

25   do you recall?

85

E. WEBER

1    technology?

2        A.    No, in fact I was able to purchase an exhaust

3    hood for my chemistry lab and it was never hooked up.  Even

4    the art teacher had something, had a kiln put in.  I assume

5    that also had some kind of a exhaust thing and it was

6    hooked up right away, she was a young teacher.

7        Q.    And do you consider the exhaust hood within the

8    category of technology?

9        A.    I don't know.  I mean no, I mean no and yes.  I

10   mean yes, it is a piece of technology, and no it's

11   different from a computer.

12       Q.    And going back to 2005, you testified that you

13   had a new computer that Ms. Nabors gave you.  Do you know

14   what other teachers had access to in their classrooms, did

15   everyone have a new computer or just some people?

16       A.    Everyone had a new computer, but the difference

17   is, some I think at that point some teachers might have had

18   more than one computer.

19       Q.    Do you know what circumstances would be that a

20   teacher having more than one?

21       A.    I am not sure.

22       Q.    Do you know if it would depend on their class

23   size or what could be their subject area?

24       A.    I am not sure, going back there at that time I

25   don't really recall so well.  I just remember specifically

E. WEBER

1    when Ms. Robinson was principal, that I was continuously

2    asking for laptops and computers, and never received any

3    laptops, even though there were computers all over the

4    building.

5        Q.    So, the computer that you had from 2005 that was

6    a desktop computer not a laptop?

7        A.    Yes, desktop.

8        Q.    And so starting from 2005 to the extent that you

9    know, everyone had a laptop computer?

10       A.    Yes.  At least one maybe more.

11       Q.    What is a smartboard, you mention a smartboard

12   and I don't exactly know what that is, they did not have

13   that when I was in school?

14       A.    A smartboard it basically just a way to show

15   what's on the computer to publically display what's on the

16   computer.

17       Q.    Like an overhead type of projector?

18       A.    It's like in place of a chalkboard.  And you can

19   also write on it and you can also save your writing.  It's

20   a very neat little tool.

21       Q.    So, it's at the front of the room where the

22   chalkboard normally is, how big is it?

23       A.    It's maybe I am thinking five by eight, something

24   like that.

25       Q.    So, that displays what's on the desktop computer,

E. WEBER

1   whatever it had been.  Why did they need to call my house

2   and harass me, that's the first question, and then when I

3   got back to the school they had subsequent meetings and I

4   told them, look I told you I sent an e-mail, I talked to

5   the attendance secretary I was taking off for Savalas, and

6   Mr. Stark was there at that time and he took Savalas.  Was

7   that 2010?

8       Q.     This was filed in November of 2010, or was it

9   something that happened shortly before that or was it

10  something that happened preceding the school year?

11      A.     I know that I had problems with Savalas one year

12  and they called my house.  I know what it was, it wasn't

13  Savalas it was Sukkot, Sukkot of that year it probably took

14  place in either the end of September or sometime in

15  October.  There were a two-day holiday, Sukkot, that

16  Mr. Stark also took off for.  They knew it was a Jewish

17  holiday they knew Orthodox, Hasidic Jews weren't coming in

18  that day.  Why did she call my house and try to get me to

19  use the phone which would be a violation of the Jewish law

20  and secondly, why did they harass me continually?  There

21  were two meetings when I came back there, were two meetings

22  about it.  Later on it was put in my file for taking off

23  for a Jewish holiday.

24      Q.     Was it Ms. Ingradi who left you the message?

25      A.     Yes.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

125

126

E. WEBER

1    Q.    What did she say?

2    A.    I know it's a Jewish holiday, that's what I

3 recall, I wrote it down somewhere, I do have a record of

4 it.  But she said, basically I know it's a Jewish holiday

5 but you must call the school right away.  We have to know

6 what's going on.

7    Q.    Did she say anything in the voicemail as to why

8 you needed to call or was there some emergency?

9    A.    No.

10    Q.    And then the meetings, so do you recall what day

11 of the week it would have been?

12    A.    No, but I probably have it written down

13 somewhere.

14    Q.    When you returned to the next working day to the

15 school, what happened then?

16    A.    I don't know if it was that day, then later they

17 give me a letter and I was supposed to meet with the

18 principal and she told me that they didn't have, that I

19 couldn't take off for the holiday or something like this.

20 She had a problem with me taking off.

21    Q.    Did she tell you that they didn't have a record

22 of your advance notice that you needed to take the day off?

23    A.    She might have said something like that.  I don't

24 see how she could have said that, I told the attendance

25 teacher and Mr. Stark was taking off.  Also, I had sent her

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

126

130

E. WEBER

1    for take two days off.

2        Q.    In 3020a charges, were the charges relating to

3    taking time off for religious observance?

4        A.    No.

5        Q.    Did they mark down those dates for religious

6    observance on your attendance sheet?

7        A.    I did with Ms. Ingradi, yes.

8        Q.    Were those counted against any of your leave

9    balances or your sicks days?

10       A.    I don't think so.  You were penalized financially

11   for taking religious days but that's a Department of

12   Education issue.

13       Q.    So they are unpaid if you take them off?

14       A.    Like half pay or something.

15       Q.    Have there been any occasions where there was a

16   Jewish holiday where you were not permitted to work by

17   Jewish law that you were not permitted to take those days

18   off by the school?

19       A.    No.

20       Q.    And then with regard to the other time that you

21   requested to take off a day based on Sukkot and Passover,

22   do you recall when that was?

23       A.    I am thinking it was February of 2010.

24       Q.    Is it was before the State Division of Human

25   Rights?

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

130

E. WEBER

1    Q.    Are there any other incidents or instances of

2    harassment that you experienced during this 2009/2010

3    school year?

4    A.    Yes, in a way they made up this whole incident

5    that took place, supposedly took place in my classroom.

6    Where I was doing a coverage, I was doing them a favor and

7    I never received a class list for the coverage.  Apparently

8    some kids were in the class that were not part of the

9    classroom, and an alleged robbery, an alleged theft took

10   place.  I didn't have awareness of it at the time.  They

11   claimed that somebody stole money from another student and

12   the next day in another part of the school completely out

13   of my awareness entirely, there was a fight between these

14   two students and the principal, Assistant Principal Ms.

15   Warren got in the way and she was injured.  You are not

16   supposed to do this, this is the basic Department of

17   Education to break up the fight.  I was blamed.  Here I was

18   trying to do a favor during a coverage, they blame the

19   fight on the observation that we saw before.  Here I think

20   they had disciplinary letter.  I think it was one dated

21   5/3/2010 they list it like five times on my observation, on

22   my final observation report, where it was like a

23   non-incident that I didn't even know about.

24   Q.    What does it mean to do a coverage?

25   A.    In those days, things changed quite a bit at

E. WEBER

1    Brownsville Academy from month to month, but in those days,

2    if a teacher was absent another teacher could cover for

3    that teacher.  Take their class students into their

4    classroom.  So, I guess I was called earlier today and I

5    reached into a coverage and some kids came in my class and

6    they were fairly well behaved and that was it.  And then

7    the next thing I know I have a letter in my file alleging

8    that a theft occurred and that because of this theft a

9    fight that I never even saw and I was somehow responsible

10   for this.  This was the kind of harassment.

11       Q.    When you do a coverage I think you were saying

12   that you didn't receive a class roster?

13       A.    Right.

14       Q.    Would you normally have received a class roster?

15       A.    They didn't give out class rosters normally.  But

16   there was certainly not one at that time.

17       Q.    Did you have a normal practice when you did a

18   coverage, when you do a coverage how do you know who is

19   supposed to be sitting there?

20       A.    Usually you have the kids write down their names

21   on a sheet of paper, as far as who was supposed to be

22   sitting.  That's you know, unless they give a class list it

23   is kind of out of my jurisdiction.  By the way, a few days

24   later I called Ms. Ingradi to see if even if I wanted a

25   class list if I could get one and I ask her for a class

E. WEBER

1    Division of Human Rights?

2        A.    I think there was a response, but I don't feel my

3    allegations were really addressed.   I think instead of

4    addressing it they try to make me out to be a racist.   So

5    the retaliation to me calling them racist, they decide to

6    call me a racist.

7        Q.    Do you know when this OEO -- is that the Office

8    of Equal Opportunity within the DOE?

9        A.    Yes.

10       Q.    And who you do believe filed that complaint?

11       A.    Ms. Robinson.

12       Q.    What's the basis for your belief that

13   Ms. Robinson filed that complaint?

14       A.    The response first of all came right after I

15   filed this.   It came in December or January they filed the

16   OEO thing.   It was all based on interviews of the students

17   in the building at the time.

18       Q.    Are you aware of whether a parent wrote the

19   letter complaining?

20       A.    Apparently a letter was produced from the

21   parents, but I believe this was all orchestrated by Ms.

22   Robinson and the other two principals.

23       Q.    How did you believe they orchestrated the parents

24   to file a complaint?

25       A.    I don't know about that.   But I mean the original

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

E. WEBER

1    complaints were recorded by Mr. Rank, who I think it was a

2    -- this is a thing that came from school.  It was a

3    retaliation to my suit.

4         Q.    Are you aware of a parents lodging a complaint of

5    any kind?

6         A.    I am aware that there was a letter from the

7    parent.  The letter was from one of the students in the

8    class.  This all happened -- the timing of it was such a

9    matter of a very nice relationship and all of a sudden

10   somebody put these kids up to do these things.

11        Q.    So you believe that either Principal Robinson or

12   one of the assistant principals asked the students to lie?

13        A.    Yes.

14        Q.    What makes you believe that?

15        A.    Based on the letters, because the letters were

16   lies.

17        Q.    Did the office of Equal Employment Opportunity

18   investigate the complaint?

19        A.    Yes.

20        Q.    Were you interviewed as part of the

21   investigation?

22        A.    Yes.

23        Q.    Who did you meet with, who were you interviewed

24   by?

25        A.    I believe her name was Nikki.

146

E. WEBER

1      A.      Because Mr. Rank was responsible or at least

2   recorded the student accusations, the racial accusations

3   against me and he also was partnered in the sort of

4   mis-scheduling of my students and it seemed to me

5   purposeful irresponsible scheduling of the students,

6   setting them up for failure.  And Ms. Ramsawak because she

7   never really acted as a lead teacher, and was more

8   interested in destroying my career than in helping me.

9      Q.      Why do you think she was interested in that?

10     A.      Because she repeatedly stood me up and never

11  showed up for professional development time and never

12  offered me any help.

13     Q.      Do you think that she deliberately wanted to

14  damage your career, or do you think that was not good at

15  what she was supposed to be doing?

16     A.      I don't know, I don't know.  It's hard to say.

17     Q.      Do you have an opinion?

18     A.      Not really.

19     Q.      Do you believe any of the actions that you just

20  told me Kevin Rank did were taken because of your age that

21  Kevin Rank was motivated by your age in doing those things?

22     A.      I think that this was part of the retaliation

23  because of the timing of it.  Could be age and religion

24  based, he did make some comments, you know little comments

25  during the year, kind of jokes about my religion, but the

147

E. WEBER

1    main reason was that I included him was the fact that he

2    was responsible for the recording of the abuse accusations

3    against me.

4        Q.    Do you think that he solicited students to write

5    things about you that were false?

6        A.    Somebody did.

7        Q.    Do you know if he did?

8        A.    I don't know, I think they do most things

9    together.   That's why I have to believe that it was a group

10   effort.

11       Q.    What kind of things did he say about your

12   religion?

13       A.    He would just sort of joke that it is Kosher

14   because he blessed it, you know just joking around, but it

15   wasn't always so friendlily.

16       Q.    What else did he say, any other type of comments

17   about your religion?

18       A.    I can't think of anything offhand.   I have to

19   think about that.

20       Q.    When he said to you, it's Kosher, did he say that

21   to you on one occasion or more than on occasion?

22       A.    More than one occasion.

23       Q.    Would he be unfriendly or was he joking?

24       A.    He was joking, but it is not a funny joke after

25   the 100th time.

149

E. WEBER

1    happened that led you to know that she knew about the

2    charge?

3         A.     Just all this retaliation and the fact that

4    immediately after getting such a glowing feedback on my

5    observation that I basically never heard about it again.

6    It was never written up.  All these accusations against me,

7    so I assume that these are retaliations.

8         Q.     Did Ms. Robinson mention your State Division of

9    Human Rights charge to you?

10        A.     I don't think so.

11        Q.     What about Ms. Warren or Ms. Phillips?

12        A.     No.

13        Q.     Did anyone at school mention to that you the fact

14   that you had filed that State Division charge?

15        A.     No, not that I can remember.

16        Q.     Did anybody ever say anything to you that implied

17   that they were aware of complaints that you made?

18        A.     Yes, Rank did make some comments about you know,

19   that he was implying that I was some sort of troublemaker

20   in some way.  I assume that he might have known something

21   about this.

22        Q.     So, what were his exact comments, did he use the

23   word troublemaker?

24        A.     I remember the comment, but I don't remember the

25   specific comment.  I remember he made some comments about

E. WEBER

1   me making things difficult for them.

2        Q.      What do you think he was referring to?

3        A.      I think he was referring to the suit.

4        Q.      Does Mr. Rank have any supervisory authority over

5   you?

6        A.      Only that he scheduled all my classes.

7        Q.      He doesn't do any observations or walk-throughs?

8        A.      No.

9        Q.      He doesn't perform any evaluations?

10       A.      No.

11       Q.      What about Ms. Ramsawak?

12       A.      No, she didn't participate in observations.

13       Q.      Did she participate in performance evaluations at

14   the end the year?

15       A.      You mean the written the final, no except that

16   she was part of the observation reports along the way.

17       Q.      Did Ms. Ramsawak do anything that affected your

18   job duties and responsibilities or your compensation or

19   benefits?

20       A.      No, except that she, you know, she probably

21   helped assessment of unsatisfactory teachers which directly

22   caused me to lose a lot of extra work.

23       Q.      You said before that once you got the U rating

24   that you were not able to do extra work?

25       A.      I couldn't get extra work.

164

E. WEBER

1    Q.    Wouldn't you have already been in the Leadership

2  Academy as aspiring principal, or do I have the order of

3  events wrong?

4    A.    I think was an aspiring principal and then she

5  went to Leadership.  I'm not sure how that happens.  I was

6  told that you can't be a principal without two years of

7  teaching experience, but apparently in her case that wasn't

8  true.

9    Q.    How does one become an aspiring principal, do you

10  know?

11    A.    I don't really know, that I know that you do it

12  by going straight to the Leadership Academy.  But I thought

13  they needed a minimum of three years teaching experience.

14  I don't know how Ms. Robinson got to circumvent that

15  requirement.

16    Q.    Do you know if that requirement is in some sort

17  of writing?

18    A.    Probably.

19    Q.    In Paragraph 34, you alleged that you were told

20  on repeated occasions by Defendant that he does not

21  understand technology.  This is the paragraph where the

22  word white board was used, what I was discussing with you

23  earlier.  Tell me about the occasions on which you were

24  told that you did not understand technology, who told you

25  that and approximately when?

165

E. WEBER

1    A.    I am not sure who was in the written

2  observations, but it was clear that they did not think

3  because of my age I was capable of using technology.  They

4  considered me like a old fuddy duddy or something.  Which

5  is clearly not the case, when I worked with Mr. Stark I was

6  able to master, regain some mastery.  Technology is not

7  that big a deal.

8    Q.    Did Principal Robinson ever have a discussion

9  with you where she told you that you do not understand

10  technology?

11    A.    I remember she made comments, Mr. Weber it is not

12  for him or something like that.

13    Q.    In your presence?

14    A.    Yes.

15    Q.    What did she say?

16    A.    I can't remember exactly, I seem to remember that

17  she would kind of, you know, remark the Mr. Weber couldn't,

18  you know, there might even be innuendoes in that in the

19  observations reports, I have to check.  I remember noting

20  that it was sort of considered that I would not have the

21  ability to because of my age to deal with technology.

22    Q.    To the extent that those things would be in

23  writing, do you believe that it would be in the observation

24  report?

25    A.    I don't know, it's possible but I know for sure

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

165

176

E. WEBER

1    A.    Just like either the day or three days right

2    before Yom Kippor.

3    Q.    Do you know who makes the decision of when to

4    serve charges?

5    A.    I don't know.

6    Q.    In paragraph 28, two paragraphs down, you were

7    denied Kosher food at mandatory staff functions, even

8    though it was available and despite your repeated requests

9    for it while accommodations are made for non-Jewish

10   teachers.  Tell me about any occasions in which you were

11   denied Kosher foods.

12   A.    All occasions.  I mean whenever they had food for

13   the staff they never included me.  They never got Kosher

14   food even though the food is close to Crown Heights.  They

15   could have gotten Kosher food at any time.  I think I even

16   ask one of the caterers once, could you get Kosher food and

17   he said, of course.

18   Q.    Do you believe that the school is supposed to

19   give you Kosher food before you ask for it or do you

20   believe you are supposed to request it?

21   A.    I asked for it.  Even on one instance during a

22   parent-teacher meeting when all the staff was fed, I asked

23   for Kosher food and they said go out and buy Kosher food,

24   we will pay you back.  I went out for the Kosher food and

25   they told me that they weren't going to pay for it.

E. WEBER

1    Q.    Who is they, who told you that?

2    A.    I think Ms. Robinson.

3    Q.    Did she give you a reason why?

4    A.    No.

5    Q.    When you say that you would request Kosher food,

6    did you show up at a meeting and then ask for Kosher food,

7    or did you request it in advance when you knew there would

8    be a meeting with food?

9    A.    I mean it's just a common courtesy.  There is an

10   union of Orthodox teachers, and I asked them about it and

11   they said, yes, if they give food to non-Jewish teachers,

12   they should also give you.  If you were having a party and

13   wouldn't you want all your guest to be.

14   Q.    But I would, but if I was having a party I

15   wouldn't bring Kosher food unless you asked me.

16   A.    I think they were well aware of the fact that I

17   only eat Kosher food.

18   Q.    And did you have any discussions with them about

19   that?

20   A.    Yes.

21   Q.    And were there any other occasions on which you

22   alleged that you asked for Kosher food and it was denied to

23   you?

24   A.    I can't remember specific ones, but it's quite

25   possible.  I know that I had mentioned to different people.

183

E. WEBER

1    Q.    During the time that you worked at Brownsville

2    Academy High School, did you ever hear any of your

3    coworkers use any age related, negative, derogatory term or

4    language of any kind?

5    A.    No.

6    Q.    Have you ever heard any of the assistant

7    principals or the administrative staff use any age related

8    derogatory terms?

9    A.    Not that I remember.

10   Q.    And then how about with regards to any religion

11   related or derogatory terms relating to being Jewish, have

12   you ever heard any coworkers or supervisory people using

13   language like that?

14   A.    Not that I remember.

15        MR. GLASS:  He testified to some things

16        earlier about that.

17   Q.    I recall you testified that Mr. Rank --

18   A.    Yes, Mr. Rank would make jokes, yes.

19

20

21        (Continued on next page to include jurat.)

22

23

24

25

184

E. WEBER

1    Q.    I am kind of more specifically looking for

2  comments of more of a negative nature.  Was there anything

3  else other than Mr. Rank saying Kosher from time to time

4  that was related to your religion that people would make?

5    A.    I can't really think of anything offhand.

6         MS. MCNALLY:  We can end for today.  Thank

7         you.

8         (Whereupon, at 4:30 P.M., the examination of

9         this witness was concluded.)

10

11

12         _____
                  EDWARD WEBER

13

14  Subscribed and sworn to before me

15  this _____ day of _____ 20___.

16

17

18  _____
         NOTARY PUBLIC

19

20

21

22

23

24

25

# EXHIBIT
# C

*LE.* 1

1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
2    ------------------------------------------------------------X
      EDWARD WEBER,
3
                                        PLAINTIFF,
4
5               -against-          Case No:
                            11-CV-5083(MKB)(CPL)
6
7    CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF EDUCATION,
      LASHAWN ROBINSON, AS PRINCIPAL OF BROWNSVILLE ACADEMY HIGH
8    SCHOOL (BAHS), LANA PHILLIPS, AS ASSISTANT PRINCIPAL OF
      BAHS, KATWONA WARREN, AS ASSISTANT PRINCIPAL OF BAHS,
9
                                 DEFENDANTS.
10
    ------------------------------------------------------------X
11
                  DATE:  May 22, 2012
12
13              TIME:  11:42 A.M.
14
15         CONTINUED DEPOSITION of the Plaintiff,
16    EDWARD WEBER, taken by the Defendants, pursuant to a Court
17    Order and to the Federal Rules of Civil Procedure, held at
18    the offices of the New York City Law Department, 100 Church
19    Street, 4th Floor, New York, New York 10007, before Eleanor
20    P. King, a Notary Public of the State of New York.
21
22
23
24
25

21

E. WEBER

1    don't remember.

2         Q.      You were there were with your union

3    representative; is that correct?

4         A.      Yes.

5         Q.      And Principal Robinson was present by phone?

6         A.      Yes.

7         Q.      And what about Assistant Principals Warren and

8    Phillips, were they present either there in person or on

9    the phone?

10        A.      Phillips I know was there and I think Warren was

11   also there, but I don't remember exactly.

12        Q.      Was there anyone else other than those people and

13   the arbitrator himself?

14        A.      My union rep.

15        Q.      Did the arbitrator have the tape recorder in

16   close proximity to him the entire time?

17        A.      Yes, he was controlling the tape.

18        Q.      Did you happen to notice during the proceedings

19   him pressing any buttons on it after he pressed record?

20        A.      I remember he turned it off a couple of times,

21   but that's, you know there was something, a break in the

22   proceedings when he turned it off.  I am not sure, but yes,

23   he did control the tape.

24        Q.      When you say "a break in proceedings", meaning,

25   everyone took a break and got up for a second and stopped?

E. WEBER

1    retaliated against me, but they never said let's have a

2    meeting, what you do mean, are you being discriminated

3    against.  I mean, yeah as far as I know there was no

4    investigation.

5         Q.    Do you know whether anyone at the DOE provided a

6    response to the State Division of Human Rights in response

7    to your complaint?

8         A.    I did get some kind of a packet from the DOE.  It

9    was mostly observation reports and these allegations from

10   students against me, but as far as I was concerned they

11   never really dealt with explaining to me why they were

12   treating me this way.

13        Q.    We talked a little bit the last time about income

14   that you believe that you lost as a result of the U rating.

15   So I want to go into that detail today.

16        A.    I would like to mention one more thing.  At the

17   3020a Ms. Robinson accused me of putting a curse on her,

18   which to me is incredibly racist.  That Jewish people sit

19   around putting curses on people.  This is outrageously

20   racist to me.  She blamed me for burning her house down

21   basically.  She said I put a curse on her and her house

22   burned down she was in two car accidents.  To me this was

23   blatant racism.

24        Q.    What was the basis for Ms. Robinson stating that

25   you had put a curse on her, what evidence did she have?

25

E. WEBER

1      A.      I once made a joke to the secretary about all the
2  complaints I was getting.  I jokingly with a wink, wink and
3  a nod, I said, maybe I should put a curse on her just as a
4  joke.  This woman, I sort of knew her for a couple of
5  years, she also had a Jewish background.  It was a joke and
6  the next thing I know that there was a letter in my file
7  claiming that I was threatening to put a curse on the
8  principal.

9      Q.      Was this Ms. Ingradi the secretary that you are
10  referring to?

11      A.      Yes.

12      Q.      Was there anything else that you wanted to say
13  about that?

14      A.      No.  But to blame me because her house burned
15  down and she was in two car accidents to me is outrageous,
16  you know Jewish hatred or a misunderstanding or something.
17  It is not necessary.

18      Q.      As a result of any of the actions that you
19  alleged Defendants took against you in the lawsuit, what
20  income have you lost?

21      A.      I lost my Tile 1 after-school job, I did not get
22  any per session work and I wasn't able to work summer
23  school.

24      Q.      Did we discuss all these the last time?  I
25  believe you told me the dollars amounts that you believe

# EXHIBIT D

ORIGINAL

1

1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
3   ------------------------------------------X
    EDWARD WEBER,
4
                                    PLAINTIFF,
5

6            -against-        Case No:
                              11-CV-5083(MKB)(CPL)
7

8   CITY OF NEW YORK, NEW YORK CITY DEPARTMENT
    OF EDUCATION, LASHAWN ROBINSON, AS
9   PRINCIPAL OF BROWNSVILLE ACADEMY HIGH
    SCHOOL (BAHS), LANA PHILLIPS, AS ASSISTANT
10  PRINCIPAL OF BAHS, KATWONA WARREN, AS
    ASSISTANT PRINCIPAL OF BAHS,
11
                                    DEFENDANTS.
12
    ------------------------------------------X
13

14                 DATE:  May 30, 2012

15                 TIME:  1:10 P.M.

16

17            DEPOSITION of the Defendant,

18  LASHAWN ROBINSON, taken by the Plaintiff,

19  pursuant to a Court Order and to the

20  Federal Rules of Civil Procedure, held at

21  the offices of the New York City Law

22  Department, 100 Church Street, 4th Floor,

23  New York, New York 10007, before Eleanor P.

24  King, a Notary Public of the State of New

25  York.

```
1                    L. ROBINSON
2              MS. MCNALLY:  It's standard
3          more for Plaintiff.
4          A.    I was a victim of identity
5     theft so I don't give out my Social.
6              MS. MCNALLY:  We redact that
7          information from documents that we
8          produce.
9              MR. GLASS:  Reserve my rights
10         if I need it.
11         Q.    What is your educational
12    background?
13         A.    I received my Master's degree
14    in social welfare.
15         Q.    What school did you get your
16    Master's from?
17         A.    Hunter College School of Social
18    Work.
19         Q.    What year did you get that?
20         A.    '98.
21         Q.    Were you working for the DOE at
22    that time?
23         A.    No.
24         Q.    So, you have a social work
25    degree?
```

6

| | | |
|---|---|---|
| 1 | | L. ROBINSON |
| 2 | A. | I have a social welfare degree. |
| 3 | Q. | Is that a CSW? |
| 4 | A. | MSW. |
| 5 | Q. | What else do you have? |
| 6 | A. | I have my educational |

administrative certification from the
College of Saint Rose.

| | | |
|---|---|---|
| 9 | Q. | What year did you get that? |
| 10 | A. | I don't have that exact year, |

but I can get that information for you.

| | | |
|---|---|---|
| 12 | Q. | Was it before or after -- |
| 13 | A. | That was after. |
| 14 | Q. | Were you working for the DOE at |

that time?

| | | |
|---|---|---|
| 16 | A. | Yes. |
| 17 | Q. | How long did it take to |

complete that program?

| | | |
|---|---|---|
| 19 | A. | I would say about a year to |

complete, a little over a year.

| | | |
|---|---|---|
| 21 | Q. | Did you get recommended by |

someone at the DOE for that program?

| | | |
|---|---|---|
| 23 | A. | Yes. |
| 24 | Q. | Who was that? |
| 25 | A. | The superintendent, Bernard |

```
1                    L. ROBINSON
2      principal at the DOE.
3           Q.    She was in the system at that
4      point?
5           A.    Right, Ms. Phillips and
6      Ms. Warren were both hired by Ms. Nabors.
7           Q.    Where did you go to high
8      school?
9           A.    Brooklyn Tech.
10          Q.    Are you from the City
11     originally?
12          A.    Yes.
13          Q.    Have you been a defendant in
14     any lawsuits besides this one?
15          A.    No.
16          Q.    Have you ever been a plaintiff
17     in a lawsuit?
18          A.    No.
19          Q.    Have you ever sued the DOE, the
20     Department of Education?
21          A.    No.
22          Q.    Have you ever testified under
23     oath before?
24          A.    Yes.
25          Q.    In what context?
```

```
 1                    L. ROBINSON
 2        A.     No.
 3        Q.     Have you ever been arrested?
 4        A.     No.
 5        Q.     Have you done anything in
 6   preparation for today's deposition?
 7        A.     I have reviewed what -- I don't
 8   know what it is called.  I guess, the case
 9   notes that Mr. Weber and your office
10   submitted.
11             MS. MCNALLY:  Are you referring
12         to the complaint that started this
13         lawsuit?
14             THE WITNESS:  Yes.
15        Q.     Have you reviewed your 3020a
16   testimony in Mr. Weber's 3020a?
17        A.     No.
18        Q.     Have you testified at any other
19   3020a?
20        A.     No.
21        Q.     In any capacity?
22        A.     No.
23        Q.     These documents you provided
24   today, how did you end up acquiring them
25   now?
```

1                    L. ROBINSON

2          A.      I looked at the document, I

3     logged into the system for the School

4     Construction Authority, I believe it is

5     call SCA, and I was able to get a history

6     of the work orders for Brownsville Academy

7     High School and the other document is a

8     part of our annual technology or inventory

9     list and I added the age of each staff

10    member on the list.

11         Q.      What lead you to do that?

12         A.      Because part of the complaint

13    is that Mr. Weber alleges that he was

14    harassed or discriminated against because

15    of his age and he cited technology as one

16    the reasons.

17         Q.      Was this something that you did

18    on your own or was it suggested to you?

19         A.      Something that I did on my own.

20         Q.      So these are all related to the

21    hood?

22         A.      With the exception of the first

23    page, the other documents are related to

24    the hood.

25         Q.      And you got that information

```
1                     L. ROBINSON
2         Q.     How many staff did you have
3    last year?
4         A.     This reflects 19.
5         Q.     Is that the same as this year?
6         A.     It's sort of different this
7    year.  Mr. Lovell is no longer on staff and
8    we have a new Math teacher.
9         Q.     The numbers is about the same?
10        A.     Yes, the same.
11        Q.     Mr. Lovell was a probationary
12   teacher?
13        A.     No, he actually went back to
14   school for his doctorate degree.
15        Q.     This is the ages next to this,
16   as of last year?
17        A.     Yes, sir.
18        Q.     So, other than Mr. King, I
19   guess Mr. Weber was the second oldest at
20   the school?
21        A.     Can I.  Yes, that would be
22   accurate.
23        Q.     Are there any other Jewish
24   staff members, to your knowledge, besides
25   Mr. Weber?
```

```
 1                    L. ROBINSON
 2          Q.    Of those ten, how many did you
 3    hire in the school?
 4          A.    I hired, Ms. Cooks,
 5    Ms. Kittrell, Mr. Lovell, three.
 6          Q.    Did you hire anyone else in
 7    that list?
 8          A.    Yes, I hired Ms. Ronquillo, I
 9    hired Mr. Zukas, I hired Ms. Chevere, so
10    three.
11          Q.    And one teacher left from last
12    year?
13          A.    Yes, Mr. Lovell.
14          Q.    Ms. Kittrell, is she a member
15    of that sorority as well?
16          A.    She is.
17          Q.    Mr. King, is he still there?
18          A.    He is.
19          Q.    Was he rated unsatisfactory for
20    this year?
21          A.    He was not.
22          Q.    He was not rated unsatisfactory
23    for 2010-2011?
24          A.    No, he was not.
25          Q.    Has he ever received an
```

```
 1                      L. ROBINSON
 2          A.    He has received unsatisfactory
 3    observations.
 4          Q.    In the past year?
 5          A.    I don't think this year, but I
 6    would have to check.
 7          Q.    Last year he did?
 8          A.    Maybe, last year.
 9          Q.    You have to ultimately approve
10    those?
11          A.    I review them, I don't
12    ultimately approve them.
13          Q.    I was asking about Bruce
14    Fosque, was that someone who was at the
15    school when you were there?
16          A.    Yes.
17          Q.    He is African-American,
18    correct?
19          A.    Yes.
20          Q.    Was he there when you arrived?
21          A.    Yes, he was there.
22          Q.    What did he teach?
23          A.    He taught physics.
24          Q.    Do you recall how old he was?
25          A.    I do not.
```

1                    L. ROBINSON

2          Q.    No.

3          A.    So, what is this?

4          Q.    An Article 78 is a State

5    proceeding, you are not familiar with that?

6          A.    No.

7          Q.    Have you ever been named in any

8    of those cases?

9          A.    No, I thought this was one with

10   Mr. Weber.

11              MS. MCNALLY:   Just so that we

12          are clear, there is an Article 78

13          case by Mr. Weber.   Right now, we are

14          here for the Federal case but he does

15          have an Article 78 too and they are

16          very related.   So, that part may not

17          have been very clear to you.

18         Q.    Is it your testimony that you

19   are not aware whether Mr. Fosque brought an

20   Article 78 as well?

21         A.    No.

22         Q.    Is there a physics program at

23   your school now?

24         A.    No, there is not.

25         Q.    Is there a chemistry teacher at

```
1                      L. ROBINSON
2    your school now?
3            A.      No, there is not.
4            Q.      Is there a reason why these
5    programs has not been replaced?
6            A.      Sure, funding is one reason.
7    Funding suitable candidates.   There are
8    hiring restrictions currently at the DOE
9    right now.
10           Q.      So, the reason there is no
11   chemistry or physics program is because of
12   hiring restrictions?
13           A.      And funding.
14           Q.      Have you looked for a chemistry
15   teacher?
16           A.      I am looking now.
17           Q.      How about physics, are you
18   looking for a physics teacher still?
19           A.      Yes.
20           Q.      And you just never found
21   anyone?
22           A.      No.
23           Q.      Are these mandated or are these
24   elective programs?
25           A.      There are science credits that
```

1                          L. ROBINSON
2    subjects, do they get reported to the
3    central DOE?
4            A.    Sure, they collect data on
5    them.
6            Q.    Have you added any other types
7    of sciences since you have arrived?
8            A.    No.
9            Q.    So you added earth science, and
10   you have taken any chemistry and physics
11   since you have arrived?
12           A.    I haven't taken them away.
13           Q.    There is no way to take them
14   right now, is there?
15           A.    We can take them through the
16   I-Zone program, where we can have another
17   teacher supervise chemistry or physics.
18           Q.    Are any students currently
19   taking chemistry or physics?
20           A.    Not right now, no.
21           Q.    Who teaches earth science?
22           A.    Ms. Phillips.
23           Q.    How about Mathematics, do you
24   have some discretion of what courses can be
25   taught?

                              L. ROBINSON

1
2          A.    No, scholars follow pretty much
3     a prescribed Math program.  So scholars
4     must complete integrated algebra and
5     geometry and then they move on to Algebra
6     2, Trig and pre-cal.
7          Q.    How about like calculus, is it
8     within your discretion to offer that in the
9     school?
10         A.    Sure.
11         Q.    Do you offer calculus
12    presently?
13         A.    No.
14         Q.    Was it offered when Ms. Nabors
15    was there?
16         A.    No.
17         Q.    Has any math been eliminated
18    since you have arrived?
19         A.    No.
20         Q.    As part of the electives?
21         A.    No.
22         Q.    I just want to know the
23    population of your school, how many
24    students are there presently?
25         A.    225 is the maximum register.

```
1                    L. ROBINSON
2          Q.    Are there actually 225 students
3     in the school?
4          A.    No, not right now.
5          Q.    Approximately, how many?
6          A.    Maybe, about 190 now.
7          Q.    And how about last year,
8     approximately the same?
9          A.    About the same.
10         Q.    Who sets the 225 maximum?
11         A.    The DOE has a formula deciding
12    on how many scholars that have seats in the
13    building.  Last year I appealed the
14    decision to have it for 225.
15         Q.    You wanted a higher number?
16         A.    I wanted 225 and they wanted to
17    allocate funding for 200, approximately.
18         Q.    So, you were receiving more
19    funding to get more students?
20         A.    I was seeking 225, because I
21    thought it accurately reflected how many
22    students we would actually admit for the
23    school and if we had less than 225, there
24    would be budget implications.
25         Q.    Have you had to make some
```

```
 1                    L. ROBINSON
 2    budget cuts?
 3          A.     The appeal was successful.
 4          Q.     So, now you can take the
 5    maximum 225?
 6          A.     Yes.
 7          Q.     But right now you don't have
 8    that number of students?
 9          A.     We have students that graduated
10    throughout the year.  Some transition to
11    GED programs or other school communities as
12    well.
13          Q.     I have heard the terms Diploma
14    Plus, is that the type of school this is?
15          A.     Yes.
16          Q.     How many Diploma Plus schools
17    are there in New York City schools?
18          A.     I don't know the exact number,
19    but I would say approximately, maybe eight
20    Diploma Plus schools.
21          Q.     They are all high schools
22    essentially?
23          A.     Yes.
24          Q.     What does Diploma Plus mean?
25          A.     Diploma Plus is an opportunity
```

1                    L. ROBINSON
2    for scholars to return to the high school
3    and receive their diploma in addition to
4    college credits, in addition to an 80-hour
5    internship.  In addition to participating
6    in community service.  In addition to
7    completing and defending a rigorous college
8    level portfolio.  So that the diploma
9    indicates that they will receive their
10   diploma at graduation and the plus piece
11   all the additional requirements for
12   graduation.
13        Q.    When you say return to high
14   school, are these students who dropped out
15   previously from high school?
16        A.    Not necessarily, some of them
17   transition from their current school
18   community.  Some of them are from out of
19   the country and they are here in the States
20   looking for a high school environment.  So
21   it depends for each child.  Some of them
22   are transitioning from private school
23   community and their family can't pay the
24   tuition anymore, so the DOE would offer
25   them to a transfer school.

```
 1                    L. ROBINSON
 2        A.    No, we are part of District 17.
 3        Q.    Does District 79 still exist?
 4        A.    No, it does not.
 5        Q.    Has it been replaced by
 6   District 17?
 7        A.    No.
 8        Q.    District 79 has been shut down,
 9   right?
10        A.    District 79 exists, but not as
11   it did previously.  But they still have
12   schools and programs and things of that
13   nature but we do not participate in
14   District 79 anymore.
15        Q.    That was designed to transfer
16   for students?
17        A.    79?
18        Q.    Yes.
19        A.    Initially yes, it was a
20   district that supported transfer high
21   schools.
22        Q.    When we talk about transfer
23   high schools, are we talking about students
24   who just did not meet academic requirements
25   previously, what's common to the transfer
```

33

1                    L. ROBINSON

2    students at your school?

3         A.    What's common to all transfer

4    schools is that the students are over-aged

5    and under-credited.  So that means that you

6    might have a 16 year old, who should have

7    20-something odd credits and maybe they

8    only have 14.

9         Q.    Is that attendance issues?

10        A.    Different issues, mainly

11   different issues.

12        Q.    Who makes the decision to

13   transition students into this program?

14        A.    Sometimes their sending school

15   may decide that this child can get back on

16   track and graduate on time.  Sometimes,

17   it's the students or their families.  So

18   that decision is made external from our

19   school.

20        Q.    Do you have discretion to help

21   in the system --

22        A.    I believe there are about

23   eight.

24        Q.    Do these students have their

25   options which ones they were to choose?

34

```
1                    L. ROBINSON
2         A.    Oh, there are over 40 transfer
3    high schools across the City.  So they can
4    select any of those schools.
5         Q.    Who is making the choices to
6    come to your school, is it based on the
7    parental input or the students themselves
8    can choose?
9         A.    There is a guide that's
10   provided by the Department of Education and
11   the families will select the schools that
12   they would like to attend based on the
13   guide.
14        Q.    Do you have the ability to say
15   no to the students who want to attend?
16        A.    Yes, if they do not meet the
17   requirements.
18        Q.    Which would have to do with
19   what?
20        A.    17 years of age, with ten or
21   more credits.
22        Q.    But I am saying if the student
23   was under age and has ten or more credits,
24   can you say no to that student or do you
25   have to take them?
```

```
 1                    L. ROBINSON
 2         A.    I can say no but based on some
 3    other criteria.  So part of the interview
 4    we are looking for scholars' willingness to
 5    come back to school, get back on track and
 6    then complete the requirements for their
 7    high school diploma.  Because we are a
 8    Diploma Plus program, we are also preparing
 9    our scholars to enter and succeed in
10    college.  So, we are looking for scholars
11    who share a similar mission for themselves
12    in their lives.
13         Q.    Is there an application or an
14    interview?
15         A.    There is an application, there
16    is an interview and an intake assessment.
17         Q.    Who does that, are you a part
18    of that?
19         A.    I am a part of the team.
20         Q.    Who else is part of that team?
21         A.    Ms. Day, Ms. Lyle,
22    Ms. Phillips, Mr. Rank, Ms. Mora --
23         Q.    Did you choose the team?
24         A.    The team pretty much -- the
25    school counselor, they were conducting
```

```
 1                    L. ROBINSON
 2    achieving those goals.  So, for example,
 3    the class pass rate goal or the Regents
 4    pass rate, things like that.
 5          Q.    Is there a measure of
 6    graduation rate on how many students
 7    actually achieve a diploma or a Regents
 8    diploma at your school?
 9          A.    Yes, it is kept through the
10    progress report.
11          Q.    So, you can actually get a
12    report to see what the Regents diploma
13    rates are?
14          A.    Not the Regents diploma rates,
15    but you can see the weighted Regents
16    diploma rate, you can see that.
17          Q.    Is there a way to measure your
18    success in your school compared to the
19    other Diploma Plus schools?
20          A.    We are the top Diploma Plus
21    school.  There is a New York City progress
22    report.  We rank five out of 40 some odd
23    schools citywide.  So, that's our ranking
24    out of all the transfer high schools.
25          Q.    That's the ranking of what?
```

1                    L. ROBINSON
2          A.    No, my previous role I
3    supervised the parent coordinators in the
4    district?
5          Q.    Which district, 79?
6          A.    79.  Yes, sir.
7          Q.    And so when did you join the
8    principal leadership academy?
9          A.    I have been a principal now for
10   four years, so the year preceding my
11   principalship, so if I stated in '08, then
12   I would have to say '07.
13         Q.    How long does the program last?
14         A.    A year.
15         Q.    Were you part of the program
16   while you were an AP?
17         A.    No.
18         Q.    Is there a summer program that
19   you --
20         A.    You have to leave your position
21   to join the leadership academy, there is a
22   summer component and then there is a
23   component that lasts throughout the school
24   year.
25         Q.    How many people were in the

```
 1                    L. ROBINSON
 2    leadership program when you attended?
 3          A.    I don't know.  There were
 4    probably about 20 some-odd people in my
 5    strand.  The year of the academy there is
 6    cohort, I believe there were three
 7    different strands, and maybe 20 some-odd
 8    people in each strand.
 9          Q.    Is it privately run,
10    independent of the DOE?
11          A.    It is now.  I think that the
12    DOE was involved in the leadership academy
13    at some point.
14          Q.    You go to like traditional
15    classes?
16          A.    I wouldn't call it traditional.
17    But you go to a classroom, yes.
18          Q.    So, you were not an AP at the
19    time you were going through this?
20          A.    No.
21          Q.    You took a leave for a year?
22          A.    I didn't take the leave, I had
23    to leave my position as AP.
24          Q.    Were you still affiliated with
25    the school then for that year?
```

                    L. ROBINSON
1
2          A.    No, I returned back to the
3    school, I believe in about, I want to say
4    May of that school year of '08.
5                MS. MCNALLY:  Was that '08?
6                THE WITNESS:  Yes.
7          Q.    Was it the whole year, were you
8    out from September to May?
9          A.    Yes, I worked at another school
10   during that time.
11         Q.    As part of the leadership
12   academy?
13         A.    Yes.
14         Q.    By the way, I know you often
15   refer to the students as scholars.  Is that
16   something you came up with or is that
17   something that they call Diploma Plus
18   candidates?
19         A.    I don't know what the other
20   Diploma Plus schools refer to their young
21   people as, but I refer to our young people
22   as scholars.
23         Q.    When did you first start doing
24   that?
25         A.    When I started as principal.

```
 1                    L. ROBINSON
 2          Q.    Why did you do that?
 3          A.    I wanted the scholars to know
 4    that they were brilliant, and to really
 5    move forward towards achieving their goals
 6    in life.
 7          Q.    It was your choice to start
 8    calling students scholars, that was your
 9    decision?
10          A.    Yes.
11          Q.    Did Ms. Nabors refer to
12    students as scholars?
13          A.    No.
14          Q.    Now, when you were the AP, was
15    there any other APs?
16          A.    No.
17          Q.    It was just Ms. Nabors and you
18    as AP?
19          A.    Yes.
20          Q.    Was there an AP prior to you?
21          A.    No.
22          Q.    When did you arrive at that
23    school again?
24          A.    In 2005, I believe.
25          Q.    The beginning of the year, or
```

```
 1                    L. ROBINSON
 2    was it during the middle of the year, the
 3    school year?
 4         A.    At the beginning of the year.
 5         Q.    So, she hired you as her own AP
 6    at that point, and then she retired,
 7    Ms. Nabors, when did she retire?
 8         A.    She retired in '08.
 9         Q.    After you came back from the
10    leadership academy?
11         A.    Yes.
12         Q.    Who selected you as principal,
13    made the decision that you became
14    principal?
15         A.    The superintendent.
16         Q.    With Ms. Nabors'
17    recommendation?
18         A.    Ms. Nabors definitely
19    recommended me to apply for the position.
20    There is a vacancy that is posted,
21    candidates will apply, there is a 3020a
22    that Ms. Nabors is not allowed to sit on.
23         Q.    A 3020a?
24         A.    A C30, excuse me, that Ms.
25    Nabors is not allowed to sit in on and then
```

```
 1                    L. ROBINSON
 2    the school community selects a candidate.
 3    So the C30 committee is comprised of
 4    parents, teachers and an administrator.
 5         Q.    What kind of an administrator?
 6         A.    Like someone in the
 7    principalship, a principal.
 8         Q.    And teachers at the school?
 9         A.    Teachers from the school,
10    students from the school are also members
11    of the C30 and they interview candidates
12    and they make a recommendation.  They have
13    to score the candidate.
14         Q.    Were there other candidates in
15    the school?
16         A.    There were.
17         Q.    Did you have to receive a
18    recommendation to become an AP?
19         A.    Yes.
20         Q.    It's a similar process?
21         A.    Yes, for any administrator
22    principal, AP you have to go through a C30
23    process.
24         Q.    Then you took over in September
25    of 2008?
```

54

1                    L. ROBINSON

2          A.     Yes.

3          Q.     And did you have discretion to

4    hire your own staff at that point?

5          A.     I don't think I hire anyone to

6    start but, yes.

7          Q.     When did you first hire another

8    administrator?

9          A.     I didn't hire an administrator.

10         Q.     Did you get an AP that first

11   year?

12         A.     No, Ms. Warren and Ms. Phillips

13   were both hired under Ms. Nabors.

14         Q.     So before she retired, she

15   hired them as APs?

16         A.     Yes, she hired Ms. Phillips to

17   replace me and she hired Ms. Warren because

18   the English department needed support.

19         Q.     Were you involved in the

20   recommendation regarding them?

21         A.     No.

22         Q.     You had no input at all in this

23   decision?

24         A.     No, Ms. Nabors hired them.

25         Q.     Did you tell them about the

```
 1                    L. ROBINSON
 2          Q.    He teaches like, living
 3    environment?
 4          A.    Yes.
 5          Q.    Was he assigned to work with
 6    Mr. Weber at some time?
 7          A.    He worked with Mr. Weber as
 8    part of their department.  It was a very
 9    collaborative community and departments
10    worked together and teachers worked
11    together to support one another.
12          Q.    Who was in that department, is
13    that a department that you created or that
14    was just considered like the science
15    department?
16          A.    The science department.
17          Q.    Is Ms. Phillips in charge of
18    that?
19          A.    Yes.
20          Q.    Who is a part of the science
21    department?
22          A.    Right now it is Ms. Phillips
23    and Mr. Andrews.  Previously, it was
24    Ms. Phillips, Mr. Weber and Mr. Andrews.
25          Q.    So, Ms. Phillips teaches like
```

```
1                    L. ROBINSON
2       the earth science and Mr. Andrews teaches
3       like living environment?
4            A.    Yes.
5            Q.    And that's the entire science
6       department, right?
7            A.    Yes.
8            Q.    And Mr. Fosque was also a part
9       of this?
10           A.    He was.
11           Q.    And Mr. Weber?
12           A.    Yes.
13           Q.    How often do they have
14      meetings, do you know?
15           A.    Yes.
16           Q.    Are you part of those meetings?
17           A.    Sometimes I would sit in the
18      meetings.
19                 MR. GLASS:  Let's take a five
20            minute break.
21                 (Whereupon, an off-the-record
22            discussion was held from 2:20 to
23            2:27.)
24                 MR. GLASS:  Back on the record.
25           Q.    I have a couple questions about
```

```
 1                    L. ROBINSON
 2    Mr. King, do you know if he is returning
 3    next year?
 4           A.    He is retiring.
 5           Q.    So, he is the oldest teacher at
 6    your school now, right?
 7           A.    Yes.
 8           Q.    Do you have any other teachers
 9    in their fifties, Ms. Cooks; is that right?
10           A.    I would have to take a look at
11    the chart.
12           Q.    You said you came into the
13    school as an AP in September of 2005?
14           A.    Yes.
15           Q.    And Mr. Weber was already
16    there?
17           A.    He started along with me.
18           Q.    The same time?
19           A.    Yes.
20           Q.    You became principal in
21    December of 2008, I believe?
22           A.    In July.
23           Q.    Now, as an AP, did you ever
24    rate Mr. Weber?
25           A.    No, the principal does all the
```

102

```
 1                    L. ROBINSON
 2          A.    I don't know the exact date.
 3          Q.    Who ultimately makes the
 4   decision to decide to charge, is that
 5   someone in legal that does that?
 6          A.    The principal in conjunction
 7   with legal, so legal files the paperwork.
 8          Q.    Is that part of your network
 9   leadership team or is that part of your
10   superintendent, like the high school
11   superintendent?
12          A.    They operate external from
13   those two entities.
14          Q.    The 3020a process, you mean?
15          A.    Yes.
16          Q.    When did you know that they
17   were going to charge him with the 3020a, it
18   was this school year, right?
19          A.    Yes.
20          Q.    And who determined the timing
21   of when to serve him?
22          A.    Legal.
23          Q.    Were you aware that he was
24   served on the eve of Yom Kippur?
25          A.    I was not aware until I read
```

1                    L. ROBINSON

2    Mr. Weber's complaint.

3          Q.     Did you have any discretion as

4    to when to serve him?

5          A.     No, I did not.

6          Q.     It was made in the fall and you

7    were told to go ahead and give him these

8    papers?

9          A.     I know the paperwork was

10   completed long before he was served, and I

11   don't know the decision in terms of the

12   date to actually serve Mr. Weber.

13         Q.     Was the DOE attorney who

14   prosecuted the case part of the TAC

15   conferences?

16         A.     She was not part of the initial

17   meetings, but she was part of the

18   subsequent meeting.  I think she assigned

19   the case through her supervisor.

20         Q.     When was he removed from his

21   duties of teaching chemistry?

22         A.     I don't have the exact date but

23   it was early this school year.

24         Q.     Was it after he received the

25   charges?

104

1                    L. ROBINSON

2         A.    Yes, after he received the

3    charges.

4         Q.    When was he removed from the

5    school?

6         A.    Early this school year as well.

7    I believe it was November of 2011.

8         Q.    Was he still teaching at that

9    point in the classroom?

10         A.    At the other school?

11         Q.    No, when he was removed from

12    your school?

13         A.    No, he was assigned to a

14    scanning position.

15         Q.    Why was he, I know that there

16    were several teachers who continued to

17    teach during the charges, why did you make

18    the decision to take him out of the

19    classroom?

20         A.    Central DOE made that decision

21    to remove him --

22         Q.    You had no input in it?

23         A.    -- from the classroom because

24    of disciplinary issues in the classroom.

25    There was a fight in his classroom, and

1                   L. ROBINSON

2     some other issues that placed scholars at

3     risk in his classroom.

4          Q.    What fight are you talking

5     about; in the fall there was a fight in his

6     classroom?

7          A.    Not in the fall, but throughout

8     the course of the time that Mr. Weber was

9     there.

10         Q.    It wasn't your choice it was

11    Central DOE did that?

12         A.    Yes.

13         Q.    Who from Central DOE?

14         A.    Folks from Tweed had him

15    removed from the classroom.

16         Q.    Was that an individual that you

17    spoke to about this?

18         A.    I believe it was part of the

19    process, where teachers are removed.  This

20    is the first time that I have ever been a

21    part of 3020a.

22         Q.    There is a story about an

23    abolition of rubber rooms, why was he

24    reassigned from your school?

25         A.    Mr. Weber was seated at

106

```
 1                    L. ROBINSON

 2    scanning.

 3            Q.     To scanning papers?

 4            A.     There is a scanning protocol at

 5    our school.  So when scholars come into the

 6    building they are scanned with metal

 7    detectors and things like that.

 8            Q.     You mean he was sitting there

 9    scanning when people come in through the

10    metal detectors?

11            A.     Yes, you have to have a

12    teacher, a pedagogue to observe the

13    scanning process.

14            Q.     Like what the guards were doing

15    essentially?

16            A.     The school safety agents, yes.

17            Q.     He was doing that after you

18    reassigned him from the teaching duty?

19            A.     Yes.

20            Q.     Why was he removed from the

21    school?

22            A.     He was removed from the school

23    through central, he was seated at scanning

24    and he was just continuing to talk about

25    myself and the AP's and things of that
```

1                    L. ROBINSON

2     nature.

3          Q.     So, you asked for him to be

4     removed?

5          A.     Oh, yes, I wanted him removed

6     at that point when he was at scanning and

7     he was talking about us at the school with

8     the students.

9          Q.     Is that because kids were

10    coming up to him and asking him, why he

11    wasn't teaching chemistry anymore?

12         A.     Mr. Weber would provide

13    information that was not solicited.

14         Q.     But he did have some popularity

15    with some of the students in the school,

16    would you say that's fair?

17         A.     Yes, some of the students at

18    the school, they knew Mr. Weber, they spoke

19    with him and he could dance with the kids.

20         Q.     Dance, what do you mean by

21    that?

22         A.     Like dance, he would do the

23    kids', their current dances.

24         Q.     It was your recommendation to

25    have him removed from the school because

108

1                    L. ROBINSON
2    you thought he was becoming disruptive?
3         A.    Yes, absolutely.
4         Q.    Now, you are aware that he had
5    brought charges filed State Division
6    charges with the Division of Human Rights?
7         A.    No, you want to tell me about
8    it.  Is it Article 78?
9         Q.    No, the discrimination charges?
10        A.    That's what this is part of,
11   correct?
12        Q.    Part of it.  Did someone at
13   legal contact you to respond to the
14   discrimination charges at some point?
15        A.    I received so many e-mails
16   throughout the years regarding Mr. Weber.
17        Q.    Do you recall the first time
18   that you became aware that he alleged
19   discrimination based on age, religion, that
20   type of thing?
21        A.    I don't know what happened with
22   that case.
23        Q.    Do you recall having to give a
24   response to those allegations to a DOE
25   attorney who was responding on behalf of

113

```
 1                L. ROBINSON
 2        production of the e-mails.
 3               MS. MCNALLY:  It's been
 4        provided already.
 5               MR. GLASS:  If you can identify
 6        for the record which e-mail she is
 7        referring to.
 8        Q.     You do remember an e-mail you
 9   having received, do you have any e-mails
10   between you -- I assume when you became
11   aware of Mr. Weber's allegations, there was
12   an e-mail sent to you saying we got a
13   complaint from Mr. Weber and we need a
14   response?
15        A.     Say that again, please.
16        Q.     When you responded to
17   Mr. Weber's allegations of discrimination
18   against you, I assume that you were
19   notified by e-mails, that a complaint had
20   come in and you had to respond, correct?
21        A.     I was notified via e-mail.
22        Q.     Do you have copies of those
23   e-mails?
24        A.     I am sure I do.
25               MR. GLASS:  I will call for the
```

116

1                    L. ROBINSON

2          Q.    So, after this parent made this

3    complaint to you, what did you do?

4          A.    I reported it.

5          Q.    You called which office?

6          A.    You have to report it through

7    -- you have to call it in.  I am trying to

8    think of the place that you call it in to

9    and create and the Online Occurrence

10   Reporting System and then they refer the

11   case to OEO, and they tell you who is going

12   to investigate the case.

13         Q.    So, you called the OEO, not OSI

14   at this point, right?

15         A.    No.

16         Q.    So, you made --

17         A.    I am contacting the central ORS

18   system, and they route the cases

19   appropriately.  So, sometimes, let's say if

20   there is a verbal abuse allegation.  They

21   might tell me to investigate or they may

22   identify someone else to investigate.

23         Q.    So you put in an ORS report on

24   the central system and someone else routes

25   it to the appropriate person?

117

```
 1                    L. ROBINSON
 2        A.    That's exactly what happens.
 3        Q.    After you did that, was there
 4   any further communication that you had with
 5   the OEO investigators?
 6        A.    After that's done, OEO was
 7   assigned to investigate the case, I didn't
 8   work with the person.  So I have to assign
 9   someone to sit in as scholars provide their
10   testimony.
11        Q.    So, you sat in on some of these
12   interviews?
13        A.    No, I didn't sit in on any of
14   them.
15        Q.    Did someone from OEO come and
16   do the investigation?
17        A.    Yes.
18        Q.    Do you remember who that person
19   was?
20        A.    I don't remember her name.
21        Q.    Did you draw your own judgment
22   as to the credibility of these allegations?
23        A.    No, I just let the case
24   investigator do what she had to do.
25        Q.    What was the outcome of these
```

```
 1                    L. ROBINSON
 2          A.    Yes.
 3          Q.    So, you are saying that he was
 4   just assigned to do this for a particular
 5   day, one coverage?
 6          A.    Yes.
 7          Q.    So, had he been assigned to
 8   this class before?
 9          A.    I don't know if he was assigned
10   to this class before.
11          Q.    If he didn't have a class list
12   that day for this class, did he have a
13   class list for every class in the school?
14          A.    Yes.
15          Q.    He would be given a class list
16   for every class in the school, is that what
17   you are saying?
18          A.    Yes.  Everyone receives a class
19   list for every class in the school.
20          Q.    Who does that, Ms. Ingradi?
21          A.    I don't know who sent it out, I
22   believe Ms. Ingradi or Mr. Rank sent it via
23   e-mail.
24          Q.    When is this sent out, in the
25   beginning of the school year?
```

124

1                     L. ROBINSON

2          A.     It was a few weeks prior to the

3     incident.

4          Q.     The class lists change during

5     the school year, don't they?

6          A.     They can change.

7          Q.     Do you provide updated class

8     lists to all the teachers every time there

9     are changes?

10          A.     The class lists are very

11     consistent after the first two weeks in any

12     quarter, that's when all program changes

13     are done.

14          Q.     Are classes sent out by e-mail?

15          A.     Via e-mail, yes.

16          Q.     Would you have a copy of that

17     e-mail as to when you received it?

18          A.     I do not, but I have to find

19     out if Ms. Ingradi or Mr. Rank retained the

20     e-mail.

21               MR. GLASS:  I ask for the

22          production of that e-mail.

23          Q.     Is there a Mr. Alba (phonetic)

24     in your school?

25          A.     Yes, not currently, he was a

125

```
 1                    L. ROBINSON
 2    member of our school community.
 3          Q.    What was his role?
 4          A.    The technology specialist.
 5          Q.    Was he assigned to give
 6    technology to teachers, was that part of
 7    his role?
 8          A.    Yes.
 9          Q.    Did Mr. Alba ever come to you
10    about Mr. Weber asking for certain
11    technology at the school?
12          A.    Yes.
13          Q.    And what did he come to you
14    about?
15          A.    Mr. Weber needing a SMART Board
16    and also Mr. Weber needing a projector in
17    his class.
18          Q.    Do you recall when he came to
19    you?
20          A.    No, I do not.
21          Q.    Did he just tell you that
22    Mr. Weber needed these things the SMART
23    Board and the projector?
24          A.    He provided Mr. Weber with the
25    SMART Board and a projector.
```

126

```
 1                  L. ROBINSON
 2          Q.   Do you recall when that
 3   occurred?
 4          A.   No, I do not.
 5          Q.   Are there e-mails that talked
 6   about that?
 7          A.   Yes.
 8          Q.   This was all said to you
 9   verbally?
10          A.   Yes.
11          Q.   Was there some point when Mr.
12   Weber did not have a SMART Board and when
13   he was requesting one?
14          A.   Not to my knowledge.
15          Q.   How about laptops, were there
16   times that Mr. Weber requested laptops and
17   was not given the laptops he was asking
18   for?
19          A.   I know Mr. Weber wanted laptops
20   and I don't know if he received the laptops
21   or not, but I do know that he was able to
22   use the Mac labs, the computer labs in the
23   building.
24          Q.   How many mac labs are there?
25          A.   There are two now, but there
```

127

1                    L. ROBINSON
2     was one Mac lab and Dell lab.
3          Q.     Some teachers had received Macs
4     in their rooms?
5          A.     Some people have laptop carts
6     and you have a list of all the teachers who
7     had laptop carts.
8          Q.     How do you decide who you give
9     laptop carts to?
10         A.     Initially, most of the teachers
11    already had laptop carts with the Dell
12    laptops, and then the I-Zone teachers
13    receive the Mac.
14         Q.     What's an I-Zone teacher?
15         A.     An I-Zone teacher utilizes the
16    I-Zone online courseware.  So we apply to
17    be a part of the I-Zone program with the
18    DOE.  The teachers who were a part of the
19    I-Zone had an opportunity to use the Mac
20    Book.
21         Q.     I-Zone teachers, is that like a
22    federal program?
23         A.     No, it is a DOE program.
24         Q.     How do you become an I-Zone
25    teacher?

```
 1                    L. ROBINSON
 2     program.
 3          Q.     These laptop carts that are
 4     listed on this chart, what does that mean?
 5          A.     Those are the letters of the
 6     carts that the teacher used.
 7          Q.     How do you decide which
 8     teachers get which carts?
 9          A.     Those were already assigned
10     prior to my arrival to the school.
11          Q.     Were you trying to get carts
12     for all the classes?
13          A.     Yes, I would love carts for all
14     of the classes.
15          Q.     Do you have to get the
16     resources for that?
17          A.     That is correct.
18          Q.     Every classroom has at least
19     one computer?
20          A.     Every single classroom, yes.
21     It has desktop computers.
22          Q.     What about this hood he asked
23     you for, like a ventilation hood, did that
24     come through Mr. Alba or someone else?
25          A.     The hood was requested through
```

130

```
 1                    L. ROBINSON
 2    Ms. Nabors, her principalship, the date of
 3    the request and the last inquiry.
 4              MR. GLASS:  Can you mark these,
 5         please.
 6              (Whereupon, the aforementioned
 7              document were marked as Plaintiff's
 8              Exhibits 1 and 2 for identification
 9              as of this date by the Reporter.)
10         Q.    This first document, did you
11    create this document?
12         A.    No, it was created by either
13    Alba or Ms. Ingradi.
14         Q.    At your request?
15         A.    Part of the technology
16    inventory for your school.
17         Q.    So, this was not created for
18    this litigation necessarily?
19         A.    No, but the ages were added as
20    a result of this litigation.
21         Q.    At your request, to add the
22    ages?
23         A.    Yes.
24         Q.    Otherwise all the information
25    was on there as of January of 2011?
```

132

```
 1                    L. ROBINSON
 2         Q.    What's the next page?
 3         A.    The next page is an e-mail from
 4    Ms. Phillips to Kevin Noland, providing a
 5    copy of the installation directions for the
 6    exhaust hood and also acknowledging that
 7    there is an outstanding work order for the
 8    installation of this equipment, and also
 9    indicating that students enrolled in the
10    chemistry class are required to complete
11    1200 minutes of lab and that we really need
12    the ventilation hood installed.
13              Subsequent pages include the
14    directions and information of the hood and
15    what would need to be done to install the
16    hood.
17         Q.    So, did it ever get installed?
18         A.    No, it's still not installed.
19         Q.    What was the reason you didn't
20    get the funding?
21         A.    Yes.
22         Q.    You feel that you made efforts
23    to try and get it?
24         A.    Absolutely.
25         Q.    When did Ms. Nabors first put
```

133

1                       L. ROBINSON
2      in that request?
3              A.     She put the request in on
4      January 17, 2007.
5                      MR. GLASS:  Can you mark these
6              documents.
7                      (Whereupon, the aforementioned
8              documents were marked as Plaintiff's
9              Exhibits 3 through 8 for
10             identification as of this date by the
11             Reporter.)
12             Q.    So, my first question is, these
13     report cards started in 2007-2008?
14             A.     Yes.
15             Q.     Have they changed the criteria
16     for evaluating the school, do you know?
17             A.     Yes, the criteria has changed
18     somewhat over the years, they became more
19     rigorous.
20             Q.     Do you know how they were
21     rating student performance at that point,
22     like what was the criteria, if you know?
23             A.     Six-year graduation rate,
24     diploma rate, and then six years' rate by
25     accredited admission.