UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

EDWARD WEBER,

                              Plaintiff,                    **MEMORANDUM & ORDER**
                                                           11-CV-5083 (MKB)

              v.

CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF EDUCATION, LASHAWN
ROBINSON, as Principal of Brownsville Academy
High School, LANA PHILLIPS, as Assistant
Principal of Brownsville Academy High School,
and KATWONA WARREN, as Assistant Principal
of Brownsville Academy High School,

                              Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Edward Weber brought the above-captioned action against Defendants City of

New York (the "City"), the New York City Department of Education ("DOE"), Principal

Lashawn Robinson ("Robinson") and Assistant Principals Lana Phillips ("Phillips") and

Katwona Warren ("Warren") of Brownsville Academy High School ("Brownsville Academy"),

alleging claims of age discrimination, religious discrimination and retaliation in violation of the

Age Discrimination in Employment Act ("ADEA"), Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law

§ 290 *et seq*. ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").  Plaintiff

also alleges equal protection claims in violation of the Fourteenth Amendment of the United

States Constitution pursuant to 42 U.S.C. § 1983 and in violation of the New York State

Constitution.  Defendants moved for summary judgment on all claims.  The Court heard oral

argument on July 26, 2013, and, at oral argument, dismissed Plaintiff's age discrimination claims

pursuant to the ADEA, NYSHRL and NYCHRL as to all Defendants, and equal protection

claims in violation of the Fourteenth Amendment and the New York State Constitution as to the

City.  For the reasons set forth below, the Court grants Defendants' motion for summary

judgment as to all other claims.

## I.    Background

### a.    The Parties' Employment at Brownsville Academy

Plaintiff, a high school teacher, has been employed by DOE since 2001.  (Def. 56.1 ¶ 1;

Pl. 56.1 ¶ 1.)[1]  Plaintiff began working as a chemistry teacher at Brownsville Academy in

---

[1]  Pursuant to Local Civil Rule 56.1(d) of the Local Rules of the United States District
Courts for the Southern and Eastern Districts of New York, "[e]ach statement by the movant or
opponent [of a summary judgment motion], including each statement controverting any
statement of material fact, must be followed by citation to evidence which would be admissible,
set forth as required by Fed. R. Civ. P. 56(c)."  Local Civ. R. 56.1(d).  Plaintiff submitted a
Counter-Statement of Material Facts ("Plaintiff's 56.1 Counter-Statement") to Defendants' Rule
56.1 Statement in which, with the exception of one paragraph, Plaintiff failed to cite to evidence.
(*See* Pl. 56.1 ¶ 106.)  Statements without citation to evidence may be properly ignored by the
Court.  *See, e.g.*, *Feis v. United States*, 394 F. App'x 797, 799–800 (2d Cir. 2010) (holding that a
district court may "decline[] to 'consider as disputed any statement supported by admissible
evidence to which Plaintiff objects, *but does not support with evidence*'" (quoting Local Civ. R.
56.1(d))); *Topalian v. Hartford Life Ins. Co.*, No. 10-CV-1965, 2013 WL 2147553, at *1 n.2
(E.D.N.Y. May 16, 2013) ("To the extent that the parties have failed to cite to admissible
evidence in support of factual assertions in their respective Rule 56.1 Statements and Responses,
the court has disregarded such unsupported factual assertions." (citing *Giannullo v. City of New
York*, 322 F.3d 139, 140 (2d Cir. 2003)); *Great Am. E & S Ins. Co. v. Hartford Fire Ins. Co.*, No.
09-CV-10010, 2012 WL 3186086, at *1 n.3 (S.D.N.Y. Aug. 3, 2012, *as amended* Aug. 9, 2012)
(deeming as admitted each paragraph of the defendant's Rule 56.1 statement for which the
plaintiff's counterstatement was not followed by a citation to admissible evidence).  However,
Plaintiff's failure does not relieve Defendants of the burden of showing that they are entitled to
judgment as a matter of law.  *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373
F.3d 241, 244 (2d Cir. 2004) ("[T]he district court may not rely solely on the statement of
undisputed facts contained in the moving party's Rule 56.1 statement.  It must be satisfied that
the citation to evidence in the record supports the assertion."  (citation omitted)).  The Court will
deem admitted those facts in Defendants' Local Rule 56.1 Statement that are supported by
admissible evidence in the record and for which Plaintiff has offered no objection supported by
citation to evidence.  *See Zhengfang Liang v. Cafe Spice SB, Inc.*, 911 F. Supp. 2d 184, 191 n.1
(E.D.N.Y. 2012); *Battle v. Day Care Council, Local 205, DC 1707 Welfare Fund*, No. 11-CV-
4043, 2012 WL 3055574, at *1 n.1 (S.D.N.Y. July 26, 2012); *Taylor & Fulton Packing, LLC v.*

Brownsville, Brooklyn, in September 2005. (Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.) Brownsville Academy is a transfer high school that serves students who are over-age and under-credited. (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.) Joanne Nabors, who was Principal of Brownsville Academy at the time, hired Plaintiff to teach chemistry. (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.) Robinson began working at Brownsville Academy in September 2005, at approximately the same time as Plaintiff. (Def. 56.1 ¶ 11.) Robinson was the Assistant Principal at Brownsville Academy during the 2005–2006 and 2006–2007 school years, (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10), spent the 2007–2008 school year at another school while participating in the New York City Leadership Academy, (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19), and was hired as principal of Brownsville Academy beginning in the 2008–2009 school year, replacing Nabors, (Def. 56.1 ¶ 31). Assistant principals Phillips and Warren were hired by Nabors during the 2007–2008 school year. (Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20.)

### b. Plaintiff's Religious Accommodation Requests

Plaintiff identifies himself as "an observant Hasidic ultraorthodox Jew" and was 56 years old at the time he commenced this action. (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.) Brownsville Academy made a number of accommodations of Plaintiff's religious practice. Throughout Plaintiff's employment at Brownsville Academy, Plaintiff was excused from school for religious observances several times, including six absences in the 2007–2008 school year, five absences in the 2008–2009 school year, two absences in the 2009–2010 school year, and five in September and October 2010 during the Fall 2010 semester. (Def. 56.1 ¶ 199 (citing McNally Decl. Ex. III).) Plaintiff acknowledges that Brownsville Academy has never prohibited him from taking a day off for religious observance of a Jewish holiday on which he was not permitted to work according to Jewish law. (Weber Day 1 Tr. 130:15–19.)

---

*Marco Int'l Foods, LLC*, No. 09-CV-2614, 2011 WL 6329194, at *4 (E.D.N.Y. Dec. 16, 2011).

Plaintiff alleges that during his employment at Brownsville Academy, Defendants "did not accommodate his request for time off for at least one religious day to bake matzahs for Passover in 2010."[2] (Pl. Opp'n 9.) Plaintiff admits that Jewish law did not require him to refrain from working on the day in question or to take off for religious observance. (Weber Day 1 Tr. at 131:13–17.) Plaintiff also alleges that on one occasion the school secretary "called his home on a Sukkot holiday in 2010." (Pl. Opp'n 9; Weber Day 1 Tr. 125:1–126:25.) According to Plaintiff, he had advised "the attendance teacher" that he would be taking the day off, but it is unclear that Brownsville Academy had a record of any notice that Plaintiff would be absent from school that day. (*Id.* at 126:24–25.) The school secretary left a message stating, "We have to know what's going on," because they did not have a record of Plaintiff's advance notice that he needed to take the day off. (*Id.* at 126:6, 21–23.) Plaintiff also alleges that he was denied kosher food at school meetings. (Pl. Opp'n 10.) Defendants assert that Plaintiff received reimbursements for kosher meals that he purchased for professional development days, and Robinson approved reimbursement for two meals on at least one occasion. (Def. 56.1 ¶ 201 (citing McNally Decl. Ex. JJJ).) Plaintiff claims that during a parent-teacher meeting he was told that he would be reimbursed for purchasing kosher food, but was refused reimbursement. (Weber Day 1 Tr. 176:21–25.)

### c. Religious Remarks

Plaintiff admits that during his employment at Brownsville Academy, he never heard any of his co-workers or supervisors use any negative religion-related or derogatory terms about his religion. (Def. 56.1 ¶ 211, 213 (citing Weber Day 1 Tr. 183:1–184:5).) Plaintiff alleges, however, Guidance Counselor Kevin Rank joked that things were "[k]osher because he blessed

_____

[2] Although Plaintiff says "at least," suggesting there were other times when he was not accommodated, Plaintiff has not identified any other requests that were denied.

it" and although Plaintiff knew Rank was joking when he made these remarks about things being "kosher," Plaintiff asserts that "it is not a funny joke after the 100th time." (Weber Day 1 Tr. 147:11–25.) Plaintiff admits that he never complained to Rank and never told the administration about Rank's comments. (Oral Arg. Tr. 55:2–56:1.)

### d. Plaintiff's Performance Evaluations

Plaintiff was regularly observed and evaluated by his superiors. (*See, e.g.*, McNally Decl. Exs. R, S, V, AA, KK, LL, QQ, SS, UU, XX, BBB.) Plaintiff's superiors prepared performance evaluations following their observations of Plaintiff's class-room performance, as well as year-end performance evaluations. (*See, e.g.*, McNally Decl. Exs. R, S, V, AA, KK, LL, QQ, SS, UU, XX, BBB.) Plaintiff's performance evaluations demonstrate that he was subject to increasing criticism during his tenure at Brownsville Academy. (*See, e.g.*, McNally Decl. Exs. R, S, V, KK, LL, QQ, SS, UU, XX.)

Plaintiff received a satisfactory rating on his year-end performance evaluations for the four consecutive school years between 2005 and 2009. (Def. 56.1 ¶¶ 13, 18, 24, 33; Pl. 56.1 ¶¶ 13, 18, 24, 33.) During this time, however, Plaintiff's teaching performance was subject to criticism. (*See* Def. 56.1 ¶¶ 14–17, 25–27 (citing McNally Decl. Exs. F, G, H, L).[3]) For example, Plaintiff was criticized for failing to actively engage his students, (McNally Decl. Ex. G), failing to address the fact that half of his students arrived late to class, (McNally Decl. Ex. H), excessive talking during class discussions, (*id.*), allowing a student to watch a sitcom on

---

[3] In response to these statements of fact in Defendants' 56.1 Statement, and throughout Plaintiff's 56.1 Counter-Statement, Plaintiff frequently states that he does not dispute the existence of the document cited but disagrees with the characterizations of the document or otherwise disputes the content, but does not cite to any other evidence. For the reasons set forth in note 1, *supra*, the Court has reviewed the evidence in the record and deemed admitted those facts in Defendant's Local Rule 56.1 Statement that are supported by the evidence.

the computer during class, (McNally Decl. Ex. I), and failing to execute the objectives of his lesson plans, (*id.*).

Plaintiff received his first unsatisfactory performance evaluation during the 2009–2010 school year, in February 2010. (*Id.* ¶¶ 37–41 (citing McNally Decl. Ex. Q).) Plaintiff was criticized for, among other things, having a vague lesson objective resulting in a failure to achieve a well-planned and executed lesson, allowing students to spend more than a half-hour on an assignment that should have taken no more than ten minutes to complete, failing to differentiate between different levels of students, and failing to display the work of the students in the classroom. (McNally Decl. Ex. Q.) Plaintiff claims that "in February of 2010, they just started going after me." (Weber Day 1 Tr. 68: 1–6; *see also* Def. 56.1 ¶ 42 (citing Weber Day 1 Tr. 67:18–68:6).)

Plaintiff received another satisfactory rating during the 2009–2010 school year followed by additional unsatisfactory ratings for the remainder of the 2009–2010 and 2010–2011 school years for issues such as failing to address the objective for the day, failing to assess the students' understanding at the end of lessons, accepting incorrect answers as correct, failing to wrap-up lessons, allowing students to arrive late without comment, moving on when students were clearly confused, and failing to provide students with clear directions.[4] (*See* McNally Decl. Exs. R, S,

---

[4] Plaintiff alleges that he had an additional satisfactory evaluation in the fall of 2010 that Phillips and Robinson failed to memorialize. (Pl. 56.1 ¶ 90.) However, Plaintiff has not cited to any evidence in support of this claim, and may not rely on allegations alone. *Hicks v. Baines* ("*Baines*"), 593 F.3d 159, 166 (2d Cir. 2010) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (alteration in original) (citation omitted)); *Sanborn v. Jennings*, No. 12-CV-00228, 2013 WL 4040391, at *2 (D. Vt. Aug. 8, 2013) ("Summary judgment cannot be defeated by mere conjecture, allegations, or speculations without hard evidence for support." (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)); *Billhofer v. Flamel Technologies, S.A.*, No. 07-CV-9920, 2013 WL 866778, at *3 (S.D.N.Y. Mar. 8, 2013) ("[T]he non-moving party may

V, KK, LL, QQ, SS, UU, XX.)  Plaintiff was commended on his strengths, including his use of

technology, and was provided detailed recommendations for improvement.  (*See, e.g.*, McNally

Decl. Exs. V, QQ, SS, UU, XX.)  Prior to and after many of the observation sessions, Phillips,

Robinson and/or Warren met with Plaintiff.  (*See, e.g.*, McNally Decl. Exs. V, KK, LL, QQ, SS,

XX.)  However, Plaintiff was not always willing to accept input from others.  For example, prior

to a lesson in April 2010, Plaintiff repeatedly refused opportunities to meet with Phillips, who

had offered to work with him on his lesson plan.  (McNally Dec. Ex. S.)

In a June 2010 performance evaluation, Robinson noted that "Phillips [had] worked

diligently with [Plaintiff] . . . to no avail."  (McNally Decl. Ex. V.)  Robinson informed Plaintiff

that his colleagues would continue to support him, but noted that Plaintiff needed to accept

constructive feedback in order to improve.  (*Id.*; *see also* McNally Decl. Exs. BB, LL.)  In April

2011 Plaintiff was given an Action plan and recommendations for achieving a satisfactory rating.

(Def. 56.1 ¶ 126 (citing McNally Decl. Ex. TT).)  According to the Action Plan, Brownsville

Academy's Lead Teacher, Diana Ramsawak, as well as Phillips, Robinson and Warren, would

continue to work with Plaintiff on various aspects of the plan.  (*Id.*)  Plaintiff was warned that

"unsatisfactory observations may lead to further disciplinary action including an unsatisfactory

rating and charges that may lead to the termination of your license."  (*Id.* ¶ 128 (quoting

McNally Decl. Ex. TT).)  In Plaintiff's last performance evaluation of the 2010–2011 school

year, Robinson reviewed all of the support Plaintiff had been provided, including support from

---

not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead
must offer evidence to show that its version of the events is not wholly fanciful." (quoting
*Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir. 1999))); *Muhammad v. Reeves*, No. 08-CV-182,
2012 WL 5617113, at *8 (W.D.N.Y. Nov. 15, 2012) ("[A]llegations, unsupported by any
evidence and based solely on speculation and surmise, are insufficient to withstand the motion
for summary judgment.").

three supervisors and the Lead Teacher Ramsawak and weekly professional development sessions, (Def. 56.1 ¶ 151 (citing McNally Decl. Ex. XX)), and found that Plaintiff had "not demonstrated the necessary growth to accelerate the learning outcomes of [his] scholars," had been "insubordinate to supervisors," "unresponsive to the supports that have been provided," and that he had "a pending . . . case regarding numerous discriminatory statements [he] made to scholars." (*Id.*) Plaintiff's overall performance rating for the 2009–2010 and 2010–2011 school years was unsatisfactory. (*Id.* ¶ 68 (citing McNally Decl. Ex. AA), ¶ 161 (citing McNally Decl. Ex. BBB).)

Defendants assert that Plaintiff reacted unprofessionally on many occasions when he was notified of various performance issues. For example, according to Nabors, at a meeting with Nabors and Robinson during the 2005–2006 school year, when Nabors attempted to discuss Plaintiff's lesson plan with him he "became very agitated and abrupt ," asking if he needed his union representative present. (McNally Decl. Ex. G.) When Nabors and Robinson attempted to address the format of Plaintiff's lesson plan, he "became very belligerent" and told Nabors to "be quiet," at which point she asked him to leave her office. (*Id.*) On another occasion during the 2007–2008 school year, after Phillips criticized Plaintiff for failing to execute his lesson plan, Plaintiff started shouting in front of his class that he was being harassed. (Def. 56.1 ¶ 26 (quoting McNally Decl. Ex. L).) After that incident, Plaintiff complained to Nabors that he was being harassed by Phillips, and Nabors investigated his complaint of harassment. (Def. 56.1 ¶¶ 28–29 (citing McNally Decl. Ex. M).) At the conclusion of her investigation of Plaintiff's complaint, Nabors found that Plaintiff's conduct was "unprofessional [and] unacceptable," and she directed Phillips to assist Plaintiff "in an effort to improve the quality of instruction and implement the very best chemistry course that Brownsville Academy High School can offer."

(*Id.* ¶ 30 (quoting McNally Decl. Ex. M).)  After Phillips observed and critiqued Plaintiff's performance in class on February 25, 2010, Plaintiff again accused Phillips of harassing him and filed a grievance against her.  (McNally Decl. Ex. Q; Def. 56.1 ¶ 50 (citing McNally Dec. Exs. T, U); Pl. 56.1 ¶ 50.)  Robinson denied Plaintiff's grievance on the grounds that he had failed to demonstrate that he had been harassed or that Phillips's performance evaluation was unfair or inaccurate.  (McNally Dec. Ex. T.)

Plaintiff was also found to be insubordinate on several occasions.  During two of the Plaintiff's classes in 2010–2011 he made inappropriate comments to Robinson and Warren while they were observing him.  Robinson and Warren observed Plaintiff's class on April 15, 2011.  (McNally Decl. Ex. SS.)  During class, Plaintiff repeatedly directed his comments and questions at Robinson and Warren, rather than the class, with statements like, "Ms. Warren, feel free to chime in since this is an easy lesson," "Ms. Warren and Ms. Phillips . . . are teachers[,] I am sure they would like to learn a little chemistry," "Ms. Warren, you should know this.  Ms Warren, do you know the answer?," and "Are you learning chemistry Ms. Warren?"  (*Id.*)  Robinson told Plaintiff that his behavior during the class towards his superiors who were observing "was unprofessional and unacceptable," and had a "negative impact" on the students.  (*Id.*)  After investigating the matter further, including meeting with Plaintiff and his union representative, Robinson concluded that Plaintiff's behavior during the class "constitute[d] conduct unbecoming of a professional educator and insubordination."  (McNally Decl. Ex. VV.)  Robinson told Plaintiff that his behavior had a "negative effect" on the "character and personality growth" of the students.  (*Id.*)  Robinson warned Plaintiff that the incident could "lead to further disciplinary action, including an unsatisfactory rating and charges that could lead to your termination."  (*Id.*)  Robinson and Warren observed Plaintiff's class again on May 17, 2011.  (McNally Decl. UU.)

While Robinson and Warren were reviewing the bulletin boards outside of Plaintiff's classroom, Plaintiff told the class, "It's not you, it's me they don't like!" (*Id.*) When Robinson asked him to refrain from making such comments to students, Plaintiff responded "I don't appreciate you eavesdropping," and closed the classroom door. (*Id.*) Robinson opened the door and asked Plaintiff to leave the door open because she planned to return to the classroom, but Plaintiff closed the door again. (*Id.*) Robinson later informed Plaintiff that his conduct "constitute[d] unprofessional and insubordinate behavior," and warned him that "this incident may lead to disciplinary action including an unsatisfactory rating and charges that may lead to your termination." (McNally Decl. Ex. UU.)

### e. Plaintiff's Appeal of his 2009–2010 Unsatisfactory Rating

On July 2, 2010, Plaintiff appealed his first unsatisfactory year-end performance evaluation, for the 2009–2010 school year, to the DOE's Office of Appeals and Reviews. (*Id.* ¶ 71 (citing McNally Decl. Ex. CC).) A hearing was held before Ron Gerstman, the Chancellor's Committee Chairperson, on November 12, 2010. (*Id.* ¶ 72.) Plaintiff, his union representative, Robinson, Phillips and Warren all participated in the hearing. (*Id.* ¶ 72.) In challenging his unsatisfactory rating, Plaintiff claimed that he was "continually harassed." (McNally Decl. Ex. DD at 2.) Plaintiff did not claim that he was harassed or discriminated against based on his religion or age. Gerstman recommended that Plaintiff's unsatisfactory rating for the 2009–2010 school year be sustained. The Chancellor Committee found that "[b]oth the verbal testimony and the documentation submitted" supported the evaluation. (*Id.*) The Committee concluded that "[t]here was clearly a failure to align curriculum, instruction and assessment, and [Plaintiff's] 'Unsatisfactory' teaching resulted in none of his students passing their Regents examinations." (Def. 56.1 ¶ 73 (quoting McNally Decl. Ex. DD); *see also* McNally Decl. Ex. EE.)

### f. Article 78 Proceeding

On July 7, 2011, Plaintiff commenced an Article 78 proceeding against the City, DOE, and the Chancellor in the Supreme Court of the State of New York, challenging the Chancellor's determination. (*Id.* ¶ 75 (citing McNally Decl. Ex. GG); Pl. 56.1 ¶ 75.) Plaintiff sought a declaration annulling the Chancellor's decision to uphold the 2009-2010 unsatisfactory rating "as arbitrary, capricious, unreasonable, an abuse of discretion, lacking a rational basis, in violation of lawful procedure, and in bad faith." (*Id.*) Plaintiff alleged that beginning in 2009–2010 he was "suddenly and without any genuine professional basis, targeted for firing by Principal Robinson and her assistant principals, and, in building a bogus paper trail to justify that termination, [they] issued an unbroken string of negative observation reports seeking to establish his impotence." (*Id.*) Plaintiff called the Chancellor's review of the unsatisfactory rating a "sham." (*Id.* at 4–5.) Plaintiff also referenced his 2010–2011 unsatisfactory annual rating, which he had recently received and accused Robinson of "ill-motives and bad faith," "harassment" and "assault," and a "desire to damage" him." (*Id.* at 5–6.) Plaintiff did not claim age or religious discrimination. (*See* McNally Decl. Ex. GG.)

On June 25, 2012, the Honorable Paul G. Feinman of New York Supreme Court issued a decision denying Plaintiff's Article 78 Petition and finding that Plaintiff "failed to show that the U[nsatisfactory]-rating was arbitrary and capricious or made in bad faith." (Def. 56.1 ¶ 77 (quoting McNally Decl. Ex. HH).) Judge Feinman reviewed the detailed reports of Plaintiff's classroom observations and other letters in his file and concluded that, "[t]aken together, these documents and the testimony presented at the [DOE Office of Appeals and Reviews] hearing were sufficient to support the Chancellor's Committee's determination to deny [Plaintiff's] internal appeal of his U-rating from the 2009–2010 school year." (*Id.* ¶ 78 (quoting McNally Decl. Ex. HH).) Judge Feinman also concluded that Plaintiff's "contention that the principal and

assistant principals are biased against him was 'speculative and insufficient to establish bad faith,'" and "unsupported by competent proof." (*Id.* ¶ 79 (quoting McNally Decl. Ex. HH).) Judge Feinman noted that "[t]o establish bad faith, the burden falls squarely on the petitioner to demonstrate, by competent proof, that a substantial issue of bad faith exists, and mere speculation, or bald, conclusory allegations are insufficient," and "mere personality conflicts must not be mistaken for unlawful discrimination." (McNally Decl. Ex. HH at 11 (alteration, citations and internal quotations omitted).) Plaintiff alleged in the Article 78 Petition that Robinson stated at the Office of Appeals and Reviews hearing that Plaintiff would never again receive a satisfactory rating, but Judge Feinman held that he did "not find a statement of this nature in the audio recording of the hearing or its written transcription."[5] (Def. 56.1 ¶ 80.) Judge Feinman noted that if Plaintiff was arguing that he was abused and harassed by Robinson, such allegation would have needed to be raised before the Chancellor's Committee, and that, in any event, implicit in the Chancellor Committee's "approval of the U-Rating is the determination that petitioner's allegations on this point were not credible or that it had no impact on petitioner's performance." (McNally Decl. Ex. HH at 12.)

---

[5] Plaintiff now speculates that the alleged statement was either said off the record or the DOE, as controller of the tape-recording process, modified the record. (Pl. 56.1 ¶ 80.) Plaintiff's speculation is not evidence. *Baines*, 593 F.3d at 166 ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (alteration in original) (citation omitted)); *Sanborn*, 2013 WL 4040391, at *2 ("Summary judgment cannot be defeated by mere conjecture, allegations, or speculations without hard evidence for support." (citing *D'Amico*, 132 F.3d at 149)); *Billhofer*, 2013 WL 866778, at *3 ("[T]he non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." (quoting *Morris*, 196 F.3d at 109)); *Muhammad*, 2012 WL 5617113, at *8 ("[A]llegations, unsupported by any evidence and based solely on speculation and surmise, are insufficient to withstand the motion for summary judgment.").

### g. Improvement Program

During the 2010–2011 school year Plaintiff was invited to participate in a voluntary program jointly developed by DOE and the United Federation of Teachers and designed for teachers who needed to work on improving their performance. (Def. 56.1 ¶ 115 (citing McNally Decl. Ex. RR).) The Peer Observation and Evaluation program, known as "PIP Plus," was "designed for tenured teachers who have been identified as in continuing need of assistance for significant instructional improvement, and who are in danger of 3020a charges being filed against them."[6] (*Id.*) Robinson strongly encouraged Plaintiff to participate in the program. (*Id.*) Plaintiff was warned that if he did not participate, his decision not to participate could be used against him in future proceedings. (*Id.*) Plaintiff declined to participate in the PIP Plus program. (*Id.* ¶ 116 (citing McNally Decl. Ex. RR).) According to Plaintiff, "the PIP Plus program has been used as a weapon against tenured teachers in which, upon information and belief, any teacher who has consented to be admitted into the program has been judged incompetent by the DOE-hired peer intervenors." (Pl. 56.1 ¶ 116.)

### h. Allegations of Misconduct

#### i. April 13, 2010 Incident While Covering Another Class

On April 13, 2010, Plaintiff covered a class for a teacher who was absent. (Def. 56.1 ¶ 57 (citing McNally Decl. Ex. W).) Five of the students present in the classroom were not on the class roster and were in Plaintiff's classroom because they failed to attend their assigned classes. (*Id.*) Plaintiff claims that he did not have a roster of students and did not ask for a roster

---

[6] Tenured teachers have rights guaranteed by New York State Education Law § 3020–a, which provides the exclusive method for disciplining a tenured teacher in New York State. *See Rausa v. Bd. of Educ. of N. Syracuse Cent. Sch. Dist.*, No. 11-CV-1152, 2013 WL 1943469, at *8 (N.D.N.Y. May 9, 2013) ("Under the statute, a tenured teacher is entitled to a due process hearing prior to the imposition of a . . . suspension for a fixed time without pay . . . ." (alteration in original) (citation omitted)).

of students who were assigned to the class.[7]  (*Id.* ¶ 58.)  Plaintiff instead assumed that everyone

who was in the classroom belonged in the class.  (*Id.* (citing McNally Decl. Ex. W).)  During the

April 13, 2010 class, $155 was allegedly stolen from L.G., one of the students on the class roster.

(*Id.* ¶ 59 (citing McNally Decl. Ex. W).)  L.G. suspected T.M., another student who did not

belong in the class and was not on the class roster, of being the individual who stole $155.  (*Id.*

¶ 60 (citing McNally Decl. Ex. W).)  The next day, L.G. confronted T.M., resulting in a fight.

(*Id.*)  Warren was injured in her attempt to break up the fight.  (*Id.*)

Following an investigation, Robinson determined that the incident may have been

avoided if Plaintiff had not allowed students to avoid attending their assigned classes by

attending his class, and she concluded that Plaintiff did not take appropriate action to ensure that

the students who did not belong in his class were removed from his classroom.  (*Id.* ¶ 61 (citing

McNally Decl. Ex. W).)  Robinson informed Plaintiff that "allowing scholars to cut in your

classroom is a very serious infraction," and notified Plaintiff that the incident could lead to

further disciplinary action, including "an unsatisfactory rating and charges that may lead to your

termination."[8]  (*Id.* ¶ 62 (quoting McNally Decl. Ex. W).)  Plaintiff objected to Robinson's

findings, accused the Brownsville Academy administration of a "campaign of harassment" and

stated that "they have been trying to find ways to give me a 'U' all year."  (McNally Decl.

Ex. Z.)

---

[7]  Guidance Counselor Rank had emailed the official class lists for every class to all
teachers, including Plaintiff, on March 22, 2010.  (*Id.*)

[8]  Plaintiff contested the facts of the incident and also argued that the letter containing the
findings should be removed from his file as it contained information about a prior incident that
had previously been grieved and removed from his file.  (McNally Decl. Ex. Z.)  Plaintiff agreed
to withdraw his grievance on the condition that the paragraph in the letter that referenced the
prior incident be deleted.  (Def. 56.1 ¶ 63.)  The letter was amended to remove the paragraph
referencing the prior incident.  (*Id.* ¶ 64 (citing McNally Decl. Ex. W).)

### ii. OEO Investigation Regarding Allegations of Inappropriate Racial Comments

On December 3, 2010, two students, C.G. and D.S., informed Brownsville Academy's Guidance Counselor Rank that they were upset about inappropriate racial comments they alleged were made by Plaintiff in class that day about African Americans. (Def. 56.1 ¶ 81.) Rank documented the information from the students in a letter to Robinson dated December 3, 2010 which states:

> Dear. Ms. Robinson,
> This morning C[.]G[.] and D[.]S[.] came into my office after their first period Chemistry class and were very upset. The two girls informed me that Mr. Weber had made some inappropriate racial comments about African Americans during the class. The girls said that not only were they upset but the whole class was upset as well. I asked the girls what comment was made and they stated that he had said that the lack of education was the reason why their community was in trouble. The girls also mentioned that he has made other comments in the past that had inappropriate racial undertones.
> Sincerely,
> Kevin Rank
> School Counselor

(McNally Decl. Ex. II.) On December 6, 2010, three students provided handwritten statements about the incident.[9] (*Id.*) The following day, December 7, 2010, a parent of one of the

---

[9] Student C.G. wrote in a statement that Plaintiff "likes to do gang signs to be 'down' but I feel like he wants to laugh at black people in the open without making it obvious that he feels [that] way about African Americans" and that Plaintiff told a fellow student "he could go back to 'the hood' and tell his 'homies' what he learned." (Def. 56.1 ¶ 83 (citing McNally Decl. Ex. II).) Student D.S. wrote in a second statement that, "[o]ne day we were in class and he stated how Jews get the good meat and black people get the sloppy seconds," and that "black people can't afford good quality meat and are just too cheap to buy it." She also wrote that, "about a week or two ago Mr. Weber says that it's because of us (the class) that our race (Blacks) are suffering. The reason he said this is because the class told him that we didn't understand what he was teaching." (Def. 56.1 ¶ 84 (citing McNally Decl. Ex. II).) A third student, D.B., described Plaintiff's comment as, "This is why our race is suffering because none of us are listening," and reported feeling uncomfortable and upset by the comment. (Def. 56.1 ¶ 85 (citing McNally Decl. Ex. II).)

complaining students emailed Robinson and Phillips about comments her daughter had shared

with her.  (Def. 56.1 ¶ 86 (citing McNally Decl. Ex. II).)  According to the parent, "[m]y

daughter continues to come home every other day and tells us how [Plaintiff] speaks candidly

about how he feels towards minorities and the racial categories that she and the other students

gets subjected to.  He has made references to drug contraband in order to make a connection to

the chemistry lesson in school to their assume[ed] outside lifestyle," and "[Plaintiff] insist[s] on

telling the students they live in the hood and if they reply they don't live in the hood[,] he would

sarcastically tell them they can go tell the people in their mansion." (*Id.*)  The parent requested a

meeting with Robinson, Phillips, the Parent Coordinator and Plaintiff to resolve these issues.

(*Id.*)

After receiving the parent's email, Robinson reported the complaints from the students

and the parent to DOE's Online Occurrence Reporting System.  (Def. 56.1 ¶ 87.)  As a result of

Robinson's report, the DOE Office of Employment Opportunity ("OEO") was assigned to

investigate the complaint.  (*Id.* ¶ 88.)  Approximately 10 months later, the OEO's Executive

Director notified Plaintiff by letter dated October 21, 2011, that OEO's investigation "did not

substantiate[] that [he] violated Chancellor's Regulation A-830, which outlines the Department

of Education's Non-Discrimination Policy."  (Def. 56.1 ¶ 89 (quoting McNally Decl. Ex. JJ); Pl.

56.1 ¶ 89.)

### iii.   May 26, 2011 Student Complaint

On May 26, 2011, a student complained that Plaintiff improperly left her alone in the

classroom.  (Def. 56.1 ¶ 135 (citing McNally Decl. Ex. WW).)  The student also complained

about comments Plaintiff made to her.  The student stated that, on or about May 24, 2011, "I told

[Plaintiff] I wanted to practice for the chemistry 2 Regent and so he told me that he didn't think I

was going to pass it because it was very hard.  For some reason Mr. Weber is always

downgrading me and making me feel like I can't make it.  Out of all teachers and staff members in the building he is the only person who thinks I can't do it or that I'm not smart enough."  (*Id.* ¶ 136 (quoting McNally Decl. Ex. WW).)  Brownsville Academy investigated the complaint and received statements from other students complaining about other comments made by Plaintiff.[10] (*Id.* ¶ 137 (citing McNally Decl. Ex. WW).)

On Friday, June 3, 2011, Robinson and Phillips met with Plaintiff and his union representative to discuss the students' complaints.  (Def. 56.1 ¶ 142 (citing McNally Decl. Ex. WW).)  Plaintiff stated that he "could not recall any of these incidents," but he "could [not] think of a reason why these scholars would lie about these incidents."  (*Id.*)  Robinson offered Plaintiff the remainder of the day and the following Monday to produce witnesses who could substantiate that the complaints were untrue, but Plaintiff did not provide any contrary evidence.

---

[10]  A second student wrote in a statement that: "Mr. Weber stated how if he passes everyone in the class, it would look bad for him. . . . [H]e cannot pass everyone and then when it's time to take the Regents we all fail.  He also said that if this was to occur, Ms. Robinson, Ms. Phillips, and Ms. Warren would ask him, '[H]ow come all your students passed the class but failed the Regents.'"  (Def. 56.1 ¶ 136 (quoting McNally Decl. Ex. WW).)  A third student stated: "Mr. Weber used to say in the morning that he ha[s] to teach them the way they want him to so that they won't be on his back about the work.  When I write they I mean Ms. Robinson, Ms. Phillips, Ms. Warren."  (*Id.* ¶ 138 (citing McNally Decl. Ex. WW).)  A fourth student stated that Plaintiff "stated on multiple occasions that the women downstairs, Mrs. Robinson, Mrs. Phillips & Mrs. Warren were hard on him.  He also stated that, that's what happens when he works with women.  He usually said this around grading periods.  Mr. Weber complained that the administration gave him a hard time because he had the highest passing rate."  (*Id.* ¶ 139 (quoting McNally Decl. Ex. WW).)  A fifth student stated: "Mr. Weber told me and the rest of his student[s] that the other teachers in the school stopped scholars from taking his chemistry Regents.  He said he thinks it's a conspiracy against him."  (*Id.* ¶ 140 (quoting McNally Decl. Ex. WW).)  A sixth student requested, on April 6, 2011, "a program change because of a race issue between myself and Mr. Weber."  (*Id.* ¶ 141 (quoting McNally Decl. Ex. WW).)  The student wrote: "My grades suffered and I was constantly hearing jokes about African Americans.  Being an African American, and very proud to be a part of the [illegible] I felt as though hearing things about living in projects and gang life wouldn't encourage me to do well in school and the words were an attempt to break my race down.  I would appreciate if my feeling[s] were taken into consideration."  (*Id.*)

(*Id.*)  Robinson notified Plaintiff in a June 7, 2011 letter that she had concluded that Plaintiff made several inappropriate comments to students, and that those comments constituted conduct unbecoming of a professional educator.  (*Id.* ¶ 143 (citing McNally Decl. Ex. WW).)  Robinson reminded Plaintiff that staff members serve as role models and instructed him that, "It is extremely unprofessional for you to make derogatory comments about your supervisors in our school community, especially to scholars.  You must always have high expectations for scholars and support them in attaining their goals.  It is paramount that the safety and welfare of our students is always a priority.  Further, it is discriminatory to make comments about a person's race, color, religion, creed, ethnicity, national origin, alienage, citizenship status, age, marital status, partnership status, disability, sexual orientation, gender (sex), etc. (this list is not exhaustive)."  (*Id.*)  Robinson warned Plaintiff that "these incidents may lead to further disciplinary action including an unsatisfactory rating and charges that may lead to your termination."  (*Id.*)

### iv.   May 26, 2011 Parent Complaint

On May 26, 2011, the parent of a student, Ms. C., wrote to Robinson that she had written a letter to Plaintiff requesting a change in her son's grade.  (Def. 56.1 ¶ 166 (citing McNally Decl. Ex. DDD).)  She complained that Plaintiff had not responded even though he previously stated that he would change the grade.  (*Id.*)  Ms. C. further stated that Plaintiff "didn't have any records in his grade book for [her son]" and told Ms. C. "to go to Administration."  (*Id.*)  Ms. C. wrote that Plaintiff "was yelling and screaming at me.  He blame [sic] on the administration because he stated that they keep changing his program all the time."  (*Id.*)  Robinson and Phillips met with Plaintiff and his union representative to discuss the complaint.  (*Id.* ¶ 166 (citing McNally Decl. Ex. DDD).)  Phillips asked Plaintiff whether he had the student's records and whether the student was in his class.  (*Id.* ¶ 167 (citing McNally Decl. Ex. DDD).)  Plaintiff told

Phillips that he would "have to get back to [her]." (*Id.* ¶ 167 (citing McNally Decl. Ex. DDD).) When asked whether he yelled and screamed at the parent and blamed the administration, Plaintiff did not respond. (*Id.*)

Robinson concluded that "the conduct [Plaintiff] exhibited when [he] did not have records available for [the student] when requested by the parent," which included yelling and screaming, and blaming the administration, "constitute[d] conduct unbecoming a professional educator." (*Id.* ¶ 168 (citing McNally Decl. Ex. DDD).) Robinson informed Plaintiff that he was obligated to address all parents in a professional manner and maintain good relationships with them, and that the student's records should have been available to his mother during the parent-teacher conference. (*Id.*)

### i. Plaintiff's Comments to Ramsawak

Lead Teacher Diana Ramsawak alleged that Plaintiff "raved" to her about the administration, complaining that he "did not deserve an unsatisfactory" rating, became "frustrated and angry," felt that the students were not "working hard enough" and stated that they "acted like animals." (Def. 56.1 ¶¶ 152–53 (quoting McNally Decl. Ex YY).) Ramsawak reported Plaintiff's comments to Robinson, and Robinson confronted Plaintiff with Ramsawak's report which Plaintiff denied. (*Id.* ¶ 152, 154.) Plaintiff acknowledged that he did not know of any reason why Ramsawak would have lied about Plaintiff making these statements. (*Id.* ¶ 154 (citing McNally Decl. Ex. YY).) Robinson concluded that Plaintiff had made the statements and exhibited conduct that was unbecoming of a professional educator, and reminded Plaintiff of his obligation to address staff members in a professional manner and not to discuss students in a derogatory manner. (*Id.* ¶ 155 (citing McNally Decl. Ex YY).)

### j.    Plaintiff's "Curse" of Robinson

Melissa Ingrati, Brownsville Academy's secretary, reported to Robinson that in May 2011, Plaintiff told her he was "sick of" receiving letters from Robinson, and that "If she doesn't stop harassing me, I'm going to put a curse on her.  I told my Rebbi about what they're doing to me and he even told me to curse her. . . .  I mean it, I'll do it and she'll be sorry."  (*Id.* ¶ 156 (quoting McNally Decl. Ex. ZZ).)  Robinson confronted Plaintiff about this "curse" statement. (*Id.* ¶ 152.)  Plaintiff did not recall making the statements but acknowledged that he did not know of any reason why Ingrati would have lied.  (*Id.* ¶ 157 (citing McNally Decl. Ex. ZZ).)  Robinson concluded that Plaintiff had made the statements, that they constituted conduct unbecoming of a professional educator, and warned Plaintiff that they may lead to further disciplinary action, including an unsatisfactory rating and disciplinary charges.  (*Id.* ¶ 158 (citing McNally Decl. Ex. ZZ).)  Plaintiff later admitted that he did mention putting a curse on Robinson, but asserts that he was "joking" when he made the statement.  (Def. 56.1 ¶ 159 (citing McNally Decl. Ex. AAA).)  According to Plaintiff, "We were sort of joking at about how I was always getting letters, and I said, just jokingly, that I could put a curse on her, but this is not something that any sane person would take seriously."  (*Id.*)

### k.    Plaintiff's State Division of Human Rights and EEOC Complaints

On or about November 9, 2010, Plaintiff filed a complaint alleging age and religious discrimination with the State Division of Human Rights and the United States Equal Employment Opportunity Commission ("EEOC").  (Def. 56.1 ¶¶ 104–105 (citing McNally Decl. Ex. MM); Pl. 56.1 ¶ 104–105.)  The State Division of Human Rights sent the complaint to the legal department of DOE sometime in November 2010.  (*See* Glass Decl. ¶ 3 (citing Glass Decl. Ex. 1); *see generally* Def. Reply.)  According to Defendants, Robinson first learned of the

complaint on December 22, 2010 when she received an email from Christina Graves of the DOE's Office of Legal Services. (Def. 56.1 ¶ 106 (citing McNally Decl. Ex. NN).)

On July 6, 2011, the State Division of Human Rights dismissed Plaintiff's complaint for administrative convenience after Plaintiff notified the State Division of Human Rights that he intended to pursue his complaint in federal court. (Def. 56.1 ¶ 107 (citing McNally Decl. Ex. OO); Pl. 56.1 ¶ 107.) The EEOC issued a Dismissal and Notice of Rights to Plaintiff on July 21, 2011. (Def. 56.1 ¶ 108 (citing Cmplt. Ex. A); Pl. 56.1 ¶ 108.) Plaintiff filed this action on October 19, 2011. (Dkt. Entry No. 1.)

### l. Service of 3020-a Disciplinary Charges

Plaintiff was served with 3020-a disciplinary charges in October 2011. DOE attorney Sherine Cummings signed the DOE's disciplinary charges on September 27, 2011. (*Id.* ¶ 172.) By letter dated October 3, 2011, Robinson notified Plaintiff of the charges. (*Id.* ¶ 173; Pl. 56.1 ¶ 173.) The letter and charges were served on Plaintiff by mail on October 4, 2011, and by personal service on October 5, 2011. (Def. 56.1 ¶ 173; Pl. 56.1 ¶ 173.) Plaintiff asserts that as an "ultraorthodox Jew," he was "observing the highest holy days of the year at that time (Rosh Hashanah fell on September 28, 2011, and Yom Kippur fell on October 7, 2011 that year)" when he was served with the 3020-a charges.[11] (Pl. Opp'n 10.) Plaintiff was charged with failing to properly, adequately and/or effectively plan and/or execute lessons or manage students in his charge during the 2009–2010 and 2010–2011 school years, using poor judgment and/or violating regulations and/or school policy by videotaping a lesson without proper authorization, using poor judgment and/or acting unprofessionally by making inappropriate comments, interacting

---

[11] The DOE Legal department determined the timing of when Plaintiff would be served with the charges. (Def. 56.1 ¶ 171.) According to Robinson, she was not aware of any temporal proximity between the Jewish holidays and the service of the charges on Plaintiff, nor did she have any discretion in the timing of the service. (*Id.*)

unprofessionally with a parent, leaving a student unattended, threatening to put a curse on Robinson, and failing to attend and/or accept professional development and assistance.[12]

(McNally Decl. Ex. EEE.)

### m. Plaintiff's Removal from Brownsville Academy

After the DOE served Plaintiff with 3020-a charges, Plaintiff was removed from his teaching duties at Brownsville Academy and assigned to non-classroom duties. (Def. 56.1 ¶ 179; Pl. 56.1 ¶ 179.) Shortly thereafter, DOE transferred Plaintiff from Brownsville Academy to another school. (Def. 56.1 ¶ 182.) Robinson requested Plaintiff's transfer because during the time Plaintiff was assigned to an administrative position at Brownsville Academy, he continued to make unsolicited negative comments to students about Robinson and the Assistant Principals, and Robinson believed Plaintiff's conduct was disruptive. (Def. 56.1 ¶ 182.)

---

[12] Plaintiff was charged with nine specifications. Specification 1 charged Plaintiff with failing to properly, adequately and/or effectively plan and/or execute separate lessons during the 2009–2010 and 2010–2011 school years, as observed on February 25, 2010, April 19, 2010, June 1, 2010, December 6, 2010, December 20, 2010, February 15, 2011, April 15, 2011, and June 10, 2010. (Def. 56.1 ¶ 174 (citing McNally Decl. Ex. EEE); Pl. 56.1 ¶ 174.) Specification 2 charged Plaintiff with failing to properly, adequately and/or effectively manage students in his charge during the 2009–2010 and 2010–2011 school years on April 20, 2010 and May 3, 2010. (Def. 56.1 ¶ 175 (citing McNally Decl. Ex. EEE); Pl. 56.1 ¶ 175.) Specification 3 charged Plaintiff with using poor judgment and/or violating regulations and/or school policy by photographing and/or video-taping a lesson without proper authorization on April 19, 2010. (Def. 56.1 ¶ 176 (citing McNally Decl. Ex. EEE); Pl. 56.1 ¶ 176.) Specifications 4 through 8 charged Plaintiff with using poor judgment and/or acting unprofessionally by: (4) making inappropriate comments to administration and/or exhibiting behavior unbecoming his position as a teacher on February 25, April 15, May 17, and June 15, 2011; (5) making inappropriate comments to students on April 15, May 17, and May 26, 2011; (6) failing to provide a parent with requested documentation and/or using an unprofessional tone with the parent on May 26, 2011; (7) leaving a student unattended in class on May 26, 2011; and (8) threatening to "put a curse" on Robinson on June 2, 2011. (Def. 56.1 ¶ 177 (citing McNally Decl. Ex. EEE); Pl. 56.1 ¶ 177.) Specification 9 charged Plaintiff with failing to attend and/or accept professional development and assistance meetings with supervisors and/or accept and/or heed advice, counsel, instruction, remedial professional development and/or recommendations regarding the elements of effective lesson planning/execution, classroom management, and production/maintenance of required records/documents. (Def. 56.1 ¶ 178 (citing McNally Decl. Ex. EEE); Pl. 56.1 ¶ 178.)

### n. 3020-a Opinion and Award

In February and March 2012, Plaintiff had a hearing on the 3020-a disciplinary charges before hearing officer John L. Woods, Jr. (Def. 56.1 ¶ 187; Pl. 56.1 ¶ 187.) On June 14, 2012, the hearing officer issued a 46-page Opinion and Award. (Def. 56.1 ¶ 188; Pl. 56.1 ¶ 188; *see also* 3020-a Opinion and Award.) The hearing officer reviewed the charges, testimony, documentary evidence, and arguments of the parties in detail. (Def. 56.1 ¶ 188; Pl. 56.1 ¶ 188; *see also* 3020-a Opinion and Award.) He noted that "[t]he parties were accorded full and fair hearings, including the opportunity to present evidence, examine and cross-examine witnesses and make arguments in support of their respective positions," and that "[t]he parties were represented by Counsel throughout the proceedings." (3020-a Opinion and Award 2.)

The hearing officer found Plaintiff "guilty" of failing to properly, adequately, and/or effectively plan and execute lessons during the 2009–2010 and 2010–2011 school years. With regard to these charges, the hearing officer found that the unsatisfactory observations that were conducted and the reports that were prepared on February 25, 2010, April 19, 2010, June 1, 2010, December 6, 2010, December 20, 2010, February 15, 2011, April 15, 2011, and June 10, 2011, were all "constructive" towards the goals of improving Plaintiff's performance. (Def. 56.1 ¶ 189; Pl. 56.1 ¶ 189.) The hearing officer concluded that "[b]ased on the totality of evidence" which included "[Plaintiff's] consistent failure to deliver satisfactory lessons," Plaintiff was guilty of the charges. (Def. 56.1 ¶ 189 (quoting 3020-a Opinion and Award 32–35); Pl. 56.1 ¶ 189.)

The hearing officer also found Plaintiff "guilty" of poor judgment and unprofessional behavior on April 15 and May 17, 2011. (Def. 56.1 ¶192 (citing 3020-a Opinion and Award 37–38); Pl. 56.1 ¶ 192.) The hearing officer found that Plaintiff's "comments to the administration in the presence of students, were distasteful, evidence of poor judgment, unprofessional,

undermined the administration[']s leadership authority as well as the academic environment, and more importantly, lacked any pedagogical significance."  (Def. 56.1 ¶ 192 (quoting 3020-a Opinion and Award 37–38); Pl. 56.1 ¶ 192.)

The hearing officer also found Plaintiff "guilty" of failing to attend assistance meetings or accept professional development throughout the 2009–2010 and 2010–2011 school years. (Def. 56.1 ¶ 196 (quoting 3020-a Opinion and Award 41–42); Pl. 56.1 ¶ 196.)  The hearing officer explained that "[a]s an employee that has demonstrated performance deficiencies, [Plaintiff] has forfeited the right to unilaterally select and avail himself to [sic] professional development opportunities solely of his choosing" and "does not have the option to disregard instruction made by and within the scope of his supervisor's supervisory and/or administrative authority."  (Def. 56.1 ¶ 196 (quoting 3020-a Opinion and Award 41–42); Pl. 56.1 ¶ 196.)  While recognizing Plaintiff's right to "challenge any perceived or actual injustices that he feels that he was subjected to by the administration," the hearing officer made clear that Plaintiff's decision to exercise such rights "does not absolve him of his duties and responsibilities as an employee," including "being professional, subordinate, and compliant with directives pertaining to professional development issued by his superiors at Brownsville Academy."[13]  (Def. 56.1 ¶ 196 (quoting 3020-a Opinion and Award 41–42); Pl. 56.1 ¶ 196.)

_____

[13]  The hearing officer dismissed the charges against Plaintiff for failure to effectively manage students on April 20 and May 3, 2010.  The hearing officer found that there was insufficient evidence to substantiate failures of classroom management on those dates.  (Def. 56.1 ¶ 190 (citing 3020-a Opinion and Award 35–36); Pl. 56.1 ¶ 190.)  The hearing officer found Plaintiff "not guilty" of videotaping a lesson on April 19, 2010, because Plaintiff denied taping the lesson and Phillips admitted that she never saw the actual tape of a class that was allegedly videotaped by Plaintiff.  (Def. 56.1 ¶ 191 (citing 3020-a Opinion and Award 36–37); Pl. 56.1 ¶ 191.)  The hearing officer dismissed the charges of poor judgment and unprofessional behavior by Plaintiff on February 25, 2011, for lack of evidence, and found Plaintiff "not guilty" with respect to allegations of poor judgment and unprofessional behavior by Plaintiff on June 15,

The hearing officer imposed a 60-day suspension without pay, "[i]n order to impress upon [Plaintiff] his need to immediately improve his conduct as well as his performance," followed by reinstatement, along with additional training and professional development at DOE's expense for a period of one year. (Def. 56.1 ¶ 197 (quoting 3020-a Opinion and Award 43–44); Pl. 56.1 ¶ 197.) The hearing officer characterized Plaintiff's teaching performance as "mediocre," but not incompetent, and stated that it was "important to note that although [Plaintiff] survived the Department's request to terminate his employment in this instance, continued resistance [to the full integration of the Diploma Plus teaching competencies and the overall academic goals of Brownsville Academy within his instruction] can ultimately progress to where [a termination] request will eventually be firmly supported and ultimately affirmed." (Def. 56.1 ¶ 198 (quoting 3020-a Opinion and Award 43–44); Pl. 56.1 ¶ 198.)

---

2011, because of concern that Ramsawak may have been motivated to write a complaint about Plaintiff because Plaintiff had recently complained about Ramsawak's professional development assistance. (Def. 56.1 ¶ 192 (citing 3020-a Opinion and Award 37–38); Pl. 56.1 ¶ 192.) The hearing officer also dismissed the charges of inappropriate comments to students on April 15 and May 17, 2011, finding those charges duplicative of the charges for inappropriate comments to administrators on those dates. He also dismissed allegations of inappropriate comments to a student and unprofessional tone with a parent on May 26, 2011, for "insufficient evidence," because the evidence consisted of uncorroborated written statements by individuals who were not presented as witnesses at the hearings. (Def. 56.1 ¶ 193 (citing 3020-a Opinion and Award 39); Pl. 56.1 ¶ 193.) The hearing officer dismissed the charge for leaving a student unattended in class on May 26, 2011, finding that the "uncorroborated written statement" was made by a student who was not presented as a witness, Plaintiff had not been absent from the room for an extended time, it was reasonable for Plaintiff to inquire about the whereabouts of a student who was missing from class, and the student he left alone was approximately 16–17 years old. (Def. 56.1 ¶ 194 (citing 3020-a Opinion and Award 40); Pl. 56.1 ¶ 194.) The hearing officer found Plaintiff "not guilty" regarding the allegations that he threatened to "curse" Robinson because Plaintiff "admitted that he 'jokingly' stated that he was going to 'put a curse' on Robinson," and the hearing officer concluded that it "was indeed a joke, albeit a bad joke." (Def. 56.1 ¶ 195 (quoting 3020-a Opinion and Award 40–41); Pl. 56.1 ¶ 195.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Kwong v. Bloomberg*, --- F.3d ---, ---, 2013 WL 3388446, at *4 (2d Cir. July 9, 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has "cautioned that '[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Taddeo v. L.M. Berry & Co.*, --- F.3d ---, ---, 2013 WL 1943274, at *1 (2d Cir. May 13, 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b. Religious Discrimination Claims — Title VII and NYSHRL

Plaintiff alleges that Defendants discriminated against him by treating him differently because of his religion and failing to provide him with religious accommodations. Title VII

makes it unlawful for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). An individual's "religion" includes not just religious beliefs, but "all aspects of religious observance and practice," unless the employer demonstrates that it is unable to reasonably accommodate that observance or practice "without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *see also Cosme v. Henderson*, 287 F.3d 152 (2d Cir. 2002) (stating that "Congress delineated the scope of an employer's duties . . . by defining 'religion' in a substantively significant way"); *Siddiqi v. N.Y. Health & Hospitals Corp.*, 572 F. Supp. 2d 353, 369 (S.D.N.Y. 2008) ("Courts interpret [42 U.S.C. § 2000e(j)] to mean that an employer cannot discriminate against any employee on the basis of the employee's religious beliefs unless the employer shows that he cannot reasonably accommodate the employee's religious needs without undue hardship on the conduct of the employer's business." (citations and internal quotation marks omitted)). Thus, "[a] plaintiff may claim a violation of religious discrimination under Title VII under theories of either disparate treatment or denial of reasonable accommodation." *Bind v. City of New York*, No. 08-CV-11105, 2011 WL 4542897, at *9 (S.D.N.Y. Sept. 30, 2011) (citing *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (disparate treatment) and *Cosme*, 287 F.3d at 158 (denial of reasonable accommodation)).

To establish a disparate treatment discrimination claim under Title VII, Plaintiff can either (1) "show[] that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin," or (2) "demonstrate[e] that harassment on one or more of these bases amounted to a hostile work environment." *Feingold*, 366 F.3d at 149; *see also Bind*, 2011 WL 4542897, at *9 ("A disparate

treatment claim . . . may be established by showing either (1) adverse job action under circumstances giving rise to an inference of discrimination on the basis of religion, or (2) harassment on the basis of religion that amounts to a hostile work environment." (citing *Feingold*, 366 F.3d at 149)); *see also Marmulszteyn v. Napolitano*, --- F. App'x ---, ---, 2013 WL 3021144, at *2 (2d Cir. June 19, 2013) (to make out a disparate treatment claim a plaintiff must "show that he suffered an adverse employment action" and present "evidence giving rise to an inference of discrimination" (citations omitted)).

Title VII disparate treatment religious discrimination claims are assessed using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[14] *See e.g.*, *Marmulszteyn*, --- F. App'x at ---, 2013 WL 3021144, at *2 (explaining that a "disparate-treatment claim" based on religion "is governed by the familiar burden-shifting framework set forth in *McDonnell Douglas*").  Under the framework, a plaintiff must first establish a *prima facie* case of discrimination.  *Id.*; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Ruiz v. Cnty. Of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  The plaintiff's burden at this stage is "minimal."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir.

---

[14]  The burden of proof and production for religious discrimination claims under Title VII and the NYSHRL are identical.  *Bowles v. New York City Transit Auth.*, 285 F. App'x 812, 813 (2d Cir. 2008) ("claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII" (citation omitted)); *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (analyzing the plaintiff's federal and state law religious discrimination claims together "since in other contexts we have applied federal standards of proof to discrimination claims under the state Human Rights Law"); *Yoselovsky v. Associated Press*, 917 F. Supp.2d 262, 273 n. 8 (S.D.N.Y. 2013) ("Because claims brought under the NYSHRL . . . are evaluated under the same burden-shifting standards applied to Title VII discrimination claims, each of [the plaintiff's religious discrimination] claims may be reviewed together."); *Weiss v. Dep't of Educ. of City of N.Y.*, No. 09-CV-1689, 2012 WL 1059676, at *7 n.8 (S.D.N.Y. Mar. 29, 2012) ("The same analytical framework [that governs the plaintiff's Title VII religious discrimination claim] governs discrimination cases brought under the NYSHRL." (citation omitted)).

2008) (quoting *Hicks*, 509 U.S. at 506). If the plaintiff satisfies this initial burden, the burden then shifts to the defendants to articulate a legitimate, nondiscriminatory reason for their actions. *Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. The defendants' burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509)); *see also Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 278 (S.D.N.Y. 2008) (applying the *Reeves* standard). If the defendants offer a legitimate, nondiscriminatory explanation for their action, the burden shifts back to the plaintiff to show that "the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that [his] [adverse treatment] was motivated at least in part by [religious] discrimination." *Adamczyk v. N.Y. Dep't of Corr. Servs.*, 474 F. App'x 23, 25 (2d Cir. 2012) (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 114 (2d Cir. 2007)); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013) ("An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision."). Plaintiff asserts a disparate treatment discrimination claim and a reasonable accommodation claim.

### i. Disparate Treatment Religious Discrimination Claim

#### 1. *Prima Facie* Case

To establish a *prima facie* case of religious discrimination based on disparate treatment, a plaintiff must show "that: '(1) he is a member of a protected class; (2) he was qualified for the

position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination.'" *Marmulszteyn*, --- F. App'x at ---, 2013 WL 3021144, at * 2 (quoting *Ruiz*, 609 F.3d at 492); *see also Yoselovsky v. Associated Press*, 917 F. Supp. 2d 262, 273 (S.D.N.Y. 2013) (citing *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) and *Stratton v. Dep't for the Aging*, 132 F.3d 869, 879 (2d Cir. 1997)). Plaintiff can satisfy the first three elements of his *prima facie* case.

## A. Member of Protected Class

Plaintiff asserts that he is a "Hasidic ultraorthodox Jew." (Pl. 56.1 ¶ 2.) Defendants concede that Plaintiff, as a Hasidic Jew, is a member of a protected class, satisfying the first element of his *prima facie* case. (*See* Def. Mem. 4 (Plaintiff "is a member of protected classes in the categories of age and religion").) *See also Weiss v. Dep't of Educ. of City of N.Y.*, No. 09-CV-1689, 2012 WL 1059676, at *7 (S.D.N.Y. Mar. 29, 2012) ("Being Jewish, he is a member of a protected class . . . ."); *Pesok v. Hebrew Union Coll.—Jewish Inst. of Religion*, 235 F. Supp. 2d 281, 285 (S.D.N.Y. 2002) ("As a Jew, [plaintiff] is a member of a protected class on the basis of his religion." (citing *Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985))). Therefore this element is satisfied.

## B. Adverse Employment Action

Plaintiff asserts that he suffered several adverse employment actions. Although not clearly stated in the Complaint or his opposition to the motion for summary judgment, at oral argument Plaintiff listed his alleged adverse employment actions as: (1) the unsatisfactory performance evaluations which led to the initiation of 3020-a charges, culminating in a 60-day suspension of Plaintiff; (2) the denial of time off for religious observance; (3) being disturbed at home on a Jewish holiday; and (4) the investigation by OEO of alleged biased conduct by

Plaintiff against some of his students. (Oral Arg. Tr. at 7:10–16:23.) In order to establish an adverse action, Plaintiff must demonstrate that he suffered "a materially adverse change in h[is] employment status or in the terms and conditions of his employment." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006).

Plaintiff's unsatisfactory performance evaluations which led to the initiation of 3020-a charges culminating in the suspension of Plaintiff qualify as adverse employment actions since Plaintiff suffered a "materially adverse change in the terms and conditions of employment . . . [that was] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Bowles v. N.Y.C. Transit Auth.*, 285 F. App'x 812, 814 (2d Cir. 2008) (citations and internal quotation marks omitted); *see also Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) ("While negative employment evaluation letters[] or reprimands may be considered adverse employment actions," that is not the case where there is "no proof that [the] evaluation had any effect on the terms and conditions of [the plaintiff's] employment." (citations and internal quotation marks omitted)); *Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-3582, 2012 WL 5989874, at *7 (E.D.N.Y. Nov. 30, 2012) (negative performance evaluation that triggers negative consequences to the conditions of employment is an adverse employment action); *Davis v. N.Y.C. Dep't of Educ.*, No. 10-CV-3812, 2012 WL 139255, at *6 (E.D.N.Y. Jan. 18, 2012) ("[W]here a negative performance evaluation results in an adverse change in work conditions, it may be considered an adverse employment action." (citations and internal quotation marks omitted)); *Kaur v. N.Y.C. Health & Hospitals Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) ("In the disparate treatment context, a negative performance evaluation only qualifies as an adverse employment action if there are accompanying adverse consequences affecting the terms of employment."); *Kelly v. Huntington Union Free Sch. Dist.* ("*Huntington Union*"), No. 09-CV-

2101, 2012 WL 1077677, at *16 n.21 (E.D.N.Y. Mar. 30, 2012) ("[T]he 3020–a charges are clearly an adverse employment action because the institution of disciplinary proceedings is sufficient in this circuit to constitute an adverse employment decision." (citation and internal quotation marks omitted)), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) ("[S]uspension without pay is sufficient to constitute an adverse employment action.").  Plaintiff has satisfied this element and Defendants concede that he has.  (Def. Mem. 11–12.)

Plaintiff's additional adverse employment action claims — denial of time off for a religious observance on a non-holiday, being disturbed at home during a religious holiday,[15] and the initiation of an OEO investigation, none of which resulted in any materially adverse change in the terms and conditions of Plaintiff's employment — are not adverse employment actions. *See, e.g.*, *Manessis v. New York City Dep't of Transp.*, No. 02-CV-359, 2003 WL 289969, at *13 (S.D.N.Y. Feb. 10, 2003) (finding no adverse employment action where the terms of the plaintiff's employment were not altered by an investigation of a co-worker's complaint alleging he was a racist, which complaint was ultimately dismissed); *Wallace v. Suffolk Cnty. Police Dep't*, 396 F. Supp. 2d 251, 261 (E.D.N.Y. 2005) (holding plaintiff "may not rely on the investigation, by itself, as an adverse employment action" where plaintiff did not allege that the charges were decided against him or that he "suffered any changes in the circumstances of his employment status as a result of the charges"); *Radolf v. Univ. of Conn.*, 364 F. Supp. 2d 204, 224 (D. Conn. 2005) (finding no adverse employment action where plaintiff was exonerated by

---

[15]  Plaintiff claims that a disciplinary letter was placed in his file as a result of him taking a leave of absence for this holiday.  (Weber Day 1 Tr. 125:21–25.)  First, Plaintiff has presented no evidence that a letter was placed in his file.  Second, Plaintiff has failed to show that he suffered any materially adverse change in the terms and conditions of his employment as a result of the alleged letter being placed in his file.

investigation and the accusations did not result in any discipline or "any reduction in his pay, benefits, or terms of his employment"); *Wharton v. Cnty. of Nassau*, No. 10-CV-0265, 2013 WL 4851713, at *3, *9 (E.D.N.Y. Sept. 10, 2013) (finding that denials of plaintiff's requests for time off for religious observances "do not constitute adverse employment actions for purposes of Plaintiff's Title VII discrimination claims," because "[d]enials of vacation time are not adverse actions" (collecting cases)); *Kaur*, 688 F. Supp. 2d at 332 ("denial of vacation time . . . do[es] not rise to the level of an adverse employment action"); *Dawson v. Cnty. of Westchester*, 274 F. Supp. 2d 364, 372, 377–78 (S.D.N.Y. 2003) (multiple telephone calls to plaintiffs on leave, even if excessive, "do not constitute adverse employment actions based on the very obvious fact that nothing adverse happened with respect to plaintiffs' employment"), *aff'd in relevant part, vacated in part, remanded*, 373 F.3d 265 (2d Cir. 2004).

### C.    Qualification for the Position

Although Defendants argue otherwise, Plaintiff is qualified for the position and satisfies this element.  "To show 'qualification' sufficiently to shift the burden . . . to the employer, the plaintiff need not show perfect performance or even average performance." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001).  "Instead, she need only make the minimal showing that *she possesses the basic skills necessary for performance of [the] job.*"  *Id.* (alteration in original) (citation and internal quotation marks omitted); *see also Kaboggozamusoke v. Rye Town Hilton Hotel*, 370 F. App'x 246, 248 n.1 (2d Cir. 2010) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue." (alteration in original) (citation omitted)); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("As we have repeatedly held, the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he possesses the basic skills necessary for performance of the job.  As a result, especially where discharge is at issue and the

33

employer has already hired the employee, the inference of minimal qualification is not difficult to draw." (alteration, citations and internal quotation marks omitted)); *Hird-Moorhouse v. Belgian Mission to United Nations*, No. 03-CV-9688, 2010 WL 3910742, at *4 (S.D.N.Y. Oct. 5, 2010) ("Plaintiff need show only that he 'possesses the basic skills necessary for performance of [the] job.'" (quoting *Slattery*, 248 F.3d at 92 (alteration in original)). However, a trail of negative performance reviews can serve as evidence that a plaintiff is not qualified for his position. *See, e.g.*, *Grant v. Rochester City Sch. Dist.*, No. 10-CV-6384, 2013 WL 3105536, at *5 (W.D.N.Y. June 18, 2013) (finding negative mid-year report and year-end evaluation to be evidence of Plaintiff's lack of qualification); *Bailey v. Frederick Goldman, Inc.*, No. 02-CV-2429, 2006 WL 738435, at *4 (S.D.N.Y. Mar. 23, 2006) (finding trail of performance reviews and improvement plans that documented plaintiff's deteriorating performance to be evidence of plaintiff's lack of qualification).

Here, Plaintiff received several unsatisfactory performance evaluations during the 2009–2010 and 2010–2011 school years, and Defendants sought his termination in part because of these evaluations. (*See generally* 3020-a Opinion and Award.) However, after a 3020-a hearing, the hearing officer declined to terminate Plaintiff. (*Id.* at 43.) The hearing officer concluded that DOE's assessment of Plaintiff's performance as "mediocre" was accurate but determined that being "mediocre is not incompetent."[16] (*Id.*) Based on the evidence before this Court —

---

[16] The Court is bound by the findings made at the Section 3020-a hearing. *See Hunt v. Klein*, 476 F. App'x 889, 891 (2d Cir. 2012) ("[T]he 'Section 3020–a hearing is an administrative adjudication that must be given preclusive effect' by federal courts." (quoting *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 308 (2d Cir. 2005))); *Burkybile*, 411 F.3d at 308 ("[A] Section 3020–a hearing is a quasi-judicial administrative action whose findings are entitled to preclusive effect . . . ."); *Page v. Liberty Cent. Sch. Dist.*, 679 F. Supp. 2d 448, 452 (S.D.N.Y. 2010) ("The Second Circuit has held that the findings reached through Section 3020–a hearings, which are 'quasi-judicial administrative

Plaintiff's satisfactory reviews from 2005 through 2009 and the hearing officer's determination — Plaintiff has met his burden of demonstrating that although his work was mediocre, he was qualified for the position.

### D. Inference of Religious Discrimination

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 04-CV-1707, 2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006). An inference of discrimination can be drawn from circumstances such as "the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position"; "the employer's criticism of the plaintiff's performance in ethnically degrading terms"; "its invidious comments about others in the employee's protected group"; "the more favorable treatment of employees not in the protected group"; or "the sequence of events leading to the plaintiff's discharge." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). However, a plaintiff's own subjective belief that he was discriminated against because of his religion is insufficient to sustain a religious discrimination claim. *See Saqib v. Stein deVisser & Mintz, PC*, --- Fed. App'x ---, ---, 2010 WL 2382253, at *1 (2d Cir. June 15, 2010) (holding that in order "[t]o defeat summary judgment" on plaintiff's claim for religion, race, color, and national origin discrimination plaintiff "may not rely on conclusory allegations or

_____

actions, are entitled to preclusive effect.'" (quoting *Burkybile*, 411 F.3d at 308 (alteration omitted))).

unsubstantiated speculation"); *Boyar v. City of New York*, No. 10-CV-65, 2010 WL 4345737, at

*4 (S.D.N.Y. Oct. 28, 2010) (finding that "[w]hile [plaintiff] states his belief that his [Jewish]

religion played a role in these decisions, personal belief is insufficient to defeat defendants'

summary judgment motion" on plaintiff's discrimination claim (citation and internal quotation

marks omitted)); *Sicular v. N.Y.C. Dep't of Homeless Servs.*, No. 09-CV-0981, 2010 WL

423013, at *19 (S.D.N.Y. Feb. 4, 2010) ("[The plaintiff's] personal belief . . . that his being

Jewish played into the prejudices of the individual defendants and reinforced their animosity

against him is insufficient to defeat defendants' summary judgment motion."), *report and*

*recommendation adopted*, No. 09-CV-0981, 2010 WL 2179962 (S.D.N.Y. May 28, 2010), *aff'd*,

455 Fed. App'x 129 (2d Cir. 2012); *see also Meiri*, 759 F.2d at 998 (holding that "conclusory

allegations of [religious] discrimination are insufficient" to defeat summary judgment, and "[t]o

allow a party to defeat a motion for summary judgment by offering purely conclusory allegations

of [religious] discrimination, absent any concrete particulars, would necessitate a trial in all Title

VII cases").

Plaintiff alleges that Defendants took certain actions against him and knew of certain

remarks that were made about his religion which they did not address, all of which demonstrate

that the adverse employment actions occurred under circumstances which give rise to an

inference of discrimination.  The actions and comments Plaintiff alleges give rise to an inference

of discrimination include: (1) the campaign by DOE administrator to paint him as angry and

racially prejudiced against the African-American students; (2) accusing him of putting a "curse"

on Robinson; (3) failure to accommodate his request for time off to bake matzahs; (4) calling

Plaintiff at home on a Jewish holiday; (5) serving Plaintiff with 3020-a charges between Jewish

holidays; (6) denying Plaintiff kosher food at school meetings; (7) a co-worker's continued reference to items as being "kosher"; and (8) Robinson's failure to hire other Jewish teachers.[17]

Assuming, without deciding, that Plaintiff can show an inference of discrimination, Plaintiff's religious discrimination claim nevertheless fails because Plaintiff cannot show that Defendants' legitimate, nondiscriminatory explanation for Defendants' unsatisfactory ratings or the 3020-a charges which resulted in the 60-day suspension of Plaintiff is pretextual and the actions taken with regard to Plaintiff were motivated at least in part by religious discrimination.

### 2. Non-Discriminatory Explanation

Defendants have articulated a legitimate, non-discriminatory reason for the unsatisfactory performance ratings and the 3020-a charges which resulted in the 60-day suspension of Plaintiff. *See Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 42 (2d Cir. 2012) ("If a plaintiff successfully establishes a prima facie case of discrimination, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action." (citation and internal quotation marks omitted)). Defendants have presented evidence that the unsatisfactory ratings and the 3020-a charges which resulted in the 60-day suspension of Plaintiff were a result of Plaintiff's unsatisfactory teaching performance, lack of receptivity to constructive criticism and professional development opportunities, and unprofessional conduct towards students. (3020-a Opinion and Award 32–35, 37–38, 41–42.) *See Gregory*, 243 F.3d at 696 ("An employer's dissatisfaction with even a qualified employee's performance may, of

---

[17]    At oral argument Plaintiff also argued that an inference of discrimination was raised by the fact that Plaintiff was criticized for his failure to properly use a Jeopardy-style game with his class. In the performance evaluation of the relevant class, Plaintiff was commended for working to infuse more technology into his classroom by using the Jeopardy game; however, Plaintiff was criticized because the game resulted in confusion since Plaintiff accepted students' incorrect answers to the questions as correct and did not explain the rules of the game to the students or make his expectations clear. (McNally Decl. Ex. V.)

course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action."); *see also Viola v. Philips Med. Sys. of N.A.*, 42 F.3d 712, 718 (2d Cir. 1994) (explaining that an employee's disagreement with an employer's negative performance evaluation is not enough to support a discrimination claim); *Yoselovsky*, 917 F. Supp. 2d at 275–76 (finding that the plaintiff's failure to improve to an acceptable level was sufficient to meet the defendant's burden); *E.E.O.C. v. Town of Huntington*, No. 05-CV-4559, 2008 WL 361136, at *7 (E.D.N.Y. Feb. 8, 2008) ("Because poor job performance constitutes a legitimate, nondiscriminatory reason, [d]efendants have satisfied their burden of production."). Defendants have met their burden.

### 3. Pretext

To avoid summary judgment, Plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that religious discrimination played a role in the adverse actions taken against Plaintiff. *See Israel v. Napolitano*, No. 08-CV-1112, 2010 WL 3338638, at *3 (N.D.N.Y. Aug. 24, 2010) ("[T]o avoid summary judgment, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." (citation and internal quotation marks omitted)); *Sulehria v. City of New York*, 670 F. Supp. 2d 288, 305 (S.D.N.Y. 2009) ("To prevail on a Title VII claim for disparate treatment based on . . . religion, plaintiff must demonstrate that he was subjected to an adverse employment action and that his . . . religion was a motivating factor in the action."); *Goldschmidt v. New York State Affordable Hous. Corp.*, 380 F. Supp. 2d 303, 313 (S.D.N.Y. 2005) ("The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason."); *see also Nassar*, 570 U.S. at ---, 133 S. Ct. at 2522–23 ("An

employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision."); *Staub v. Proctor Hosp.*, 562 U.S. ---, ---, 131 S. Ct. 1186, 1191 (2011) ("Title VII . . . prohibits employment discrimination 'because of . . . race, color, religion, sex, or national origin' and states that such discrimination is established when one of those factors 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'" (citing 42 U.S.C. §§ 2000e–2(a), (m))).

Plaintiff argues that the unsatisfactory ratings and the 3020-a hearing which resulted in his 60-day suspension without pay were pretext for religious animus because "Plaintiff never received an unsatisfactory annual rating at [Brownsville Academy] before Principal Robinson arrived at the school," (Pl. Opp'n 11), implying personal bias on the part of Robinson.[18] However, in denying Plaintiff's Article 78 petition which challenged the first unsatisfactory year-end performance evaluation, Judge Feinman found that Plaintiff's "contention that the principal and assistant principals are biased against him was 'speculative and insufficient to establish bad faith,'" and "unsupported by competent proof," (McNally Decl. Ex. HH). This finding undermines Plaintiff's argument that the legitimate reason proffered by Defendants is a mere pretext for *any* discrimination, let alone religious discrimination.[19]

---

[18]  Based on the evidence in the record, Plaintiff and Robinson both began working at Brownsville Academy at or around the same time, in the fall of 2005, although Robinson did not become principal until the 2008–2009 school year.

[19]  To the extent Plaintiff's argument that Robinson is the source of Plaintiff's poor reviews can be read to suggest that the years of negative performance evaluations were created by Robinson or Defendants to establish a false record to camouflage discriminatory animus, this argument is unsupported by the evidence. The evidence demonstrates that Plaintiff's performance at Brownsville Academy was characterized by many unsatisfactory performance evaluations, insubordination and misconduct. In *Yoselovsky*, a plaintiff made a similar argument

Moreover, at the 3020-a hearing where the hearing officer evaluated the allegations of poor performance against Plaintiff in detail, the hearing officer found Plaintiff guilty of failing to properly, adequately, and effectively plan and execute lessons during the 2009–2010 and 2010–2011 school years and he concluded that Plaintiff "consistent[ly] fail[ed] to deliver satisfactory lessons." (3020-a Opinion and Award 32–35.) The hearing officer also found Plaintiff guilty of poor judgment and unprofessional behavior on multiple occasions, finding that his "comments to the administration in the presence of students, were distasteful, evidence of poor judgment, unprofessional, undermined the administration[']s leadership authority as well as the academic environment, and more importantly, lacked any pedagogical significance." (*Id.* at 37–38.) The hearing officer also found that Plaintiff failed to attend or accept professional development or assistance meetings throughout the 2009–2010 and 2010–2011 school years, (*id.* at 41–42), and concluded that Plaintiff's teaching performance was mediocre, (*id.* at 43). Plaintiff argues that

---

in support of pretext. *See Yoselovsky*, 917 F. Supp. 2d at 282–83. Yoselovsky, an Orthodox Jew, sued his former employer the Associated Press ("AP") under Title VII, the NYSHRL and NYCHRL, alleging that the AP terminated him because he requested time off to observe the weekly Jewish Sabbath and other religious holidays. *Id.* at 265. AP presented evidence that Yoselovsky was terminated because his job performance had fallen below his managers' expectations. *Id.* at 275–76. The court found that Yoselovsky had "*no . . . supporting evidence*," for his claim that after he took time off time for religious holidays his supervisors started creating a record to rationalize his termination, and the court found that his argument was based "solely on his theory" that there "may be something suspicious in the timing between when he took off work for religious holidays and when the AP's allegedly discriminatory actions arose." *Id.* at 282. The court concluded that "[w]ithout any additional evidence of some invidious desire to falsify his employment reviews . . . the argument is wholly speculative." *Id.* (citing *Schupbach v. Shinseki*, No. 09-CV-3513, 2012 WL 3638791, at *13 (E.D.N.Y. Aug. 23, 2012) ("A plaintiff cannot simply substitute utter speculation for the competent proof that would be necessary to permit rational inferences by a jury of discrimination or retaliation.")). In addition, Plaintiff's supervisors repeatedly met with Plaintiff to review the various problems with his teaching performance and to make suggestions about how to improve. *See Yoselovsky*, 917 F. Supp. 2d at 283 (noting that "[t]he fact that [plaintiff's managers] spent time in their emails detailing specific problems with [plaintiff's] work and offered to help him improve dispels any claim that he was given negative reviews only out of some preconceived design by the AP to create a false record so that it could eventually terminate him because of his [protected status].")

because the hearing officer dismissed some of the charges against him and did not terminate his employment as requested by DOE, the hearing officer's decision supports his claim that Defendants' actions were pretext. (Pl. Opp'n 5–6.) Contrary to Plaintiff's claim, the hearing officer's decision underscores the fact that Plaintiff's claim of pretext is without merit. The hearing officer found numerous teaching failures on Plaintiff's part warranting a 60-day suspension without pay.

Defendants repeatedly met with Plaintiff, commended him on his strengths, noted areas in need of improvement, and offered assistance to help Plaintiff achieve satisfactory performance ratings, further undermining Plaintiff's argument that Defendants' actions were pretext. (*See, e.g.*, McNally Decl. Exs. P, Q, R, S, V, BB, KK, LL, PP, QQ, SS, TT, UU, XX, CCC.) For example, Plaintiff was commended for his "good rapport" with his students, (McNally Decl. Ex Q), his neat and well decorated classroom, (McNally Decl. Ex. S), his efforts to infuse technology into his curriculum, (McNally Decl. Exs. V, LL), and his "real world" examples during lessons, (McNally Decl. Ex. LL). Defendants offered specific suggestions to Plaintiff to address areas in need of improvement, such as Plaintiff's need to "encourag[e] scholars to reflect on the concept of the day," "include a wrap up of the lesson," "check for understanding by asking probing questions, observing and reviewing scholars work, and [then] make changes as necessary to ensure that teaching and learning is taking place," having the students "share out by having them transcribe their work on to the chalkboard, present their answers to the class and have their peers review and comment on their work," "involve your scholars by having them organize, distribute, and collect the lab materials," "provide scholars with clear, explicit directions," and "utilize academic language." (McNally Decl. Exs. V (emphasis omitted), KK; *see also* McNally Decl. Exs. LL, QQ, SS, UU, XX.) Some of the support offered to Plaintiff to

achieve his goals included pre- and post-observation sessions with Phillips, Robinson and

Warren, (*see, e.g.*, McNally Decl. Exs. S, V, KK, LL, QQ, SS, XX), sessions with the Lead

Teacher Ramsawak, meetings with Phillips to explore online resources, opportunities to view

other teachers utilizing best practices, (McNally Decl. Ex. QQ), weekly professional

development sessions, (McNally Decl. Ex. XX), and participation in the PIP Plus program,

(McNally Decl. Ex. RR).  Despite Defendants' efforts, during the 2009–2010 and 2010–2011

school years, Plaintiff continued to exhibit poor performance, poor judgment, unprofessional

behavior and an unwillingness to accept professional development.  (*See* 3020-a Opinion and

Award 32–35, 37–38, 41–42.)

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that no

reasonable jury could conclude that religious discrimination played *any* role in Plaintiff's

unsatisfactory performance evaluations or the initiation of 3020-a charges, which charges

resulted in the suspension of Plaintiff for 60-days without pay.  Plaintiff has failed to meet his

burden to prove that Defendants' justification for Plaintiff's unsatisfactory ratings and the 3020-a

charges which resulted in the 60-day suspension of Plaintiff without pay were pretextual for

religious discrimination.  Plaintiff's claims of religious discrimination based on disparate

treatment pursuant to Title VII and NYSHRL are without merit and are dismissed.  *Nassar*, 570

U.S. at ---, 133 S. Ct. at 2522–23; *see also Gumbiner v. Williams-Sonoma, Inc.*, No. 05-CV-

2569, 2006 WL 870445, at *7 (S.D.N.Y. Mar. 30, 2006) ("Plaintiff has not provided any

evidence to rebut the assertion that Ms. Murtha recommended Plaintiff's termination because of

unacceptable job performance." (citing *Garvin v. Potter*, 367 F. Supp. 2d 548, 565–66 (S.D.N.Y.

2005))); *Garvin*, 367 F. Supp. 2d at 565–66 ("Each of the disciplines was for a reason, such as

failure to follow instructions, that was unrelated to the failure to work on Saturdays or Jewish

holidays. . . . The plaintiff's suspicions of [religious] discrimination in the absence of any

supporting evidence cannot defeat a motion for summary judgment.").

### ii. Reasonable Accommodation Religious Discrimination Claim

#### 1. *Prima Facie* Case

To establish a *prima facie* case of religious discrimination based on failure to

accommodate, a plaintiff must prove that: "(1) he or she has a bona fide religious belief that

conflicts with an employment requirement; (2) he or she informed the employer of this belief;

[and] (3) he or she was disciplined for failure to comply with the conflicting employment

requirement." *Bowles*, 285 F. App'x at 813 (citations and internal quotation marks omitted); *see*

*also Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006); *Muktadir v. Bevacco Inc.*, No. 12-

CV-2184, 2013 WL 4095411, at *2 (E.D.N.Y. Aug. 13, 2013); *Chukwueze v. NYCERS*, 891 F.

Supp. 2d 443, 453 (S.D.N.Y. 2012).

To satisfy the first element, "whether a plaintiff has a 'bona fide religious belief,' the

Court's analysis is limited to whether the beliefs professed by the plaintiff are sincerely held and

whether they are, in his own scheme of things, religious." *Hickey v. State Univ. of N.Y. at Stony*

*Brook Hosp.*, No. 10-CV-1282, 2012 WL 3064170, at *6 (E.D.N.Y. July 27, 2012) (alteration,

citation and internal quotation marks omitted); *see also Bowles v. N.Y.C. Transit Auth.*, No. 00-

CV-4213, 2006 WL 1418602, at *9 n.18 (S.D.N.Y. May 23, 2006) (same), *aff'd*, 285 F. App'x

812; *Eatman v. United Parcel Serv.*, 194 F. Supp. 2d 256, 268 (S.D.N.Y. 2002) (same).

"To satisfy the second element, a plaintiff must properly notify the employer of the

plaintiff's conflicting religious belief." *Hickey*, 2012 WL 3064170, at *7; *Massie v. Ikon Office*

*Solutions, Inc.*, 381 F. Supp. 2d 91, 100 (N.D.N.Y. 2005) (collecting cases). Knowledge that an

employee has strong religious beliefs does not place an employer on notice that the employee

might engage in any religious activity. *See Knight v. Conn. Dep't of Public Health*, 275 F.3d

156, 167 (2d Cir. 2001) (holding that an employer's knowledge that employees had particular religious beliefs was insufficient to put their employers on notice of their need to engage in particular religious activity because "[t]o hold otherwise would place a heavy burden on employers, making them responsible for being aware of every aspect of every employees' religion which could require an accommodation" (citing *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1020 (4th Cir. 1996) ("Knowledge that an employee has strong religious beliefs does not place an employer on notice that she might engage in any religious activity . . . ."))); *Hickey*, 2012 WL 3064170, at *7 ("[T]he Court recognizes that knowledge that an employee has strong religious beliefs does not place an employer on notice that he might engage in any religious activity . . . ." (alteration, citation and internal quotation marks omitted)); *Massie*, 381 F. Supp. 2d at 99 (same).

To satisfy the third element, a plaintiff must show that he suffered an adverse employment action for failing to comply with the employment requirement that conflicted with his religious belief. *See Edwards v. Elmhurst Hosp. Ctr.*, No. 11-CV-4693, 2013 WL 839535, at *4 (E.D.N.Y. Feb. 15, 2013) ("The third prong requires some adverse employment action — typically, discipline, demotion, transfer or termination — for refusing to comply with the conflicting employment requirement." (alterations and citation omitted)), *report and recommendation adopted*, No. 11-CV-4693, 2013 WL 828667 (E.D.N.Y. Mar. 6, 2013).

If the employee establishes a *prima facie* case, "the employer must offer him or her a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." *Baker*, 445 F.3d at 546 (alteration, citation and internal quotation marks omitted). "[T]o avoid Title VII liability, the employer need not offer the accommodation the employee prefers. Instead, when any reasonable accommodation is provided, the statutory inquiry ends."

*Cosme*, 287 F.3d at 158; *see also Baker*, 445 F.3d at 548 ("We do note that employees are not entitled to hold out for the most beneficial accommodation." (citation and internal quotations omitted)); *Vallejo v. Four Seasons Solar Products, Inc.*, No. 07-CV-2991, 2011 WL 1153812, at *6 (E.D.N.Y. Mar. 28, 2011) (holding that the employer need not offer the accommodation the employee prefers).

Defendants were aware that Plaintiff is an observant Hasidic ultraorthodox Jew and observes Jewish holidays and kosher dietary restrictions. Because Plaintiff cannot demonstrate that his religious belief or practice conflicted with any employment requirement or that he was disciplined for failing to comply with any conflicting employment requirement, Plaintiff cannot establish religious discrimination based on a failure to accommodate.

### A.    Conflict with Employment Requirement

Plaintiff has failed to identify any employment requirement that has conflicted with his religious beliefs or practice. Plaintiff asserts that Defendants have failed to accommodate his religious practice by denying him kosher food at school meetings, denying his request for time off to bake matzahs for a religious holiday in 2010, and calling Plaintiff at home on a Sukkot holiday in 2010. (Pl. Opp'n 9–10; Weber Day 1 Tr. 125:21–23.)

Plaintiff was never prevented through any action or policy of Defendants from complying with his religious dietary restrictions. Plaintiff could, and the record demonstrates that Plaintiff did, purchase kosher food for himself. Defendants accommodated Plaintiff's dietary restrictions by reimbursing Plaintiff for his purchase of kosher food. Plaintiff complains that while he was sometimes reimbursed for purchasing his own kosher meals, on one occasion he was not. (Pl. Opp'n 10; Weber Day 1 Tr. 176:21–25.) However, at no time was Plaintiff prevented from complying with his religious dietary restrictions. Plaintiff has not shown that the denial of

45

kosher food or the denial of reimbursement on one occasion conflicts with any employment requirement.

Plaintiff complains that he was denied permission to take off a day to bake matzahs for Passover in 2010. (Pl. Opp'n 9; Weber Day 1 Tr. 130:15–131:17.) Plaintiff was not required to work on Jewish holidays and Plaintiff admits that every request to take off a Jewish holiday where he was not permitted to work by Jewish law was accommodated by Defendants. (Weber Day 1 Tr. 130:15–19, 131:13–17.) Plaintiff admits that although the day he sought to take off to bake matzahs was "important to [him]," it was not a Jewish holiday and he was not prevented from working because of his religious beliefs. (*Id.* at 131:13–17.) Plaintiff does not assert that he needed to take the day off because of a "bona fide" religious belief. Plaintiff therefore cannot show that denying him the day off to bake matzahs was a conflict with his religious beliefs or practice. *See Leifer v. New York State Div. of Parole*, 391 F. App'x 32, 34 (2d Cir. 2010) (allowing Jewish employee to miss work obligations "on account of the Jewish holidays . . . satisf[ied] the requirement that [defendant] provide reasonable accommodations for religious observances").

Plaintiff complains that as a result of Defendants not knowing that Plaintiff was off for the Sukkot holiday, he was disturbed at home. (Pl. Opp'n 9; Weber Day 1 Tr. 125:11–126:26.) Plaintiff was called at home on the Sukkot holiday in 2010 because Defendants did not have a record that Plaintiff would be taking the day off. (Weber Day 1 Tr. 126:6, 21–25.) Plaintiff does not identify any employment requirement that conflicted with the exercise of his religious beliefs and practice to take off from work for this holiday. The fact that Plaintiff was required to provide Defendants with notice in advance of taking the day off is not in conflict with Plaintiff's religious beliefs. *See Douglas v. Eastman Kodak Co.*, 373 F. Supp. 2d 218, 224 (W.D.N.Y.

2005) (holding that requiring plaintiff to comply with vacation notice call-in policy, where plaintiff took off Fridays to observe his Sabbath and plaintiff's supervisor knew he would not be coming in, was insufficient evidence of discrimination and did not make the accommodation unreasonable, and noting that "[n]othing about plaintiff's religious beliefs prevented him from adhering to the 24-hour advance vacation notice policy").

## B. Lack of Discipline

Plaintiff cannot make out a religious discrimination case based on failure of Defendants to accommodate any requests because Plaintiff cannot show that he was disciplined for failure to comply with any alleged conflicting employment requirement. *See Garvin*, 367 F. Supp. 2d at 566 (finding that where a Jewish plaintiff was not required to work on Saturdays or Jewish holidays and had provided no evidence of any disciplinary measures taken against him related to his failure to work on such days, plaintiff had "not established a prima facie case that the defendant failed to accommodate his religious beliefs in violation of Title VII"); *Reznick v. Aramark Corp.*, No. 97-CV-18977, 1999 WL 287724, at *11 (E.D.N.Y. May 5, 1999) (finding that where an Orthodox Jewish plaintiff worked on the Sabbath voluntarily, was permitted to take off work to observe Jewish holidays whenever she requested, had not suffered any adverse actions for taking those days off, and had not linked her observance of the Sabbath to any discipline, plaintiff had "failed to establish a prima facie case of religious discrimination"); *see also Guy v. MTA New York City Transit*, No. 10-CV-1998, 2012 WL 4472112, at *8 (E.D.N.Y. Aug. 6, 2012) (finding that "it is a reasonable accommodation of an employee's observance of the Sabbath for an employer to require the employee to use his or her vacation days or to take unpaid leave" as the provision of unpaid leave eliminates the conflict between employment

requirements and religious practices), *report and recommendation adopted*, No. 10-CV-1998, 2012 WL 4472098 (E.D.N.Y. Sept. 26, 2012).

Plaintiff has not shown that denying him kosher food, denying him time off to bake matzahs, or calling him at home on Sukkot resulted in any discipline for failure to comply with any conflicting employment requirement. The only alleged disciplinary action was a letter to Plaintiff's file after Plaintiff took the day off for Sukkot and Defendants advised him that they did not have a record of any request to be absent for the day. (*See* Weber Day 1 Tr. 126:21–25.) Plaintiff has not presented any evidence that he received a letter in his file because he took the day off for the Sukkot holiday. In addition, even assuming a letter was placed in Plaintiff's file, Plaintiff has not shown that the alleged note in his file resulted in any adverse action and the note is therefore insufficient to show that he was disciplined for the purposes of satisfying the elements of a reasonable accommodation discrimination claim. *See Leifer*, 391 F. App'x at 33–34 ("[The plaintiff's] claim of discrimination based upon defendants' failure to accommodate his religious practices fails because there is insufficient evidence showing that [the plaintiff] suffered an adverse employment action." (citations omitted)); *Baker*, 445 F.3d at 546 (stating that plaintiffs who allege discrimination for failure to accommodate must show, *inter alia,* that they suffered an adverse employment action for failure to comply with the employment requirement that conflicted with their religious belief); *Gueye v. Gutierrez*, 277 F. App'x 70, 71 (2d Cir. 2008) ("We agree with the District Court that [the plaintiff] did not assert a prima facie claim for religious discrimination because he did not allege that he was disciplined for failing to comply with an employment demand that conflicted with his religious beliefs."); *Farina*, 458 F. App'x at 17 (finding that "[w]hile negative employment evaluation letters[] or reprimands may be considered adverse employment actions" for purposes of an employment discrimination claim,

that is not the case "[w]here there is no proof that [the] evaluation had any effect on the terms and conditions of [the plaintiff's] employment" (citations and internal quotation marks omitted)); *see also Taylor*, 2012 WL 5989874, at *7 (noting that to qualify as an adverse employment action, a negative performance evaluation "must trigger negative consequences to the conditions of employment"); *Davis*, 2012 WL 139255, at *6 ("As a matter of law, an 'unsatisfactory' performance evaluation alone does not amount to an adverse employment action because such an evaluation does not constitute a material change in employment. . . . On the other hand, where a negative performance evaluation results in an adverse change in work conditions, it may be considered an adverse employment action." (citations and internal quotation marks omitted)). Plaintiff cannot sustain a religious discrimination claim based on failure to accommodate. Plaintiff's claims of religious discrimination based on a failure to accommodate pursuant to Title VII and NYSHRL are dismissed.

### c. Religious Discrimination Claims — NYCHRL

The NYCHRL does not differentiate between discrimination and hostile work environment claims; rather, both are governed by N.Y.C. Admin. Code § 8–107(1)(a). *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims."), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (per curiam). The NYCHRL provides that it is unlawful for an employer "to refuse to hire or employ or to bar or to discharge from employment" an individual or "to discriminate against such person in compensation or in terms, conditions or privileges of employment" "because of the actual or perceived . . creed . . of any person." N.Y.C. Admin. Code § 8–107(1)(a). The NYCHRL further provides that it is unlawful for an employer "to impose upon a person as a condition of . . . retaining employment any terms or conditions, compliance with which would require such person to violate, or forego a practice

of, his or her creed or religion." N.Y.C. Admin. Code § 8–107(3). Though for many years the Second Circuit "construed the NYCHRL to be coextensive with its federal and state counterparts," the New York City Council amended the NYCHRL in 2005 and "[a]s amended, the NYCHRL requires an independent analysis." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108–09 (2d Cir. 2013). The NYCHRL requires that "its provisions 'be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws . . . have been so construed.'" *Id.* at 109 (quoting N.Y.C. Admin. Code § 8–130); *see also Russo v. N.Y. Presbyterian Hosp.*, --- F. Supp. 2d ---, ---, 2013 WL 5346427, at *14 (E.D.N.Y. Sept. 23, 2013) (same); *Kerman-Mastour v. Fin. Indus. Regulatory Auth., Inc.*, 814 F. Supp. 2d 355, 365–66 (S.D.N.Y. 2011) ("[T]he Second Circuit has directed the district courts to conduct an analysis of the NYCHRL claims that is separate from that undertaken for Title VII and New York State Human Rights Law claims." (citing *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278–79 (2d Cir. 2009))).

"To establish a . . . discrimination claim under the NYCHRL, the plaintiff need only demonstrate by a preponderance of the evidence that []he has been treated less well than other employees because of [his protected status]." *Mihalik*, 715 F.3d at 110; *see also Russo*, --- F. Supp. 2d at ---, 2013 WL 5346427, at *15 ("Under the NYCHRL, a plaintiff need . . only [establish] that []he has been treated less well than other employees because of [his protected status]." (citation and internal quotation marks omitted)); *Teasdale v. City of New York*, No. 08-CV-1684, 2013 WL 5300699, at *12 (E.D.N.Y. Sept. 18, 2013) ("To prevail on a disparate treatment claim under the NYCHRL, the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." (citation and internal quotation marks

omitted)); *E.E.O.C. v. Bloomberg L.P.* ("*Bloomberg*"), No. 07-CV-8383, 2013 WL 4799161, at *8 (S.D.N.Y. Sept. 9, 2013) ("[T]he NYCHRL has simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well than other similarly situated employees, at least in part for discriminatory reasons." (alteration, citation and internal quotation marks omitted)); *Gelin v. City of New York*, No. 10-CV-5592, 2013 WL 2298979, at *12 (E.D.N.Y. May 24, 2013) (holding that to establish a claim of discrimination under the NYCHRL a plaintiff "must show that she has been treated less well at least in part *because of* her [race, color, or] gender." (alteration in original) (citation and internal quotation marks omitted)); *Clarke v. InterCont'l Hotels Grp., PLC*, No. 12-CV-2671, 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) ("In *Mihalik,* the Second Circuit . . . held that, to establish a discrimination claim under the NYCHRL, the plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her protected status." (alterations, citation and internal quotation marks omitted)).  An employer "may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played *no* role in its actions."  *Mihalik*, 715 F.3d at 110 n.8 (alteration, citation, and internal quotation marks omitted); *see also Teasdale*, 2013 WL 5300699, at *12 (same); *Bloomberg*, 2013 WL 4799161, at *8 (same).

Since clarifying the inquiry for NYCHRL disparate treatment discrimination claims in *Mihalik*, the Second Circuit has not had occasion to address the standard applicable to reasonable accommodation discrimination claims.  Prior to *Mihalik*, courts in this Circuit required a plaintiff asserting a NYCHRL religious accommodation claim to "show that (1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers

of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement." *Stavis v. GFK Holding, Inc.*, 769 F. Supp. 2d 330, 335 (S.D.N.Y. 2011) (finding that the plaintiff could not make out a NYCHRL or NYSHRL religious accommodation claim where he was never denied a religious holiday and never told that he could not take a religious day off); *Price v. Cushman & Wakefield, Inc.*, 829 F. Supp. 2d 201, 222 (S.D.N.Y. 2011) (holding that a plaintiff bringing a NYCHRL religious accommodation claim "must show: (1) he has a bona fide religious belief that conflicts with an employment requirement; (2) he informed the employer of his belief; and (3) he was disciplined for failure to comply with the conflicting employment requirement"); *see also Muktadir*, 2013 WL 4095411, at *2 (holding, even after *Mihalik*, that the same standard governs Title VII and NYCHRL religious accommodation claims). Plaintiff cannot meet this test, for the reasons set forth in the discussion of his Title VII and NYSHRL religious accommodation claims, nor can he show even under the liberal construction of the NYCHRL required by *Mihalik* that he was discriminated against based on a failure to accommodate his religious beliefs or practices. Brownsville Academy accommodated Plaintiff's religious practices and there is no evidence that Plaintiff was ever disciplined in connection with those accommodations or required to forego his religious practices.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has not shown that religious discrimination played any role in Defendants' treatment of him. Plaintiff has not put forth evidence from which a reasonable jury could conclude that he was treated less well because of his religion. Nor has Plaintiff put forth any evidence that he was subjected to any employment condition requiring him to violate or forego a practice of his religion. Defendants' motion for summary judgment as to Plaintiff's claim for religious discrimination pursuant to the NYCHRL

is granted.  *See Lugo v. City of New York*, --- F. App'x ---, ---, 2013 WL 1811271, at *2 (2d Cir.

May 1, 2013) ("While the NYCHRL is indeed reviewed independently from and more liberally

than federal or state discrimination claims, it still requires a showing of some evidence from

which discrimination can be inferred." (citation and internal quotation marks omitted)).

### d.   Retaliation Claims — Title VII, the ADEA and NYSHRL

Plaintiff claims that Defendants retaliated against him for filing a complaint with the

State Division of Human Rights alleging age and religious discrimination.[20]  (*See* Pl. Opp'n 6.)

Claims of retaliation for engaging in protected conduct under Title VII, the ADEA and the

NYSHRL are examined under the *McDonnell Douglas* burden-shifting framework.  *See Summa*

*v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in

*McDonnell Douglas* . . . governs retaliation claims under both Title VII and the NYSHRL."

(citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006))); *Gorzynski*, 596

F.3d at 110 ("Retaliation claims under Title VII and the ADEA are also analyzed under the

*McDonnell Douglas* burden-shifting test described above.").  Under the test, "[f]irst, the plaintiff

must establish a *prima facie* case of retaliation.  If the plaintiff succeeds, then a presumption of

---

[20]   In his Complaint in this action, Plaintiff claimed that he had been retaliated against "[s]ince [he] dually filed his age and religious discrimination charge with the S[tate ]D[ivision of ]H[uman ]Rights] and EEOC in November 2010."  (Compl. ¶ 39.)  In his summary judgment motion and opposition to Defendants' motion for summary judgment Plaintiff has not relied upon his EEOC filing as a protected activity, and at oral argument Plaintiff's counsel argued only that Plaintiff was retaliated against for filing a complaint with the State Division of Human Rights, making no mention of the EEOC filing.  (Oral Arg. Tr. 63:4–5, 64:6–8, 66:2–7.)  Plaintiff has made no argument that he was retaliated against for filing a complaint with the EEOC, and appears to have abandoned this claim.  Assuming Plaintiff did intend to rely on his EEOC filing as a protected activity, the Court notes that his filing is a protected activity.  *See Gaines v. N.Y.C. Transit Auth.*, 353 F. App'x 509, 511 (2d Cir. 2009) (filing a charge with the EEOC is a protected activity); *Shine v. City of New York*, No. 12-CV-8393, 2013 WL 5231472, at *6 (S.D.N.Y. July 24, 2013) ("Plaintiff engaged in Title VII protected activity by filing a charge of discrimination with the EEOC . . . .").  However, a retaliation claim on that basis would fail for the same reasons Plaintiff's retaliation claim on the basis of his filing with the State Division of Human Rights complaint fails, as discussed *infra*.

retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (citations omitted); *see also Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 n.6 (2d Cir. 2011) (discussing the burden shifting analysis in the retaliation context); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (same). If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, he would not have suffered the adverse employment action.[21, 22] *See Nassar*, 570 U.S. at ---, 133 S. Ct. at 2534

---

[21] Prior to the Supreme Court's decision in *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, 133 S. Ct. 2517 (2013), the Second Circuit expressly left undecided whether a claim for retaliation under the ADEA also requires but-for causation. *See Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 41–42 (2d Cir. 2012); *see also Fordham v. Islip Union Free Sch. Dist.*, No. 08-CV-2310, 2012 WL 3307494, at *6 n.5 (E.D.N.Y. Aug. 13, 2012) ("[I]n the context of ADEA retaliation, following the Supreme Court's ruling in *Gross* . . . courts are split on whether the 'but for' standard or the mixed-motive standard applies."). In *Nassar*, the Supreme Court concluded that "[g]iven the lack of any meaningful textual difference between the text in [Title VII's retaliation provision] and the one in *Gross* [the ADEA's discrimination provision]," the "proper conclusion" was that Title VII's prohibition against "tak[ing] an adverse employment action against an employee 'because' of certain criteria" "require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action." *Nassar*, 570 U.S. at ---, 133 S. Ct. at 2528. Like Title VII's retaliation provision and the ADEA's discrimination provision, the ADEA's retaliation provision also bars retaliation "because" of certain behavior. *See* 29 U.S.C. § 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . opposed any practice made unlawful by this section . . . .") The Supreme Court's analysis in *Nassar* suggests that the language of the ADEA retaliation provision requires that plaintiffs meet the but-for standard of causation, and in the short time since the Court's opinion was rendered at least one court has interpreted *Nassar* in this fashion. *See Ramos v. Molina Healthcare, Inc.*, No. 12-CV-856, 2013 WL 4053227, *7 n.3 (E.D. Va. Aug. 8, 2013) ("*Nassar* further established that Title VII retaliation claims and ADEA retaliation claims are both analyzed under a "but for" standard . . . ."). The Second Circuit has not yet had occasion to evaluate the impact of *Nassar* on ADEA retaliation claims. However, based on the Supreme Court's statutory analysis in *Nassar* and *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009), and the similarity of the language in the ADEA retaliation statute, the Court finds that Plaintiff must prove but-for causation in order to establish an ADEA retaliation claim.

[22] Traditionally, "[t]he standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL." *Kelly v. Howard I. Shapiro & Associates Consulting Engineers,*

(holding that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); *see also Russo*, --- F. Supp. 2d at ---, 2013 WL 5346427, at *18 ("Title VII retaliation claims must be proved according to traditional principles of *but-for* causation . . . .  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." (alteration in original) (citation omitted)); *Dall v. St. Catherine of Siena Med. Ctr.*, No. 11-CV-0444, 2013 WL

_____

*P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir. 2000)); *Vandewater v. Canandaigua Nat. Bank*, 893 N.Y.S.2d 916 (2010) ("It is well settled that the federal standards under [T]itle VII of the Civil Rights Act of 1964 are applied to determine whether recovery is warranted under the Human Rights Law." (citing *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 330 (2004))); *Forrest*, 3 N.Y.3d at 330 (stating that "[b]ecause both the Human Rights Law and [T]itle VII address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful to the resolution of this appeal" (quoting *Matter of Aurecchione*, 98 N.Y.2d 21, 26 (2002)).  New York State courts have yet to address the impact of the Supreme Court's recent holding in *Nassar* on the NYSHRL, and the Second Circuit had not yet had the opportunity to address this issue.  However, the relevant provisions of Title VII and NYSHRL are textually similar, and both prohibit an employer from discriminating or retaliating against an individual "because" he or she engaged in protected activity.  In *Nassar*, the Supreme Court held that under "the default rules" of statutory construction, "causation" should be interpreted as "but-for causation" "absent an indication to the contrary in the statute itself," and therefore, interpreted Title VII's use of "because" as requiring "proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Nassar*, 570 U.S.at ---, 133 S. Ct. at 2525, 2528.  Since the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under NYSHRL consistent with Title VII jurisprudence, as clarified by the Supreme Court in *Nassar*.  *See, e.g., Russo v. N.Y. Presbyterian Hosp.*, --- F. Supp. 2d ---, ---, 2013 WL 5346427, at *18–19 (E.D.N.Y. Sept. 23, 2013) (interpreting the plaintiff's NYSHRL retaliation claim consistent with his Title VII retaliation claim after *Nassar*); *Leacock v. Nassau Health Care Corp.*, No. 08-CV-2401, 2013 WL 4899723, at *9 n.4 (E.D.N.Y. Sept. 11, 2013) (construing the NYSHRL as requiring the same elements at Title VII (citing *Dall v. St. Catherine of Siena Med. Ctr.*, No. 11-CV-0444, 2013 WL 4432354, at *19 n.12 (E.D.N.Y. Aug. 14, 2013)); *Dall*, 2013 WL 4432354, at *19 n.12 (noting that federal Title VII standards are applied in interpreting the NYSHRL and applying the but-for causation requirement to NYSHRL retaliation claim); *Brown v. City of New York*, No. 11-CV-2915, 2013 WL 3789091, at *19 (S.D.N.Y. July 19, 2013) (reviewing the but-for causation requirement for Title VII retaliation articulated in *Nassar* and stating that the plaintiff's "retaliation claim under the NYSHRL is 'analytically identical to [her] claims brought under Title VII'" (citation omitted)).

4432354, at *19 (E.D.N.Y. Aug. 14, 2013) ("If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, he would not have been terminated."); *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *14 (E.D.N.Y. July 30, 2013) (same); *Brooks v. D.C. 9 Painters Union*, No. 10-CV-7800, 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) ("If the defendant [articulates a legitimate, non-retaliatory reason], the plaintiff must offer 'proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'"  (quoting *Nassar*, 570 U.S. at ---, 133 S. Ct. at 2534)).

### i. Prima Facie Case

"To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that '(1) [he] engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'"  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *see also Summa*, 708 F.3d at 125; *Schiano*, 445 F.3d at 608.  The burden at the summary judgment stage for Plaintiff is "'minimal' and '*de minimis*,'" and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citations omitted).  Plaintiff satisfies the first, second and third elements because he filed a complaint with the State Division of Human Rights alleging age and religious discrimination, DOE was notified that he filed a complaint with the State Division of Human Rights and thereafter Plaintiff was subject to negative performance evaluations, the OEO investigation and, ultimately, 3020-a charges.  However, Plaintiff cannot show that there is a

causal connection between his alleged adverse employment actions and the filing of his complaint with the State Division of Human Rights.

### 1. Protected Activity

Plaintiff's filing of a complaint alleging age and religious discrimination with the State Division of Human Rights was protected activity. *See Brooks*, 2013 WL 3328044, at *4 ("Plaintiff engaged in protected activity when he filed a charge of discrimination with the NYSDHR."); *Lovell v. Maimonides Medical Center*, No. 11-CV-4119, 2013 WL 4775611, at *16 (E.D.N.Y. Sept. 6, 2013) (noting that the plaintiff's filing of a complaint with NYSDHR did constitute protected activity).

### 2. Knowledge

Plaintiff filed a complaint with the State Division of Human Rights on November 9, 2010, alleging age and religious discrimination, (Def. 56.1 ¶ 104; Pl. 56.1 ¶ 104), and that complaint was subsequently served on DOE in November 2010, (*see* Glass Decl. ¶ 3; Def. Reply), satisfying the second element. "To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that . . . the employer was aware of [the protected] activity . . . ." *Kelly*, 716 F.3d at 14. "Plaintiff can satisfy the 'knowledge' element of the *prima facie* case by demonstrating that his employer had general corporate knowledge of his protected acts at the time of the alleged retaliation." *Stella v. Brandywine Sr. Living, Inc.*, No. 11-CV-1094, 2012 WL 3764505, at *6 (E.D.N.Y. July 9, 2012), *report and recommendation adopted*, No. 11-CV-1094, 2012 WL 3764500 (E.D.N.Y. Aug. 27, 2012); *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) ("Even if the [corporate defendant's] agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice."); *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010) ("[A] jury may 'find retaliation even if the agent denies

direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.'" (alteration in original) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)); *Dall*, 2013 WL 4432354, at *21 ("It is not necessary that Plaintiff prove that the specific actors knew of the protected activity as long as Plaintiff can demonstrate general corporate knowledge." (citations omitted)).

Defendants argue that Plaintiff cannot prove the knowledge element because Robinson did not know that Plaintiff had filed his complaint with the State Division of Human Rights until after the commencement of the OEO investigation. (Def. Mem. 25.) However, Plaintiff is only required to show general corporate knowledge. *See Trivedi v. N.Y.S. Unified Court Sys. Office of Court Admin.*, 818 F. Supp. 2d 712, 736 (S.D.N.Y. 2011) ("A plaintiff need not prove that the specific actors within an organization were aware that the plaintiff made allegations of retaliation to make out a *prima facie* retaliation claim; rather, general corporate knowledge that the plaintiff has engaged in a protected activity is sufficient." (citations and internal quotation marks omitted)); *Adams v. City of New York*, 837 F. Supp. 2d 108, 121 (E.D.N.Y. 2011) (holding that "[t]o satisfy the knowledge requirement, nothing more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." (quoting *Gordon*, 232 F.3d at 116 (alteration omitted)); *Martinez v. N.Y.C. Dep't of Educ.*, No. 04-CV-2728, 2008 WL 2220638, at *11 (S.D.N.Y. May 27, 2008) (finding the knowledge element satisfied for the plaintiff's retaliation claim where "[a]lthough . . . Plaintiff has proffered no evidence that [the public school principal that supervised Plaintiff] personally knew about Plaintiff's protected activity . . . there is no dispute that the New York City Department of Education, as a corporate

entity and Defendant in this case, knew about Plaintiff's protected activity" (citing *Gordon*, 232 F.3d at 116)).  DOE knew of Plaintiff's filing of the complaint with the State Division of Human Rights prior to the commencement of the OEO investigation and the commencement of the 3020-a proceeding and therefore Plaintiff has satisfied this element.

### 3. Adverse Employment Action

Plaintiff has sufficiently alleged that he suffered multiple adverse employment actions after he filed his complaint with the State Division of Human Rights alleging age and religious discrimination.[23]  (*See* Oral Arg. Tr. 62:18–20; 63:19–65:3.)  To establish an adverse employment action for purposes of a retaliation claim, "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Fincher*, 604 F.3d at 721.  The adverse actions Plaintiff relies upon for his retaliation claims are: (1) the 3020-a charges; (2) the OEO investigation; and (3) the unsatisfactory evaluations Plaintiff received after he filed his complaint.  (Oral Arg. Tr. 63:13–18, 64:11–65:8.)

The institution of a 3020-a proceeding is an adverse employment action.  *See Huntington Union*, 2012 WL 1077677, at *16 n.21 ("[T]he 3020–a charges are clearly an adverse employment action because 'the institution of disciplinary proceedings is sufficient in this circuit to constitute an adverse employment decision.'" (quoting *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006))).  A suspension without pay also qualifies as an adverse employment action and here, Plaintiff was suspended for 60 days without pay at the conclusion

---

[23]  At oral argument Plaintiff clarified that the adverse actions he relies upon for his retaliation claims are: (1) the 3020-a charges; (2) the OEO investigation; and (3) the frequent unsatisfactory evaluations Plaintiff received after he filed his complaint.  (Oral Arg. Tr. 63:13–18, 64:11–65:8.)

of the 3020-a proceeding. *See Lovejoy–Wilson*, 263 F.3d at 223 ("[S]uspension without pay is sufficient to constitute an adverse employment action."); *Satterfield v. United Parcel Serv., Inc.*, No. 00-CV-7190, 2003 WL 22251314, at *13 (S.D.N.Y. Sept. 30, 2003) ("[T]he one-day suspension . . . arguably meets the 'materially adverse' standard outlined by the Second Circuit . . . .").

Plaintiff's unsatisfactory performance evaluations received after he filed his complaint with the State Division of Human Rights, the subsequent 3020-a charges filed against him and his 60-day suspension also qualify as adverse employment actions for retaliation purposes.[24] *See*

---

[24] Following the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), district courts in this Circuit have disagreed as to whether a negative performance evaluation, absent concrete negative consequences to the employee, is sufficient to support a retaliation claim. Some courts have found that negative performance evaluations, standing alone, can be considered an adverse employment action. *See Siddiqi v. N.Y.C. Health & Hospitals Corp.*, 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008) ("Unlike in discrimination claims, [for the purposes of a retaliation claim] negative performance reviews, standing alone, can be considered an adverse employment action." (citation omitted)); *Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-3582, 2012 WL 5989874, at *10 (E.D.N.Y. Nov. 30, 2012) ("[N]egative performance reviews, standing alone, can be considered an adverse employment action for purposes of a retaliation claim." (citation and internal quotation marks omitted)). Other courts have found that even for retaliation claims, a plaintiff must show that a negative performance evaluation resulted in concrete negative consequences to the employee. *See Carmellino v. Dist. 20 of N.Y.C. Dep't. of Educ.*, No. 03-CV-5942, 2006 WL 2583019, at *32 (S.D.N.Y. Sept. 6, 2006) (granting summary judgment to employer on retaliation claim where plaintiffs "failed to produce . . . evidence of any negative consequences resulting from the [negative] evaluations"); *Jackson v. City Univ. of New York*, No. 05-CV-8712, 2006 WL 1751247, at *4 (S.D.N.Y. June 23, 2006) (holding, as to the plaintiff's retaliation claim, that "negative evaluations alone do not constitute an adverse employment action in the absence of some attendant effect on the terms and conditions of plaintiff's employment"). Plaintiff was suspended for 60 days based upon unsatisfactory performance evaluations as a result of observations on February 25, 2010, April 19, 2010, June 1, 2010, December 6, 2010, December 20, 2010, February 15, 2011, April 15, 2011, and June 10, 2011. (3020-a Opinion and Award 32–34.) The majority of these observations and unsatisfactory performance evaluations occurred after Plaintiff filed his complaint with the State Division of Human Rights in November 2010. Because Plaintiff suffered concrete negative consequences as a result of the negative performance evaluations received after he filed his complaint, these performance evaluations qualify as an adverse employment action under either standard.

*Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) ("Adverse employment actions may include negative evaluation letters."); *Taylor*, 2012 WL 5989874, at *10 ("[The plaintiff's] receipt of "U" evaluations for science lessons during the 2009–10 school year as well as a "U" rating at the end of that school year constitute adverse employment actions for purposes of her retaliation claim.").

District courts in this Circuit have disagreed as to whether, in the retaliation context, an investigation may suffice to establish an adverse employment action, even where such investigation does not result in any discipline. Some courts have found that the commencement of an investigation, even without attendant negative consequences, is sufficient to establish an adverse employment action. *See, e.g.*, *O'Neal v. State Univ. of N.Y.*, No. 01-CV-7802, 2006 WL 3246935, at *13 (E.D.N.Y. Nov. 8, 2006) (finding that a letter informing the plaintiff "that she had to submit to a disciplinary interview and that she was the subject of a disciplinary investigation" rendering "the prospect of [the plaintiff] being disciplined . . . imminent" and "underscore[ing] the serious and formal nature of the disciplinary interview" by inviting the plaintiff to bring a union representative or attorney was "sufficient to constitute a 'materially adverse' action" for purposes of Title VII retaliation claim (citation omitted)); *c.f. Eldridge v. Rochester City Sch. Dist.*, No. 12-CV-6365L, 2013 WL 5104279, at *11 (W.D.N.Y. Sept. 13, 2013) ("I conclude that the pressure of an internal investigation, coupled with a veiled threat of an involuntary transfer, could dissuade a reasonable employee from engaging in protected activity, and thus adequately alleges an adverse employment action for the purposes of the Section 1983 retaliation claim."). Other courts have held that commencement of an investigation alone is not sufficient to establish an adverse employment actions. *See, e.g.*, *Wright v. Monroe Cmty. Hosp.*, No. 09-CV-6593, 2011 WL 3236224, at *7 (W.D.N.Y. July 28, 2011) ("Employee

investigations, unwanted scrutiny from supervisors, and negative performance evaluations without attendant negative results or deprivation of position/opportunity, do not sufficiently constitute adverse employment actions under Title VII.") ,*aff'd,* 493 F. App'x 233 (2d Cir. 2012); *McInnis v. Town of Weston*, 375 F. Supp. 2d 70, 84-85 (D. Conn. 2005) (noting that "plaintiff offer[ed] no authority for the proposition that the initiation of an investigation, without more, is itself an adverse employment action," and holding that "the internal affairs investigations directed at [plaintiff] . . . cannot, in themselves, be found to violate the ADEA's proscription on retaliation"); *Radolf*, 364 F. Supp. 2d at 224 (holding that an internal investigation into plaintiff's possible fraud that cleared plaintiff of any wrongdoing, without allegations of attendant material disadvantage in employment terms, could not support a First Amendment retaliation claim). Since the commencement of an OEO investigation might "dissuade[] a reasonable worker from making or supporting a charge of discrimination," the Court assumes for the purposes of this motion that the commencement of the OEO investigation was an adverse employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Plaintiff has satisfied this element by showing that he has suffered several adverse employment actions since the filing of his complaint with the State Human Rights Division.

### 4. Causal Connection

Plaintiff can prove a causal connection between the filing of his complaint with the State Division of Human Rights and the initiation of the OEO investigation through temporal proximity. "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar

conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon*, 232 F.3d at 117; *see also Dawson v. City of New York*, No. 09-CV-5348, 2013 WL 4504620, at *16 (S.D.N.Y. Aug. 19. 2013) (same); *Brooks*, 2013 WL 3328044, at *4 (same). "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski*, 596 F.3d at 110 (citing *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)); *see also El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation . . . ."); *Feingold*, 366 F.3d at 156 ("[T]he requirement that [Plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two."); *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("We have held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation."). There is no brightline rule for how long after a plaintiff has engaged in the protected activity that the adverse action must have occurred to benefit from the inference, but the Second Circuit has held that periods as long as five months are not too long. *Gorzynski*, 596 F.3d at 110–11 ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship.").

Although it is unclear when the OEO investigation into comments made by Plaintiff was commenced, the statements from the students who complained about Plaintiff's comments are dated December 6, 2010, suggesting that the OEO investigation was commenced shortly after

Plaintiff filed his complaint with the State Division of Human Rights on November 9, 2010. In addition, Plaintiff received unsatisfactory performance evaluations on December 6 and 20, 2010, February 15, April 15, and June 10, 2011, all of which were used as a basis for the 3020-a charges against Plaintiff, resulting in a 60-day suspension. Drawing all inferences in favor of Plaintiff, Plaintiff has met his minimum burden of demonstrating a causal connection between his protected activity and at least some adverse employment actions.

### ii. Non-Retaliatory Explanation

As discussed in the context of Plaintiff's discrimination claim, Defendants have articulated a legitimate reason for the unsatisfactory ratings which led to the commencement of the 3020-a proceeding, resulting in the 60-day suspension of Plaintiff. Defendants have shown that Plaintiff's teaching performance was unsatisfactory, that he refused to accept constructive criticism and professional development opportunities and that he was unprofessional towards the students. (*See* Part II.b.i.2.) Defendants have also shown that the OEO investigation was commenced in response to complaints by two students and a parent. Defendants have satisfied their burden.

### iii. Pretext

Plaintiff cannot prove that but for his filing of the complaint with the State Division of Human Rights, he would not have received the additional unsatisfactory performance ratings or been subjected to the 3020-a charges or the OEO investigation. Under the recent Supreme Court decision in *Nassar*, "Title VII retaliation claims must be proved according to traditional principles of *but-for* causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." 570 U.S. at ---, 133 S. Ct. at 2533. Therefore, the plaintiff must show that retaliation was a but-for cause of the adverse employment action. *See Russo*, --- F. Supp. 2d at ---, 2013 WL 5346427, at

*18 ("Title VII retaliation claims must be proved according to traditional principles of *but-for* causation . . . ." (alteration in original) (citation omitted)); *Leacock v. Nassau Health Care Corp.*, No. 08-CV-2401, 2013 WL 4899723, at *11 (E.D.N.Y. Sept. 11, 2013) ("[D]uring the final stage of the burden shifting frame-work, the plaintiff must show that retaliation was a but-for cause of the adverse employment action." (citation and internal quotation marks omitted)); *Dall*, 2013 WL 4432354, at *19 ("If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, he would not have been terminated."); *Moore*, 2013 WL 3968748, at *14 (same); *Brooks*, 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) (stating that "but for" causation must be proved if the defendant articulates a legitimate, non-retaliatory reason for the adverse employment action).

In order to establish but-for causation, Plaintiff would have to prove that the adverse employment actions would not have occurred in the absence of a retaliatory motive. Plaintiff has provided no evidence that the additional unsatisfactory performance reviews, the 3020-a charges or the OEO investigation were motivated by retaliation. Instead, Plaintiff asks the Court to infer that these actions were retaliatory because of their temporal proximity to the filing of his complaint with the State Division of Human Rights. Plaintiff specifically argues that "[t]he basis for a finding of retaliation against Plaintiff is more than plain and obvious here based on the timing of events." (Pl. Opp'n 6.) Plaintiff claims that after he filed his complaint with the State Division of Human Rights on November 9, 2010, the OEO investigation was commenced concerning remarks he allegedly made on December 3, 2010, Plaintiff was subjected to a high number of unsatisfactory reviews, and in March 2010, Plaintiff received a letter inviting him to participate in PIP Plus which, Plaintiff argues, was a "trigger" for the subsequent 3020-a charges. (Oral Arg. Tr. 62:18–65:3.)

Even under the "motivating factor" standard that was in use in the Second Circuit prior to the Supreme Court's recent decision in *Nassar*, 570 U.S. ---, 133 S.Ct. 2517, "temporal proximity — while enough to support a prima facie case — was insufficient to establish pretext." *Ben-Levy v. Bloomberg, L.P.*, 518 Fed. App'x. 17, 19 (2d Cir. 2013); *see also Govori v. Goat Fifty, L.L.C.*, --- F. App'x ---, ---, 2013 WL 1197770, at *2 (2d Cir. Mar. 26, 2013) ("[W]hile temporal proximity between events may give rise to a *prima facie case* of discrimination, 'such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext.'" (quoting *El Sayed*, 627 F.3d at 933)); *Moore*, 2013 WL 3968748, at *20 n.13 (same). Thus, Plaintiff's claim cannot satisfy the prior more relaxed mixed-motive standard or *Nassar*'s but-for standard. Moreover, based on the detailed record of Plaintiff's unsatisfactory performance, including the numerous unsatisfactory reviews prior to the filing of Plaintiff's complaint, as well as the complaints by the two students and the parent that resulted in the OEO investigation[25] and the findings of the 3020-a hearing officer, no reasonable jury could conclude that the filing of a complaint with the State Division of Human Rights was the but-for cause of

---

[25] Although DOE's corporate knowledge of the filing of the complaint with the State Division of Human Rights was sufficient to meet Plaintiff's *prima facie* burden to establish knowledge, because Defendants have shown that there is no evidence that Robinson, who Plaintiff alleges orchestrated the OEO investigation, knew of the complaint at the time the OEO investigation was initiated, DOE's corporate knowledge fails to demonstrate the necessary causal connection. *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (explaining that although corporate knowledge of a plaintiff's complaint is sufficient to satisfy the "knowledge" prong of a plaintiff's *prima facie* case, evidence that the specific decision-makers responsible for the adverse action were not aware of the plaintiff's protected activity is still relevant "as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment."); *E.E.O.C. v. Bloomberg L.P.*, No. 07-CV-8383, 2013 WL 4799161, at *28 (S.D.N.Y. Sept. 9, 2013) ("*Gordon* makes clear that even where general corporate knowledge may satisfy the second prima facie prong of a retaliation claim (employer's knowledge), the lack of evidence indicating knowledge of particular individual agents can doom a plaintiff's ability to show the fourth element (causation).").

the adverse employment actions taken against Plaintiff. Plaintiff's Title VII, ADEA and NYSHRL retaliation claims are therefore dismissed.

### e. Retaliation Claim — NYCHRL

Plaintiff's NYCHRL retaliation claim is also dismissed. "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that []he took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citations omitted); *see also Noel v. BNY-Mellon Corp.*, 514 Fed. App'x 9, 11 (2d Cir. 2013) ("[T]he NYCHRL has been amended to abolish the parallelism between the [NYCHRL] and federal and state anti-discrimination law, and under the NYCHRL, a plaintiff need not have suffered a materially adverse change in the terms and conditions of employment to establish a prima facie case of retaliation." (citation and internal quotation marks omitted)). "[S]ummary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision." *Mihalik*, 715 F.3d at 116. A plaintiff must still establish that there was a causal connection between his protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for his termination was pretextual or "motivated at least in part by an impermissible motive." *Brightman v. Prison Health Serv., Inc.*, --- N.Y.S.2d ---, ---, 108 A.D.3d 739, 741 (App. Div. 2013); *see also Mihalik*, 715 F.3d 112–13 (holding that to prevail on a retaliation claim under the NYCHRL, the plaintiff must show that the employer's action was taken "because of" plaintiff's opposition to discrimination and "a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by . . . retaliatory motives"); *Tse v. New York Univ.*, No. 10-CV-7207, 2013 WL 5288848, at *17 n.17 (S.D.N.Y. Sept. 19, 2013) ("Because [the plaintiff] cannot establish a causal connection between her NYSDHR . . . complaint[] and her termination, her NYCHRL [retaliation] claim fails as

well."); *Bloomberg*, 2013 WL 4799161, at *32 (finding that the "broader standard" of the

NYCHRL "does not absolve [the plaintiff] from putting forth evidence tending to show a causal

connection between her action opposing . . . alleged discrimination and the alleged adverse

actions").  No reasonable jury could conclude that the actions taken against Plaintiff were

motivated, even in part, by retaliatory animus.  *See Bryant v. Merrill Lynch, Pierce, Fenner &*

*Smith*, No. 12-CV-2940, 2013 WL 2359109, at *5 (S.D.N.Y. May 30, 2013) ("Because the

federal and state retaliation claims on which summary judgment is granted fail because of the

absence of retaliatory animus, they also fail under the broader NYCHRL.").  Plaintiff's

NYCHRL retaliation claim is therefore dismissed.

### f.   Equal Protection Claims — Federal and NY Constitutions

Plaintiff also brings a § 1983 claim for violation of his constitutional right to equal

protection pursuant to the Fourteenth Amendment as well as a claim for violation of his right to

equal protection under the New York constitution.  "[Section] 1983 and the Equal Protection

Clause protect public employees from various forms of discrimination, including hostile work

environment and disparate treatment" claims.[26]  *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir.

---

[26]   At oral argument Plaintiff indicated that his equal protection claim included a hostile work environment claim in addition to his discrimination claim.  (Oral Arg. Tr. 2:17–22.) Plaintiff did not assert a hostile work environment claim in the Complaint.  (*See generally*, Cmplt.)  The Court need not consider a claim presented for the first time in an opposition to a summary judgment motion.  *See Lyman v. CSX Transp., Inc*., 364 F. App'x 699, 701 (2d Cir. 2010) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims." (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1183, at 23 n.9 (3d ed. 2004))); *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (upholding the district court's denial of the plaintiff's request to amend the complaint in the summary judgment motion as the request was "untimely"); *Levion v. Societe Generale*, 822 F. Supp. 2d 390, 394–99, n.4 (S.D.N.Y. 2011) ("Indeed, '[b]ecause a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'" (citations omitted)), *aff'd*, No. 11-CV-4476, 2012 WL 5861809 (2d Cir. Nov. 20, 2012); *Evans v. Solomon*, 681 F. Supp. 2d 233, 253 (E.D.N.Y. 2010)

2006); *see also Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x 186, 188 (2d Cir. 2010).

Once a plaintiff has established action under color of state law, the same analytical framework applies whether the disparate treatment claim is brought under § 1983 or Title VII. *See Abdul-Hakeem v. Parkinson*, --- Fed. App'x ---, ---, 2013 WL 3111300, at *1 (2d Cir. June 21, 2013) ("In the context of a § 1983 suit where the color of state law is established, an equal protection claim parallels a Title VII employment discrimination claim." (alteration, citations and internal quotation marks omitted); *see also Das*, 369 F. App'x at 188; *Demoret*, 451 F.3d at 149; *Alexander v. City of New York*, No. 11-CV-4638, 2013 WL 3943496, at *7 (E.D.N.Y. July 23, 2013). In addition, the Second Circuit has held that "the Equal Protection Clauses of the federal and New York Constitutions are coextensive." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 53 n.3 (2d Cir. 2007) ("Because the Equal Protection Clauses of the federal and New

---

("[I]f a complaint does not fairly assert facts supporting a particular cause of action, 'it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion.'" (citations omitted)). To the extent Plaintiff has asserted a hostile work environment claim, it is without merit and is dismissed. Plaintiff has not shown that his work environment was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (quoting *Gorzynski*, 596 F.3d at 102). Even under the broader standard of the NYCHRL, which does not require a plaintiff to prove that the atmosphere was "severe or pervasive," but rather that the plaintiff "has been treated less well than other employees," *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013), a plaintiff still must establish that he suffered a hostile work environment *because of his protected status*. *See, e.g.*, *Margherita v. FedEx Exp.*, 511 Fed. App'x 71, 73 (2d Cir. 2013) (finding that, "even under the broad and liberal construction of the NYCHRL," there was no evidence that plaintiff suffered a hostile work environment because of his protected status); *Russo*, --- F. Supp. 2d at ---, 2013 WL 5346427, at *14 (finding that "a plaintiff must still establish that she suffered a hostile work environment *because of* [*her protected status*]." (collecting cases)); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) (dismissing plaintiff's NYCHRL hostile work environment claim because "plaintiff cannot show that a hostile work environment was created because of her race, age, or national origin" (internal quotation marks omitted)), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (per curiam). A reasonable jury could not conclude that Plaintiff was treated less well because of his religion.

York Constitutions are coextensive, *see Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1317

(2d Cir. 1991), our analysis responds to [plaintiff's] claims under each of these provisions.");

*Dotson v. Farrugia*, No. 11-CV-1126, 2012 WL 996997, at *8 n.3 (S.D.N.Y. Mar. 26, 2012)

("The Equal Protection Clauses of the United States and the New York Constitutions are

coextensive, and therefore an analysis under one equally supports an analysis under the other.").

As discussed *supra*, Plaintiff has failed to establish a claim for religious or age discrimination

pursuant to Title VII.  For the same reasons that Plaintiff cannot establish a claim under Title

VII, Plaintiff cannot establish a claim for equal protection pursuant to § 1983 and the New York

constitution.

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment

and the Complaint is dismissed in its entirety.


SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 29, 2013
       Brooklyn, New York